UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. PAUL CAIRNS, TERRY CLEAVER, M.D., KYLE COLLE, M.D., SCOTT GIBBS, M.D., PAUL TOLENTINO, M.D., KEVIN VAUGHT, M.D., and DANIEL HENSON, | ) ) ) ) ) ) ) | |
| Relators, | ) ) | No. 1:12 CV 00004 SNLJ |
| v. | ) ) | JURY TRIAL DEMANDED |
| D.S. MEDICAL, L.L.C., MIDWEST NEUROSURGEONS, L.L.C., SONJAY FONN, M.D., and DEBORAH SEEGER , | ) ) ) ) ) | |
| Defendants. | ) | |

## UNITED STATES' COMPLAINT IN INTERVENTION

1.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact, unjust enrichment, and fraud. This court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.      Venue is proper in the Southeastern Division of the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), because the defendants reside and transact business in this district.

### Parties

3.      Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (SSA), 42 U.S.C. §§ 1395 et seq., (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the

Act, 42 U.S.C. §§ 1396 et seq. (Medicaid).  Relators Paul Cairns, Terry Cleaver, M.D., Kyle

Colle, M.D., Scott Gibbs, M.D., Paul Tolentino, M.D., Kevin Vaught, M.D., and Daniel Henson

have filed this case under the *qui tam* provisions of the False Claims Act, and the Government

has now partially intervened.

4.      Defendant Sonjay Fonn, D.O., (Dr. Fonn) resides in Cape Girardeau, Missouri,

and was licensed by the State of Missouri as a physician at all times relevant to this complaint.

Since at least 2009, Dr. Fonn has maintained a residence and an office in Cape Girardeau,

Missouri.

5.      Defendant Deborah Seeger (Seeger) resides in Cape Girardeau, Missouri, and has

been the fiancée of Dr. Fonn since approximately June 2008.  Since at least 2009, Seeger has

maintained a residence and an office in Cape Girardeau, Missouri.

6.      Defendant DS Medical (DS) is a Missouri limited liability company formed and

operated by Deborah Seeger on or about June 11, 2008, with an office in Cape Girardeau,

Missouri.  Through DS, Seeger and Dr. Fonn obtained spinal implants and related items from

spinal implant manufacturers for use in Dr. Fonn's surgeries and procedures involving Medicare

and Medicaid patients, and distributed these implants and items to the places where Dr. Fonn

performed surgeries.

7.      Defendant Midwest Neurosurgeons (MWN) is a Missouri limited liability

company formed and operated by Dr. Fonn on or about December 4, 2008, with an office in

Cape Girardeau, Missouri.  Dr. Fonn was and is the only physician who worked at MWN.

Through MWN, Dr. Fonn submitted and caused to be submitted claims for reimbursement to the

Government's Medicare and Medicaid programs for spinal fusion surgeries and related services

and items that he performed using spinal implants and related items from DS Medical.

## The Law

8.     The False Claims Act (FCA), as amended by Public Law 111-21, the Fraud

Enforcement and Recovery Act of 2009, 31 U.S.C. § 3729(a)(1)(A - C), provides in pertinent

part that any person who:

> (A)  knowingly presents, or causes to be presented, to an officer or
> employee of the United States Government or a member of the Armed Forces of
> the United States a false or fraudulent claim for payment or approval;
>
> (B)  knowingly makes, uses, or causes to be made or used, a false record
> or statement to get a false or fraudulent claim paid or approved by the
> Government; [or]
>
> (C)  conspires to defraud the Government by getting a false or fraudulent
> claim paid or approved by the Government;

is liable to the United States Government for a civil penalty of not less than $5,500 and

not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

1990, plus 3 times the amount of damages which the Government sustains because of the act of

that person.  *See also* 28 C.F.R. § 85.3(a)(9) (setting forth the current civil penalties level of not

less than $5,500 and not more than $11,000 for violations of the FCA).

9.     The terms "knowing" and "knowingly" are defined at 31 U.S.C. § 3729(b)(1)(A)

to mean a person who, with respect to relevant information:

> (i)      has actual knowledge of the information;
>
> (ii)     acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii)     acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1)(B).

10.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional

concerns involving physicians' conflicts of interest and overutilization of medical services and

items.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that

kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub.L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

11.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs.  In relevant part, 42 U.S.C. § 1320a-7b(b) provides:

> (b) Illegal remunerations:
>
>  (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —
>
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) in return for purchasing, leasing, ordering or arranging for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

12.     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare and Medicaid programs.  In addition, violation of the statute can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, to civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

4

13.     In March 2010, Congress amended the Anti-Kickback Statute to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."  Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, 124 Stat. 119, codified at 42 U.S.C.§ 1320a–7b(g).

## The Medicare and Medicaid Programs

14.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A. Part A of the Medicare Program covers surgical procedures performed in the hospital setting, while Part B of the Medicare Program authorizes payment of federal funds for medical and other health services, including physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services.

15.     HHS is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (CMS) is part of HHS and is directly responsible for the administration of the Medicare program.

16.     Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program.  In order to be eligible for payment under the program, physicians must certify on CMS Form 855I:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

5

17.     Dr. Fonn was obligated to make and comply with this certification in order to be eligible to submit claims to Medicare.  On June 15, 2009, and other dates, Dr. Fonn executed a Medicare CMS Form 855I for MWN.

18.     Hospitals must make a similar certification to be eligible to submit claims to Medicare using the CMS Form 855S.

19.     As detailed below, Dr. Fonn and Seeger, individually and through their corporations MWN and DS, submitted and/or caused claims to be submitted to Medicare Parts A and B for benefits, services, and items that Dr. Fonn provided to beneficiaries.

20.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid program is jointly financed by the federal and state governments.  CMS administers Medicaid on the federal level.  Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.  The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury.  42 C.F.R. §§ 430.0-430.30 (1994).  The federal share of Medicaid expenditures varies by state and can fluctuate annually.

21.     In Missouri, providers participating in the Medicaid program (sometimes referred to as "MO Healthnet") submit claims for services rendered to Medicaid recipients to the Missouri Department of Social Services for payment.

22.     As detailed below, Dr. Fonn and Seeger, individually and through their corporations DS and MWN, submitted and/or caused claims to be submitted to Medicaid for services that Dr. Fonn provided to Medicaid recipients.

**Specific Allegations**

At all times relevant to this Complaint in Intervention are the following facts:

**Dr. Fonn and Seeger's Relationship**

23.     Dr. Fonn and Seeger have a long-standing personal relationship.  Since at least June 2008, Dr. Fonn and Seeger have been engaged to be married, but have never actually gotten married.

24.     On or about June 11, 2008, Seeger insured a wedding ring, advising her insurance broker that she will wear it always unless cleaning or showering.

25.     Dr. Fonn and Seeger's business and personal affairs are closely inter-connected. For example, DS Medical rents space from MWN, and MWN and DS Medical have "shared" employees and contractors.

26.     Seeger, through DS Medical and other corporations, acquired some commercial real estate and later sold it to Dr. Fonn.  Seeger also opened bank accounts and deposited commission revenue from spinal implant manufacturers into these accounts, and titled the bank accounts "transfer on death" to Dr. Fonn.

27.     Dr. Fonn and Seeger share title to some assets, including a truck and recreational vehicle that were purchased in part with commission revenue from spinal implant manufacturers.

28.     Dr. Fonn and Seeger frequently appeared together at DS Medical business meetings, and frequently have traveled together for work and vacation trips.

29.      Since at least June 2008, Dr. Fonn and Seeger have lived together in the same residence, which was purchased with commission payments received by DS Medical.  Dr. Fonn and Seeger have used their residence together to host social functions for their employees and business associates.

**Payment for Implants Used by Dr. Fonn During Surgeries**

30.      During the period November 2008 through March 2012, Dr. Fonn had been granted privileges to perform spinal implant fusion surgeries at a hospital located in Cape Girardeau, Missouri.

31.      For these spinal implant surgeries, the hospital typically treated spinal implants as a "physician preference" item, meaning each physician performing surgeries at the hospital could pick and choose which type of spinal implants from one of many spinal implant manufacturers would be used for each of their surgeries.

32.      Typically, to obtain spinal implant devices, physicians could deal directly with a spinal implant manufacturer, or obtain them through a distributor.  In theory, from the hospital's perspective, physicians would use their expertise and discretion to pick spinal implants that best suited each patient's medical needs, using only the implants that gave each patient the best chance of having a favorable surgical outcome.

33.      After physicians at the hospital, including but not limited to Dr. Fonn, picked the type of spinal implants and used them while performing patients' spinal surgeries, the hospital received and paid invoices from the spinal implant manufacturers for the specific spinal implants used during each surgery.  If the spinal implant manufacturer had a distributor involved with the surgery, the manufacturer would typically pay the distributor a commission consisting of a set percentage of whatever the hospital had paid for the surgical devices.

34.     After the surgery, the hospital submitted claims for reimbursement to and received payments from Medicare Part A and Medicaid, for hospital services and supplies, including for surgical implants associated with Dr. Fonn's surgeries.  Claims to Medicare Part A were submitted on Form UB-04 or CMS Form 1450.  Claims to the Missouri Medicaid program were submitted on UB-04 or CMS Form 1500.  In response, Medicare Part A and Medicaid would pay the hospital for each surgery, typically reimbursing the hospital for the costs and services associated with each surgery, including but not limited to the hospital's cost of acquiring spinal implant devices.

35.     In addition, Dr. Fonn, through MWN, billed the Medicare Part B and Medicaid programs for his personal services associated with each surgery.  Claims to Medicare Part B and Medicaid were submitted on Form UB-04 or CMS Form 1500.  In response, Medicare Part B and Medicaid paid MWN for physician services and other items associated with the surgeries performed by Dr. Fonn.

36.     Given their prior experience in the health care industry, Dr. Fonn and Seeger knew that a number of Dr. Fonn's spinal implant surgery patients were beneficiaries of the Medicare and Medicaid programs.

**Seeger and Dr. Fonn Jointly Operated DS Medical**

37.     From the beginning of DS Medical's operation in November 2008 until DS Medical ceased providing spinal implant devices to the hospital in Cape Girardeau, Missouri in March 2012, Dr. Fonn and Seeger set up and operated DS Medical together as a joint venture, using it as a common enterprise for their mutual economic benefit.

9

38.     The essential component of DS Medical's extraordinary financial success was Dr. Fonn's decision to use DS Medical as his virtually exclusive source of spinal implants and related products for all of his patients.

39.     During this entire time frame, DS Medical had only one true physician customer, namely Dr. Fonn, that was generating any significant spinal implant distribution commission revenue.

40.     As such, DS Medical relied almost exclusively on Dr. Fonn's patient population and referrals for its revenues, predominately serving that captive group of surgical patients.

41.     DS Medical had little real financial risk and marketing expenses when opening and operating, given Dr. Fonn and Seeger's scheme to use DS Medical for almost all of Dr. Fonn's spinal implant distribution needs.

42.     In December 2008, approximately the first full month of operation for DS Medical, Dr. Fonn caused the hospital where he performed surgery to order approximately $1,331,090 worth of spinal implants, more than twice as much as his nearest medical peer in the local health care market.  DS Medical supplied virtually all of the implants that he used.

43.     At the same time, DS Medical incurred almost no "start up" costs in 2008 or 2009, beyond buying a printer, a computer, and some office supplies.

44.     DS Medical enabled Dr. Fonn to profit from his decisions regarding which implants would be used during his surgeries.

45.     Seeger, using a DS Medical bank account, purchased a residence on or about April 30, 2009, using her commission revenue from DS Medical.  Both Seeger and Dr. Fonn have resided together in that residence since its purchase.  The purchase price of $284,331.42 for the residence was paid directly from DS Medical's bank account, and represented approximately

99% of DS Medical's April 2009 bank deposits. In other words, DS Medical's largest expense for April 2009 was a house used by its biggest and only physician/customer.

46.     Throughout its operation, DS Medical had difficulties performing the typical activities of a distributorship.

47.     Seeger had never operated or been employed by a spinal implant distributorship before opening DS Medical, and could not personally conduct appropriate product evaluations or evaluate competing spinal implant products.

48.     For particularly complex surgeries, DS Medical would request that spinal implant manufacturers send employees to assist with such surgeries rather than just using DS Medical employees or contractors to assist with these surgeries.

49.     DS Medical repeatedly failed to manage spinal implant hardware inventory, and several spinal implant manufacturers raised significant inventory discrepancies with DS Medical after audits.

50.     Beyond being DS Medical's only significant physician customer, Dr. Fonn played an important management role at DS Medical, helping the distributorship make important decisions.  Dr. Fonn directly and indirectly benefitted financially from DS Medical's financial success.

51.     During February and March 2009, a hospital employee noted how high Dr. Fonn's implant costs were compared to his peers, and decided it was "now urgent" to communicate directly with Dr. Fonn, given that the hospital employee had already "communicated the issue with his sales rep but it appears they keep putting us off."

52.     Dr. Fonn met with the hospital employee twice.  After the second meeting, the hospital employee informed other hospital employees on February 23, 2009 that "after meeting

with Dr. Fonn this afternoon, he informed me that his vendor of choice for instrumentation will be lowering their prices."  Determining the price of goods that are offered for sale is one of the most important functions of a distributorship.

53.     During February 2009, the hospital also told Dr. Fonn that DS Medical's pricing for a cervical fusion product was too high, and the hospital could source the exact same product from another vendor for a substantially lower price.

54.     On February 23, 2009, Dr. Fonn forwarded the hospital employee's pricing email to Seeger, adding "Get the [cervical fusion product] pricing squared away with [spinal product salesperson A and B] FIRST before you call [the hospital employee.]  [The hospital] is willing to accept the lower price – my advice is to take it rather than a higher percentage of ZERO!"

55.     During the summer of 2009, Seeger and DS Medical had a business dispute with spinal implant manufacturer A.  Spinal implant manufacturer A claimed that DS Medical lost and could not account for $431,834 worth of screws, cages, rods, spacers, and other spinal implants.  Given the value of the missing inventory, spinal implant manufacturer A withheld several months of sales commissions that it owed to DS Medical.

56.     On or about August 18, 2009, Seeger called a representative of spinal implant manufacturer A and informed him that "Dr. Fonn wanted to make sure that everything was solid for me" and further that Dr. Fonn had instructed Seeger to "see what else is out there in case there was a problem" and to "get ready" if there was no new contract resolving the commission and inventory dispute with spinal implant manufacturer A.

57.     Negotiations to resolve the dispute between DS Medical and spinal implant manufacturer A ultimately failed during the Fall of 2009.

58.     Shortly thereafter, Dr. Fonn ceased purchasing implants from spinal implant manufacturer A, and personally approached spinal implant manufacturer B on or about October 31, 2009, asking for a meeting with spinal implant manufacturer B's executives.  An executive of spinal implant manufacturer B discussed the benefits and risks of meeting with Dr. Fonn by listing as a "pro" that Dr. Fonn "could bring in between $200 – 400k a month in business" and as a "con" that Dr. Fonn was "idiosyncratic."

59.     After a November 3, 2009 meeting attended by both Dr. Fonn and Seeger, on or about November 17, 2009, spinal implant manufacturer B raised DS Medical's commission rate to 50%, and also agreed to pay a monthly "commission enhancement" of $1700 a month to DS Medical.  The reason spinal implant manufacturer B was willing to pay a 50% commission to DS Medical was because it had been led by Dr. Fonn and Seeger to believe that Dr. Fonn's choice of implants and other devices was directly related to spinal manufacturer B's agreement to pay a higher commission rate to DS Medical.

60.     Thereafter, Dr. Fonn began purchasing large amounts of spinal implants from spinal implant manufacturer B through DS Medical.

**Dr. Fonn Alters His Medical Practice After DS Medical Opens**

61.     Once DS Medical started operating, Dr. Fonn altered the way he practiced medicine, generally using more spinal implants in each of his surgeries while performing more surgeries than he typically performed before or after DS Medical was operating.

62.     Multiple persons within the health care industry noted Dr. Fonn's unusually high spinal implant utilization patterns.

63.     For example, on or about December 16, 2008, one employee of spinal implant manufacturer B sent an e-mail to other salespersons explaining "why I love Dr.Fonn," disclosing

that Dr. Fonn's surgeries involved "40k [a] day" and "likely 150k [a] week" worth of spinal implant purchases.  "Gotta love it" was the spinal implant manufacturer employee's conclusion.

64.     Similarly, on or about February 6, 2009, a hospital employee told other hospital employees that "it is now urgent that we communicate with Dr. Fonn" as the expense to the hospital for implants Dr. Fonn was ordering through DS Medical "appears to be getting out of hand."  The hospital employee noted that Dr. Fonn's vendor (through DS Medical) charged $3,150 for connectors, while another hospital vendor charged $1,341.

65.     Seeger herself made similar observations.  In text messages dated on or about December 14, 2009, March 26, 2010, and March 29, 2010, Seeger noted with excitement that Dr. Fonn used nine spacers in one patient's surgery, nine spacers in another patient's surgery, and twelve spacers in another patient's surgery, concluding "more is better" and wondering if an employee of the spinal implant company was going to "have a stroke" over the amount of spacers used (and sold to the hospital) during the surgery.

66.     Similarly, a private health care benefit program conducted a review of Dr. Fonn's surgical charges, and determined that his billed amounts were significantly higher than other local neurosurgeons.  In July 2010, the health care benefit program considered a number of "strategic options" to resolve the problem, including "terminate Dr. Fonn" and "investigate allegations of possibility of conflict of interest" after noting that Dr. Fonn's fiancée was his sole source spinal implant distributor.

### DS Medical Provides Remuneration

67.     DS Medical had extraordinary financial returns, with an approximate net profit margin of 95%, calculated as the company's gross income versus the adjusted gross income after deductions.  DS Medical's approximate profit margin was 94% in 2010, and 86% in 2011.

68.     Seeger's gross income with DS Medical in 2009, the company's first full year in operation, was approximately 31 times what she reported as wage income for 2008.

69.     Every time Dr. Fonn ordered a spinal implant or related service through DS Medical, Seeger received a commission from the spinal implant manufacturer.  Since DS Medical had essentially no other significant physician customers, each treatment decision made by Dr. Fonn to use DS Medical's products affected DS Medical's bottom line.  Since DS Medical had no other investors or owners beyond Seeger, each treatment choice by Dr. Fonn to use DS Medical's implants also provided a commission and financial benefit for his fiancée.

70.     Dr. Fonn and Seeger together spent spinal implant commission revenue from DS Medical.

71.     A list of remuneration or things of value that Seeger provided, directly or indirectly, in cash or in kind, to Dr. Fonn is attached hereto as Exhibit 1.

**Seeger and Dr. Fonn's Knowledge of the Law**

72.     As health care industry professionals, both Dr. Fonn and Seeger received training and guidance on the Anti-Kickback Statute from various sources, understood the Anti-Kickback Statute's prohibitions and requirements, and therefore had "knowledge" of the Anti-Kickback Statute within the meaning of the False Claims Act when conducting the activities discussed in this Complaint in Intervention.  Further, given their training and background, and as shown in the examples listed below, both defendants knew that their conduct was wrongful when submitting or causing to be submitted claims to Medicare and Medicaid for implants supplied by DS Medical for Dr. Fonn's surgeries and the associated hospital and physician billings.

73.     Both Seeger and Dr. Fonn understood the legal risks behind Seeger providing something of value to Dr. Fonn, as Dr. Fonn was Seeger's only source of spinal implant referrals used by Medicare and Medicaid surgical patients.

74.     For example, on or about September 28, 2008, Dr. Fonn informed a spinal implant manufacturer salesperson that he could not accept free tickets to a sports event, as "due to the new rules regarding physician inducement, it WOULD be considered an inducement or kickback for [the company] to buy [me] tickets."

75.     On or about February 10, 2009, Seeger asked an employee of a spinal implant manufacturer to fly Dr. Fonn to India, noting "Dr. Fonn requests that we travel first class accommodations since it is such a long flight, it makes a big difference in comfort."  When the spinal implant manufacturer responded by offering to pay coach fare to India for Dr. Fonn and to take the difference between Dr. Fonn's coach fare and first class fare out of Seeger's spinal implant commissions, Seeger wrote Dr. Fonn stating "obviously they should not take the difference for your flight out of my commissions.  [My lawyer] would not approve."

76.     Similarly, on or about June 10, 2009, Seeger asked a spinal implant manufacturer to pay for air fare for Dr. Fonn to travel to a medical training course, noting "I can't pay for him from DS Medical."

77.     Dr. Fonn was told by a hospital in Cape Girardeau, Missouri, on or about February 20, 2009, that "what our legal department will need from you is a detailed description of DS Medical and any relationship you have with that company.  We will send that to our legal department and they will more than likely have you sign a prepared statement to ensure that you are not to be compensated in any way from DS Medical and any relationship you have with that company."

78.     On or about October 27, 2011, Seeger received an e-mail from a spinal implant manufacturer specifically discussing her responsibilities as a distributor under the Anti Kickback Statute.  The e-mail noted that the "general rule" for health care providers was "no gifts" beyond occasional modest gifts valued under $100, and then only if that modest gift benefitted patients or served an educational function.

### Count I  --  False Claims Act, 31 U.S.C. § 3729(a)(1)(A)  -- Submitting and Causing the Submission of False Claims to Medicaid and Medicare for Services Rendered as a Result of Kickbacks

79.     Plaintiff incorporates by reference paragraphs 1-78 of this Complaint in Intervention as if fully set forth.

80.     The United States seeks relief in this Count against defendants Dr. Fonn, Seeger, DS Medical, and MWN under the False Claims Act, 31 U.S.C. § 3729 (a)(l)(A).

81.     Dr. Fonn, personally and through MWN, knowingly and willfully solicited and received remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind from Seeger and DS Medical in return for ordering, arranging for, and recommending the hospital's purchasing and ordering of spinal implants for which payment was made in whole or in part by the Medicare and/or Medicaid programs.

82.      Seeger and DS Medical knowingly and willfully offered and paid remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to Dr. Fonn and MWN to induce Dr. Fonn to order, arrange for, and recommend the hospital's purchase and ordering of spinal implant devices through Seeger and DS Medical for which payment was made in whole or in part by the Medicare and/or Medicaid programs.

83.     Defendants Dr. Fonn, Seeger, DS Medical, and MWN knowingly caused false claims for payment or approval to be presented to the United States in violation of 31 U.S.C. §

17

3729(a)(1)(A) when they submitted and caused the submission of claims to Medicaid and

Medicare for spinal implant devices and related services by the hospital and MWN as a result of

kickbacks and/or illegal remuneration in violation of the Anti-Kickback Statute.  A list of each

such false claim submitted or caused to be submitted to Medicare or Medicaid is attached hereto

as Exhibit 2.  In order to protect each patient's privacy and comply with the Court's local rules,

counsel for defendants has received with the service copy of the complaint a more complete list

of claims that contains additional identifiers for each claim, such as the identity of the patient

among other details.

84.     By virtue of the false and/or fraudulent claims caused by the defendants to be

submitted to the Medicare and Medicaid programs, the United States suffered damages in an

amount to be determined at trial, and therefore is entitled to treble damages under the False

Claims Act plus a civil penalty of $5,500 to $11,000 for each violation.

### Count II  --  False Claims Act, 31 U.S.C. § 3729(a)(1)(A)  -- Submitting and Causing the Submission of False Claims to Medicaid and Medicare for Services Rendered as a Result of Kickbacks

85.     Plaintiff incorporates by reference paragraphs 1-78 of this Complaint in

Intervention as if fully set forth.

86.     The United States seeks relief in this Count against defendants Dr. Fonn, Seeger,

DS Medical, and MWN, under the False Claims Act, 31 U.S.C. § 3729 (a)(l)(A).

87.     As discussed above, Dr. Fonn, Seeger, and DS Medical knowingly and willfully

solicited and received remuneration (including any kickback, bribe, or rebate) directly or

indirectly, overtly or covertly, in cash or in kind in from spinal implant companies A and B in

return for ordering, arranging for, and recommending the hospital's purchasing and ordering of

spinal implants for which payment was made in whole or in part by the Medicare and/or Medicaid programs.

88.     Defendants Dr. Fonn, Seeger, MWN, and DS Medical knowingly and willfully caused false claims for payment or approval to be presented to the United States by the hospital in violation of 31 U.S.C. § 3729(a)(1)(A) when they submitted and caused the submission of claims to Medicaid and Medicare for spinal implant devices and related services as a result of kickbacks and/or illegal remuneration in violation of the Anti-Kickback Act.  A list of each such false claim submitted to Medicare or Medicaid is attached hereto as Exhibit 3.  In order to protect each patient's privacy and comply with the Court's local rules, counsel for defendants has received with the service copy of the complaint a more complete list of claims that contains additional identifiers for each claim, such as the identity of the patient among other details.

89.     By virtue of the false and/or fraudulent claims submitted or caused by the defendants to be submitted to the Medicare and Medicaid programs, the United States suffered damages in an amount to be determined at trial,  and therefore is entitled to treble damages under the False Claims Act plus a civil penalty of $5,500 to $11,000 for each violation.

### Count III --Violations of the False Claims Act --
### Conspiring to Violate the False Claims Act, 31 U.S.C. § 3729(a)(l)(C)

90.     The United States incorporates by reference paragraphs 1 through 78 above as if fully set forth in this paragraph.

91.     The United States seeks relief in this Count against defendants Dr. Fonn, Seeger, DS Medical, and MWN under the False Claims Act, 31 U.S.C. § 3729(a)(l)(C).

92.     As set forth above, Dr. Fonn and Seeger conspired individually, and through DS Medical and MWN, to knowingly and willfully solicit and receive kickbacks through DS Medical from multiple spinal manufacturers in exchange for, or to induce, a hospital to purchase,

order, or recommend spinal implant devices in violation of the federal Anti-Kickback Statute, 42
U.S.C. § 1320a-7b(b)(2), thereby causing the hospital and Dr. Fonn, through MWN to submit
false and fraudulent claims to Medicare and Medicaid, identified in Exhibit 2 hereto, seeking
reimbursement for spinal implants and related hospital and physician services provided in
connection with the kickback scheme.  In order to protect each patient's privacy and comply with
the Court's local rules, counsel for defendants has received with the service copy of the
complaint a more complete list of claims that contains additional identifiers for each claim, such
as the identity of the patient among other details.

93.     Accordingly, defendants Dr. Fonn, Seeger, DS Medical, and MWN conspired to
defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31
U.S.C. § 3729(a)(3) (1986), and conspired to commit violations of 31 U.S.C. §§ 3729(a)(l)(A)
and 3729(a)(l)(B), in violation of 31 U.S.C.§ 3729(a)(l)(C) (2009).

94.     By reason of the false or fraudulent claims Dr. Fonn, Seeger, DS Medical, and
MWN conspired to get allowed or paid in violation of 31 U.S.C. §§ 3729(a)(l)(A), the United
States has suffered damages to be determined at trial and is entitled to recover treble damages
plus a civil monetary penalty for each false claim.

### Count IV -- Payment Under Mistake of Fact

95.     Plaintiff incorporates by reference paragraphs 1-78 of this complaint as if fully set
forth.

96.     This is a claim for the recovery of monies paid by the United States and the State
of Missouri to defendant Dr. Fonn as a result of mistaken understandings of fact.

97.     The false claims which Dr. Fonn and MWN submitted to the United States' and the State of Missouri's agents were paid by the United States and the State of Missouri based upon mistaken or erroneous understandings of material fact.

98.     The United States and the State of Missouri, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Dr. Fonn and MWN's certifications and representations, paid certain sums of money which Dr. Fonn and MWN were not entitled to receive, and defendants Dr. Fonn and MWN are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.  A list of each such claim submitted to Medicare or Medicaid is attached hereto as Exhibit 2.

## Count V -- Unjust Enrichment

99.     Plaintiff incorporates by reference paragraphs 1-78 of this Complaint In Intervention as if fully set forth.

100.     This is a claim for the recovery of monies by which the defendants Dr. Fonn, Ms. Seeger, DS Medical, and MWN have been unjustly enriched.

101.     By directly or indirectly obtaining government funds to which they were not entitled, defendants Dr. Fonn, MWN, Ms. Seeger, and DS Medical were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## Prayer For Relief

WHEREFORE, plaintiff, United States of America requests that judgment be entered in its favor and against defendants as follows:

On the First, Second, and Third Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by

law, together with any relief due the Relators under the False Claims Act, costs, prejudgment interest at Medicare and Medicaid's rates as set by regulation, post judgment interest, and all such further relief as may be just and proper.

On the Fourth and Fifth Counts, for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which the defendant was unjustly enriched or by which defendant retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

### Jury Demand

The United States demands a trial by jury.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ Andrew J. Lay*

ANDREW J. LAY, #28542
SUZANNE J. MOORE, #45321MO
Assistant United States Attorneys
111 S. 10th St., Room 20.333
St. Louis, Missouri 63102
(314) 539-2200
FAX (314) 539-2284

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was filed electronically with the Court to be served upon the following via the Court's ECF system upon the following this 9th day of July, 2014:

Jeffrey B. Jensen
Matthew T. Schelp
Matthew P. Diehr
Husch Blackwell
Attorneys for Relators

A copy of the foregoing together with Waiver of Service forms was mailed this 9th day of July, 2014, to the following:

James Martin
Dowd Bennett
Attorney for Dr.Sonjay Dr. Fonn and Midwest Neurosurgeons

Sandy Boxerman
Capes Sokol
Attorneys for Deborah Seeger and DS Medical

*/s/ Andrew J. Lay*
_____