**UNITED STATES DISTRICT CO**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **United States, ex rel. Cairns et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:12 CV 00004 AGF** |
| | ) | |
| **D. S. Medical et al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PURSUANT TO RULE 12(b)**

Defendants, through their respective counsel, have moved the Court to dismiss all five counts of the Complaint in Intervention.  Defendants submit this memorandum in support which sets out the basis for Defendants' motion and establishes why, in this case, dismissal with prejudice of the Government's Complaint is appropriate.

The Complaint in Intervention's five counts; two False Claims Act ("FCA") counts, one count for conspiracy to violate the FCA, one unjust enrichment count and one count of mistake of payment, are based strictly on an underlying allegation that the Defendants violated the criminal Anti-Kickback Statute ("AKS"). There is no allegation that any claims submitted by Defendants, described in the Complaint, are factually false. Rather, the Government's theory is that all the claims are legally false because the underlying transactions are "tainted" by the alleged AKS violations. The Government's premises of the alleged AKS violations are 1) Dr. Fonn's receipt of "remuneration" from his fiancée Ms. Seeger, who was also a manufacturers' representative for several spinal implant companies that supplied equipment to Dr. Fonn (Count I, III, IV and V); and 2) Dr. Fonn and Ms. Seeger's receipt of remuneration from the implant companies (Count II). As set out below, the Complaint fails to state a claim for multiple reasons.

## STANDARD OF REVIEW

At this stage of the litigation, the Court must accept as true all of the factual allegations contained in the Complaint, and it reviews the Complaint to determine whether its allegations show that the pleader is entitled to relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007); *FED. R. CIV. P. 8(a)(2)*. The plaintiffs must include sufficient factual information to provide the "grounds" on which the claim rests and to raise a right to relief above a speculative level. *Twombly*, 550 U.S. at 555,  n. 3. When ruling on a motion to dismiss under Rule 12(b), the Court looks "to whether the plaintiffs' allegations suffice to show the required causal connection between the defendant's wrongful conduct and the plaintiffs' losses." *Schaaf  v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008).

The pleading standards have been increased as a result of the Supreme Court rulings in *Twombly*, and *Ashcroft v. Iqbal*, 556 U.S 662 (2009). As the Supreme Court has now made clear, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Though fact pleading is not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly***,** 550 U.S. at 555 (internal citations omitted)).

## ARGUMENT

**I.     The Complaint Should Be Dismissed Because it Fails to Allege AKS Violations Were A But-For Causation of the Alleged False Claims**

The courts have made very clear that not every fraud perpetrated against the government is a violation of the FCA. By the plain language of the statute, the FCA attaches liability not to underlying fraudulent activity but to the "claim for payment." *31 U.S.C. § 3729(a)(1)(A)-(B)*; *U.S. ex rel. Dunn v. N. Mem'l Health Care*, 739 F.3d 417, 419 (8th Cir. 2014); *Costner v. URS*

*Consultants, Inc.,* 153 F.3d 667, 677 (8th Cir. 1998). And, to fit under the FCA, the claim for payment must be false.

The AKS and the FCA have different purposes. The AKS makes it illegal to offer or pay knowingly "any remuneration (including any kickback, bribe, or rebate)" to any person to induce that person to "purchase, [] order . . . or recommend purchasing [] or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." *42 U.S.C. § 1320a-7b(b)(2)*. The AKS is meant to ensure that a physician's medical judgment is based on the best interests of the patient, not improper financial incentives. The Department of Justice's press release in this case has embraced this purpose of the AKS: "The Anti-Kickback Statute is intended to ensure that a physician's medical judgment is not compromised by improper financial incentives and is instead based on the best interests of the patient."[1] On the other hand, the FCA was enacted to "indemnify the government . . . against **losses** caused by a defendant's fraud." *Mikes v. Strauss*, 274 F.3d 687, 696 (2d Cir. 2001) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549, 551-52 (1943) (emphasis added).

The AKS provides the specific circumstances for when a violation of the AKS, a criminal statute, can also amount to a false claim under the FCA. As Paragraph 13 of the Complaint sets out, the AKS explicitly provides that a claim submitted to the government for reimbursement is "false or fraudulent" for purposes of the FCA where the claim "includes items or services **resulting from a violation**" of the AKS. *42 U.S.C. § 1320a-7b(g)* (emphasis added). The phrase "resulting from" is not defined in the AKS. Fortuitously, the Supreme Court, in a recent decision, left no doubt as to its statutory meaning. Specifically, in *Burrage v. United States*, 134 S.Ct. 881, 889 (2014), the Court stated earlier this year that "it is one of the traditional background

---

[1] *See* Press Release, U. S. Dep't of Justice, *Government Files Suit Against Missouri Neurosurgeon and Medical Device Supplier for Violations of the False Claims Act and Anti-Kickback Statute* (July 17, 2014) ("DOJ Press Release"), *available at* http://www.justice.gov/opa/pr/2014/July/14-civ-758.html.

principles 'against which Congress legislate[s],' that a phrase such as 'results from' imposes a requirement of but-for causation." (Internal citations omitted). The Court explained that, "[i]n the usual course," a defendant's wrongful conduct is an "actual cause" of an injury if "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 887-888 (additional citations and internal quotations omitted). Relying on the "traditional background principles" that inform statutes using "results from" or similar language such as "because of," "based on," and "by reason of," the Court found that "resulting from" requires a showing of but-for causation.[2] *Id.* at 889. Importantly, the *Burrage* decision rests not upon any defined term peculiar to that statute, but upon the ordinary meaning of the words "results from." *Id.* at 887. The Court held: "Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Id.* at 888. The same reading must also apply here to the AKS.

Consequently, contrary to the attempt made by the Government in the Complaint, not every alleged violation of the AKS results in a violation of the FCA. Rather, the Government must plead and prove a "but for" causation. The Complaint fails to allege causation between an alleged kickback and the items and/or services provided. In other words, the Government has failed to alleged that but for the alleged kickbacks, Dr. Fonn's utilization of the spinal implants he used would have been different. The Complaint does not allege that the spinal fusions done by Dr. Fonn were medically unnecessary. The Complaint likewise never alleges that Dr. Fonn would have utilized different spinal implants from different vendors absent the alleged kickbacks. Rather, Paragraph 32 indicates that doctors "use their expertise and discretion to pick spinal implants that best suit each patient's medical needs . . . [and give] each patient the best

---

[2] The Court rejected the "contributing factor" theory of causation. *Burrage*, 134 S. Ct. at 890-91.

4

chance of a favorable outcome." There is no allegation that Dr. Fonn deviated from this standard.

When a causal connection is a required element, the complaint must "provide a defendant with some indication of  . . . the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347 (2005); *Schaaf,* 517 F.3d at 549.  Applying the but-for causation standard here, it is clear that the Government has failed to state a claim. As the Eighth Circuit has noted: "But for causation has been defined as follows: 'The defendant's conduct is a cause of the event if the event would not have occurred *but for* that conduct; conversely, the defendant's conduct is not a cause of the event if the event would have occurred without it.'" *Koch Asphalt Co., A Div. of Koch Fuels, Inc. v. Farmers Ins. Group*, 867 F.2d 1164, 1167 n.1 (8th Cir. 1989). In Paragraphs 61 through 66, the Complaint alleges certain "facts" suggesting that Dr. Fonn utilized a large number of spinal implants. But, there is no allegation that the "large number" was an inappropriate number of implants. There is no allegation that the "large number" was medically unnecessary. There is no allegation that the number of implants would have been lower "but for" the alleged kickbacks. There is no allegation that without the alleged kickbacks Dr. Fonn would have utilized different instrumentation. There is no allegation that the exact same procedures and the exact same implants would not have been used without the alleged kickback. In fact, there is nothing within the Complaint to suggest that the spinal implants utilized by Dr. Fonn were not of the highest quality.[3]

---

[3] A more detailed review of the allegations within Paragraphs 61-66 is even more telling of the lack of allegations which could meet the but-for causation requirement. (In fact, Paragraphs 62, 63, 64 and 66 are the subject of Defendants' motion to strike because of their lack of relevance) In a most curious move, it is extremely significant to note that the Government is not itself making any allegation of over-utilization or lack of medical necessity, but simply alleges that people in the community may have thought Dr. Fonn used a lot of implants – though no factual basis whatsoever is provided. And, not one of the paragraphs alleges misconduct of any kind. For instance, the allegation in Paragraph 62, that "[m]ultiple persons within the health care industry noted Dr. Fonn's unusually high spinal implant utilization pattern," does not even hint that any of these unidentified persons thought the "high implant utilization pattern" was improper. And, the Government does not make an allegation that the alleged utilization pattern was

To meet the but-for causation requirement of the statute, a defendant's wrongful conduct is only an "actual cause" of an injury if "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage*, 134 S. Ct. at 887-888. Nothing in the Complaint alleges that but for the alleged kickbacks, the same claims for the same implants would not have been the submitted. And for good reason–the medical claims are factually correct and nothing in the Complaint alleges otherwise.

The Complaint is void of any allegation addressing the requirement of a but-for causation. Consequently, the Complaint fails to state a claim for violation of the FCA. Without an FCA violation, all five counts are unsupportable.

## A.     The Plain Language Of The AKS Imposes A Causal Requirement

The starting point in statutory interpretation is the statute's plain meaning. *Braswell v. City of El Dorado, Ark.*, 187 F.3d 954, 958 (8th Cir. 1999).  Where Congress has not defined a term, courts first consider the ordinary, common sense meaning of the words. "[Courts] begin by analyzing the statutory language," *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251 (2010), "giv[ing] words their 'ordinary, contemporary, common meaning' unless they are otherwise defined in the statute itself." *Hennepin Cnty. v. Fed. Nat'l Mortg. Ass'n,* 742 F.3d 818, 821 (8th Cir. 2014) (quoting *United States v. Friedrich,* 402 F.3d 842, 845 (8th Cir. 2005)).

If the language's meaning is unambiguous when "read in its proper context," *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991), "then, this first canon is also the last: 'judicial inquiry is complete.'" United States v. Smith 756 F.3d 1070, 1073(8th Cir. 2014)(quoting, *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 254 (1992)).  "[T]he 'cardinal canon' of statutory interpretation

---

caused by the kickbacks or was in any way improper. Certainly in a complaint alleging fraud, these allegations could not possibly meet the standard required under Rule 9(b) for alleging a but for causation.

is 'that a legislature says in a statute what it means and means in a statute what it says there.' "

*Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1012 (8th Cir. 2010).

In this case, the phrase "resulting from" is not defined in the AKS, and therefore the Court must look at the plain meaning of the words of the statute. Fortuitously, the Supreme Court, in a recent decision, left no doubt as to the statutory meaning of "resulting from." Just this year, the Court made clear that in federal legislation, "resulting from" has a clear meaning— imposing a "but for-causation" requirement.  Specifically, in *Burrage v. United States*, 134 S.Ct. 881, 889 (2014), the Court stated "it is one of the traditional background principles 'against which Congress legislate[s],' that a phrase such as 'results from' imposes a requirement of but-for causation." (Internal citations omitted). The Court explained that, "[i]n the usual course," a defendant's wrongful conduct is an "actual cause" of an injury if "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 887-888 (additional citations and internal quotations omitted). Relying on the "traditional background principles" that inform statutes using "results from" or similar language such as "because of," "based on," and "by reason of," the Court found that "resulting from" requires a showing of but-for causation.[4] *Id.* at 889. *Burrage* rests not upon any defined term peculiar to that statute, but upon the ordinary meaning of the words "results from." *Id.* at 887. The Court held: "Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Id.* at 888. The same reading must also apply to the AKS.

### B.     When The Statutory Language Is Clear, Policy Considerations And Legislative History Are Of No Consequence

*Burrage* demonstrates that courts must interpret a statute's language of "resulting from" according to its plain meaning and not according to the parties'—or even the Court's—

assessment of what constitutes good policy. The Court emphasized in *Burrage* that the court's role is to apply the statute as written and not to delve into general policy considerations. "[T]hese always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accord with good policy.'" *Id.* at 892 (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252 (1996)). As the Supreme Court had previously explained, "it frustrates rather than effectuates legislative intent . . . to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam).[5] Likewise, the Court has held, "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994).

*Burrage* specifically noted that Congress could have utilized other phraseology. "[Congress] chose instead to use language that imports but-for causality. Especially in the interpretation of a criminal statute subject to the rule of lenity, we cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant." 134 S. Ct. at 891 (internal citation omitted). If Congress had wanted to include every claim that "related to" or "connected with" or even was "tainted by" an anti-kickback statute violation, it could have

---

[5] Moreover, the reality is the requirement of "but-for" causation is sound policy. As set forth above, the Government itself has recognized that the AKS "is intended to ensure that a physician's medical judgment is not compromised by improper financial incentives and is instead based on the best interests of the patient." *See DOJ Press Release*. The FCA was enacted to prevent fraud by Civil War-era contractors who were presenting the government with inflated invoices and faulty goods. *See United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995); *see also Vt. Agency of Natural Res. v. United States ex. rel. Stevens*, 529 U.S. 765, 781 (2000) ("[T]he FCA was enacted in 1863 with the principal goal of stopping massive frauds perpetrated by large [private] contractors during the Civil War.") (internal quotation marks omitted) (brackets original)

   Taken together, which must be done here where the Government alleges an FCA violation based solely on an AKS violation, these statutes are aimed at prohibiting the use of financial incentives to compromise a healthcare provider's independent medical judgment and protecting the government from any monetary losses resulting from that compromised judgment—an aim that is entirely consistent with the requirement that there be a causal nexus between an alleged kickback to a healthcare provider and the items that are the subject of the claim for reimbursement submitted by that provider.

easily done so. It did not. "The question . . . is not what Congress would have wanted but what Congress enacted." *Republic of Argentina v. NML Capital, Ltd*., 134 S. Ct. 2250, 2258 (2014).

Congress has legislated that claims that are false under the statute are only those "resulting from a violation" of the AKS – that is, those claims which would not have been submitted were it not for the alleged kickbacks.

### C.    *Burrage* **Is Applicable To The Pending Complaint**

As in *Burrage,* here the "resulting from" provision is part of the AKS—a criminal statute. In fact, the provision in question, 42 U.S.C. § 1320a-7b(g), specifically provides for further penalties for violation of the criminal statute "in addition to the penalties provided for in [§ 1320a-7b]." Congress could have chosen to insert this amendment into the FCA, but it did not. Certainly, it was inserted into the criminal statute for a reason. It is part of the criminal statute and, therefore, like any other criminal statute, *Burrage* should apply.

Moreover, any reading of *Burrage* shows that its decision applies equally to criminal and civil statutory interpretation. Indeed, *Burrage* relied on but-for causation requirements in similarly worded tort statutes. 134 S. Ct. at 888-89. The Court relied heavily on *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013), where the Court held that Title VII's anti retaliation provision, which contains the language "results from" "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." In fact, *Nassar* noted that but-for causation was the standard in civil actions:

> It is thus textbook tort law that an action is not regarded as a cause of an event if the particular event would have occurred without it. **This, then, is the background against which Congress legislated** in enacting Title VII, and these are the default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself.

*Id.* at 2525 (emphasis added)(internal citations and quotations omitted).

In fact, just this month in *Annex Medical, Inc. v. Burwell*, 2014 WL 437863 (8th
Cir. September 5. 2014), Judge Colloton, in a concurring opinion,  applied *Burrage* in
interpreting civil statutory language. ("If . . .the unavailability of a group health plan
without the objected –to coverage is a 'result of the Mandate,' then it follows in ordinary
usage that the HHS mandate is a but-for causation of the desired plan's unavailability.")
See also, *Tolbert v. RBC Capital Markets Corp*., 758 F.3d 619, 625 n. 4 (5th Cir.
2014)(citing *Burrage*, the court stated, "The word 'results' retains its ordinary meaning
regardless of whether it appears in Title 21 or Title 29 of the United States Code.")

Whether criminal or civil, what is clear from both *Burrage* and *Nassar*, is that "absent an
indication to the contrary **in the statute itself**," *Nassar*, 133 S. Ct. at 2525,  "it is one of the
traditional background principles 'against which Congress legislates' that a phrase such as
'results from' imposes a requirement of but-for causation" *Burrage*, 134 S. Ct. at 889 (quoting
*Nassar*, 133 S. Ct. at 2525). Consequently, when Congress chose to use the phrase "resulting
from" and did not provide a different meaning to that phrase within the statute, then it must be
presumed that it intended to "impose[] a requirement of but-for causation." *Id.*

Where the Supreme Court has spoken and, 1) found that "it is one of the traditional
background principles against which Congress legislates" that a phrase such as 'results from'
"imposes a requirement of but-for causation" and 2) refers to but-for causation as the "ordinary,
accepted meaning" of the phrase resulting from, the provision in the AKS can mean nothing else.

### D.  The Allegations Regarding Part B Claims Are Devoid Of Even A Scintilla Of Causal Connection To The Kickback Allegations

As alleged in the Complaint, there are two different types of claims challenged by the
Government. Part A claims are submitted by a hospital and include the hospital services and the
cost of the spinal implants involved in this case. Part B claims are alleged to be submitted by

Defendant Midwest Neurosurgeons ("MWN") and include the costs of the physician services, but do not include any costs for the spinal implants.

Beyond the arguments set out above,  Defendants submit that in keeping with the plain language and intent of the FCA, the AKS, and relevant case law, for the Government to pursue its claims related to Part B services, it must plead, with particularlity, a nexus  between the alleged kickbacks and the Medicare Part B services provided by Dr. Fonn. The claims submitted to the Government under Part B never include a charge for spinal implants. Those are Part A charges. (*See* Complaint, ¶ 34). Yet, according to any commonsensical reading of the Complaint, the sole purpose of the kickbacks was to induce the use of certain spinal implants. (See Complaint ¶¶ 81, 82, and 87). There are **no** allegations that the kickbacks were to (or, in fact, did) induce more surgeries or different procedures or the related services. Because there is no allegation of medically unnecessary procedures conducted by Dr. Fonn, the Medicare Part B claims for his services do not include "services resulting from a violation" of the AKS, and therefore are not false claims. Nothing in the Complaint could possibly be asserted as alleging a causation between the alleged kickbacks and the surgery services. The Complaint merely alleges that Dr. Fonn's Medicare Part B claims were "related services." Complaint ¶¶ 84 and 88. Nothing in the Complaint alleges how the physician services claims are false under the FCA. Where the "services" that are the subject of the reimbursement claim are the product of a physician's untainted and independent medical judgment (e.g., this patient needs back surgery) and there is no allegation to the contrary, the services did not "result from" an AKS violation and cannot be considered false claims for purposes of the FCA. Even more so than the Part A claims, there is absolutely nothing suggesting that but for the alleged kickbacks, the surgeries would not have occurred.

Nothing in the Complaint suggests in any way that Dr. Fonn conducted any more surgical procedures than were medically necessary. In fact, the phrases "medically unnecessary" and "medical necessity" appear nowhere in the Complaint. The Complaint simply does not allege that the provision of the surgical procedures was tied to the alleged AKS violations. The allegations set out in the Complaint relate to one issue and one issue only—the source of the spinal implants. No services, whether provided by Dr. Fonn or the hospital, are alleged to be part of the AKS scheme. Thus, causation is completely lacking.

The Eighth Circuit addressed this issue directly years ago in *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47 (8th Cir. 1973). *Cooperative Grain and Supply* involved the Agricultural Act of 1949, 7 U.S.C. § 1421 *et seq*., which directs the Secretary of Agriculture to provide for government price supports through the Commodity Credit Cooperation ("CCC") for certain agricultural commodities, including corn and wheat. Under that act, the farmer would deliver his grain to a grain elevator, receive a negotiable warehouse receipt, take the receipt to the CCC, sign a Purchase Agreement Settlement containing representations that the delivered grain was produced by him, and receive payment from the CCC at the price support rate. *Id.* at 52-54. At some point, a co-defendant began advising the defendant-producers that they could buy the grain to be placed under price support from the grain elevator rather than deliver the produced grain to the grain elevator. *Id.* at 54. The Government subsequently filed a FCA case.

Specifically as to John Horton, one of the defendant-producers, as to all the grain he placed under price support, 86 per cent was actually produced by him and 14 per cent was purchased from the grain elevator. However, the Government sought receiving charges and storage charges for 100 per cent of Horton's corn.  The Eighth Circuit held, however, that "the Government cannot support a claim for these warehouse charges against 100 per cent of the

producer's commodity. The Government should only receive damages for warehouse charges paid on the purchased grain [the 14 per cent which was fraudulently price supported]." *Id.* at 63. As to the Government's claim that "had the false representations not been made," the Government would not have made any warehouse payments (or for that matter any payments at all), the Court held:

> The Government's position is extreme. The *Woodbury* test reasonably sets the measure of damages at the amount paid due to the false claim minus the amount paid had the claim been truthful. The Government should have to pay the storage and receiving charges on the 86 per cent delivered corn that had been produced by Horton. For the same reason that the Government allows the producer's claim for the market value of the delivered commodity, the Government should allow the payments for warehouse charges for the properly delivered and produced grain, and not request further monetary sanctions by way of disallowing proper charges…
>
> The Government should be allowed to recover only the damages that it has actually suffered after having entered into a transaction, plus the statutory penalties. No one wants to deal with a "fraudulent" party to a contract. However, the Government has contracted with the producers, has received the benefit of the properly produced and delivered corn, and has received the benefit of the warehouse charges on the 86 per cent produced corn ….

*Id.*

The Eighth Circuit's ruling applies equally in this case. While the spinal implants are alleged to be tainted by kickbacks, there are no allegations that the physician services were part of the kickback scheme. Therefore, because there is no allegation tainting the Part B services, under § 1320a-7b(g) and *Cooperative Grain and Supply*, Part B claims are not false claims.

## II.    The Allegations of Improper Remuneration Are Not Plausible and Improper.

The Government concedes Defendants are in a "long-standing personal relationship" and are engaged to be married.  (Complaint ¶ 23). Indeed, the Government alleges that Ms. Seeger has vowed to "always" wear her wedding ring "unless cleaning or showering."  *Id.* at ¶ 24.  Yet, the Government nonetheless uses its Complaint as a platform to repeatedly attack

13

Defendants for conduct that virtually all couples in a committed, intimate relationship undertake. The Government attaches sinister motivations to Ms. Seeger for opening a bank account with a provision leaving the account to her fiancé if she should die before him. *Id.* at ¶ 26. The Government attaches sinister motivations to Ms. Seeger for sharing title to a truck and recreational vehicle with her fiancé. *Id.* at ¶ 27. The Government attaches sinister motivations to Ms. Seeger for allowing her fiancé to move in with her. *Id.* at ¶ 29. The Government even attaches sinister motivations to Ms. Seeger for traveling with her fiancé on "vacation trips," *Id.* at ¶ 28, and for "host[ing] social functions" together with her fiancé. *Id.* at ¶ 29.

The Government never challenges the legitimacy or sincerity of Ms. Seeger and Dr. Fonn's long-term relationship. Yet, the Government attempts to use their relationship, and the altogether normal conduct that occurs between life partners, as the basis to state a claim for violation of the AKS. More specifically, it describes such conduct as reflecting improper remunerations provided by Ms. Seeger to her fiancé. Such allegations are patently absurd. More importantly, these allegations are insufficient under virtually any pleading standard, and they are certainly lacking under the standards recently described by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under those standards, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'" *Varga v. U.S. Bank Nat. Ass'n*, 2014 WL 4099727, at *3 (8th Cir. Aug. 21, 2014) (quoting *Iqbal*, 556 U.S. at 678) (emphasis added).

For the reasons described below, there is nothing "plausible" about the Government's allegations of *improper* remuneration under the AKS. Moreover, the Government's attempt to state a claim under the AKS by taking issue with the fact that Dr. Fonn and Ms. Seeger are

14

engaged to be married improperly intrudes upon Congress' decision not to include such

relationships under the Stark Act. Finally, the Government's decision to explore and critique the

the very personal nature and conduct of two people in a committed, long-term, intimate

relationship implicates important liberty interests, and the Government's intrusion upon the same

should not be sanctioned by this Court.   For these reasons and those described further below,

Defendants' Motion to Dismiss should be granted.

A.      **The Complaint Fails To Allege A Violation Of The Anti-Kickback Statute**

Federal Rule of Civil Procedure 8(a)(2) requires the Government to set forth a "short and

plain statement of the claim showing that the [Government] is entitled to relief."  The Supreme

Court, however, has found that this requirement "demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or

'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement."  *Iqbal*, 556 U.S.

at 678 (internal citations omitted).

As is well understood now:

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A
> claim has facial plausibility when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. The plausibility standard is not akin to a 'probability
> requirement,' but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. Where a complaint pleads facts that are 'merely consistent with'
> a defendant's liability, it 'stops short of the line between possibility and
> plausibility of entitlement to relief.'

*Id.* (internal citations and quotations omitted).

The Supreme Court has identified two "working principles" that serve as the basis for its

pleading standards.  First, the Court does not "accept as true" the allegations in a Complaint that

set forth only legal conclusions.  *Id.*  As such, "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

Thus, plausibility is a clear and threshold requirement that the Government's Complaint must satisfy. The Government's Complaint fails to meet this requirement, however, as it fails to allege with plausibility that Defendants engaged in any illegal inducement, an essential element under the AKS.

B.   **The Complaint Fails to Allege *Illegal* Remuneration**

The AKS makes it illegal to offer or knowingly pay "any remuneration" to any person "**to induce such person** … to purchase, [] order . . . or recommend purchasing [] or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." *42 U.S.C. § 1320a-7b(b)(2)* (emphasis added).

The Government has attempted to plead an AKS claim by alleging in its charging paragraphs that Dr. Fonn solicited, and Ms. Seeger provided, "kickbacks and/or illegal remuneration" to *induce* the "ordering, arranging for, and recommending the hospital's purchasing and ordering of spinal implants." (See, e.g., Complaint ¶¶ 81-83). As to this element of inducement, which is necessary to establish a violation of the AKS, the Complaint is silent except for these recitals of the statutory language (Paragraph 71, which allegedly sets out all the remunerations from Ms. Seeger to Dr. Fonn, does not even refer to the remuneration as "illegal."). These "threadbare recitals" of the AKS and allegations that reflect nothing more than legal conclusions are, of course, not sufficient under the Supreme Court or Eighth Circuit precedent described above. *See, e.g., Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of action, supported by mere conclusory statements, do not suffice.").

16

In addressing the element of inducement, the question is not whether it is "possible" that the alleged remuneration was for the purpose of inducement but, rather, whether it is "plausible." And, the Supreme Court has given clear guidance on how to answer that question.

As the Supreme Court stated in *Iqbal*, assessing whether a complaint states a plausible claim, "requires the reviewing court to draw on its judicial experience and common sense." *Id.* When the issue involves the long-standing relationship and engagement between Dr. Fonn and Ms. Seeger, application of judicial experience and common sense yields the inescapable conclusion that the alleged "remuneration" here was plainly not for the purpose of improper inducement, but was merely the product of – what the Government concedes was – a long-standing intimate relationship.  The Complaint, lacking any factual basis for its conclusory allegation that the alleged remuneration from Ms. Seeger was to induce her fiancé to purchase product, can at best only suggest the possibility of misconduct. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged –but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (citing *FED. R. CIV. P. 8(a)(2)*).

Moreover, in assessing *possibility* versus *plausibility*, the Supreme Court has provided further guidance. As the Court said in addressing the issue of illegal profiling in *Iqbal*, "[t]aken as true, these allegations are consistent with petitioners' purposefully designating detainees 'of high interest' because of their race, religion, or national origin. **But given more likely explanations, they do not plausibly establish this purpose**." *Id.* at 681 (emphasis added).  As discussed below, the Complaint, itself, and in combination with judicial experience and common sense, provide an abundantly more likely explanation for why Dr. Fonn would direct business in the direction of his fiancé. Confronted by similar alternatives, the Supreme Court in *Iqbal* stated,

"As between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* at 682 (internal quotations omitted).

Based on this standard, the Government wades into dangerous territory when ascribing motives for the interactions and intimate dealings between life partners who, the Government concedes, are engaged to be married and have been in a "long-standing personal relationship." (Complaint ¶ 23).  Yet, with Exhibit 1, the Government does not wade, but dives, into the Defendants' relationship, attaching sinister motivations to various items purchased by Ms. Seeger over the course of her relationship with Dr. Fonn.  Exhibit 1 identifies the house and the jointly-owned truck and recreational vehicle as constituting illegal remuneration.[6]  Other than these items, as set out in Defendants' motion to dismiss pursuant to Rule 9(b), it is nearly impossible to determine precisely what the Government is alleging to be illegal remuneration and how any item benefitted Dr. Fonn because the identifiable items listed are definitively titled only in Ms. Seeger's name, and there are no allegations that such items benefitted Dr. Fonn in any way. (See Def.s' Motion to Dismiss Pursuant to Rule 9(b), pp. 8-14). To the extent Defendants are forced to speculate (which Rule 9(b) is supposed to prevent) what the Government is suggesting in its Exhibit 1, there appears to be a great deal of focus – to Defendants' best guess – on items which would be the ordinary items life partners might share – primarily home improvements (e.g., kitchen updates, landscaping, stereo equipment).[7]

---

[6] The truck and recreational vehicle are jointly owned.  (Complaint ¶ 27).  Thus (and not that it should matter, as it is commonplace for couples to purchase such items with joint assets), it is impossible to understand the Government's allegation that Ms. Seeger is "inducing" Dr. Fonn with these two items since he presumably paid for "his half" of the truck and recreational vehicle.

[7] Of the over 100 items listed in Exhibit 1, only a small number are identified with information revealing what, precisely, was purchased.  However, for the purpose of this motion it is assumed based on the DOJ Press Release ("[t]he commissions paid to D.S. Medical and Ms. Seeger by manufacturers were allegedly used . . . [for] various home improvements which they shared") that the vast majority of the items are

Thus, the Government goes as far as alleging that Ms. Seeger and Dr. Fonn's very **residence**, and the improvements made to it, are nothing more than kickbacks from Ms. Seeger to Dr. Fonn.  Plainly, however, the items that can be identified in Government Exhibit 1 go to the heart of any intimate relationship – particularly one that is longstanding and includes a formal engagement.  It is unclear how the Government thinks that these items reflect allegations of "inducement."  Moreover, the Government takes issue not only with the gifts exchanged or property shared between Dr. Fonn and Ms. Seeger, but also with the time they spend together, going so far as to complain that they entertain together and "frequently have traveled together for work and **vacation trips**."  (Complaint ¶¶ 28, 29) (emphasis added).

In addition considering its judicial experience and common sense, as mandated by *Iqbal*, this Court may take judicial notice of the fact that, in the Eastern District of Missouri as well as throughout the country, it is common knowledge that husbands and wives, couples engaged to be married, life-partners, and couples in long-standing relationships, regularly give gifts to each other, leave assets to the other upon their death, travel with one another, share assets, spend money on each other, and allow each other to utilize the material goods they possess.  *See* FED. R. EVID. 201 (stating that a court may take judicial notice of facts "generally known within the trial court's territorial jurisdiction.  Indeed, courts have long taken judicial notice of such facts, though the nature of those facts has thankfully evolved over time.  *See, e.g., Pauling v. Pauling*, 65 F. Supp. 814, 817 (D. Minn. 1946) (explaining that it is "common knowledge" that many married people handle their personal and real property by placing it in joint tenancy); *Carr v. Lincoln*, 293 S.W.2d 396, 400-401 (Mo. 1956) (stating that it is "common knowledge" that "husband frequently pays entire expenses pertaining to property held by the entirety, particularly

---

related to the house as multiple items refer to "OC Construction," "Thomasville," "Stereo One," and "Bloomfield Landscaping."

when, as here, the wife is not engaged in business and occupies the status of housewife");
*Freund v. English*, 358 P.2d 1038, 1040, 143 (Idaho 1961) (stating that "[i]t is common
knowledge that in many cases, where children are involved, the earnings of the wife provide the
principal means of maintenance for the entire family while the husband pursues a course of study
to enable him to later provide a more desired standard of living"); *McGrue v. Brownfiled*, 117
S.E.2d 701, 708 (Va. 1961) (providing that "it is common knowledge that husbands frequently
cause property acquired by them to be conveyed to their wives for benevolent purposes").

Such is the case here, where the Government's allegations do nothing more than reflect
transactions and conduct undertaken in a normal, intimate, relationship.  As such, the
Government's allegations set forth in the Complaint and Exhibit 1 do not purport to allege
conduct that, if proven, would show that Ms. Seeger "induced" her fiancé to do anything that
would amount to a violation of the AKS.  And, research undertaken in connection with this
motion has revealed no instances where the sharing of a home between life partners has served as
the basis for improper remuneration under the AKS.

On the face of the Complaint, it is clear that there are compelling and legitimate reasons
wholly within the law for (1) Dr. Fonn to choose to direct business to his fiancé; and (2) Ms.
Seeger to purchase and provide the items that can be identified in Exhibit 1. Nothing in the
Complaint suggests it is against the law for a doctor to send business to a vendor because of love
and compassion, out of friendship, or to assist one's life partner in her business development.
Nothing in the Complaint suggests that Dr. Fonn's decisions were detrimental to his patients.
Nothing in the Complaint alleges Dr. Fonn would have used different spinal implants. Therefore,
when the Court applies its judicial experience and common sense, the most logical and plausible
reasons for business allegedly being directed toward Ms. Seeger are not illegal. And, when there

20

is an "obvious alternative explanation" which is not improper, the government's theory does not reach the level of plausibility.

The Complaint, without factual support for the AKS' element of inducement, cannot overcome the logical and more likely reasons for the conduct with whicht the Government purports to take issue with. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show]n]' – "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

Defendants suggest that the Supreme Court's analysis of *Twombly* contained in the *Iqbal* opinion speaks directly to the issue in this case

> The [*Twombly*] Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "legal conclusion" and, as such, was not entitled to the assumption of truth. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.

*Id.*

The Complaint in Intervention is similarly flawed. First, its legal conclusions are not entitled to an assumption of truth. Second, while Defendants' alleged interactions might be viewed as consistent with an unlawful agreement/inducement, they do not suggest an illicit arrangement "because it [is] not only compatible with, but indeed [is] more likely explained by, lawful, unchoreographed" behavior between two people in love and committed to a life together.

21

The Government may argue that the Federal Rules expressly allow it to allege Defendants' intent "generally." However, *Iqbal* precludes such an argument, stating:

> "[G]enerally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8.

*Id.* at 686.

Thus, the standards and analysis set forth by the Supreme Court's decisions in *Iqbal* and *Twombly* speak directly to the issue in this case. For the foregoing reasons, the Complaint does not set forth a plausible claim for a violation of the AKS.

C.      **The Complaint Intrudes Improperly Upon Legislative Authority And Intent**

The absurdity of the Government's criticism of conduct that surely even members of the Government engage in with their significant others reveals the its real problem with the Defendants: it simply takes issue with a doctor's ability to order healthcare products from his or her fiancé. The problem with this position, however, is that the U.S. Attorneys' Office for the Eastern District of Missouri cannot use this lawsuit as the tool by which to anoint itself as the government body permitted to make this policy determination. Indeed, such a determination has already been made by the United States Congress when it enacted the Stark Act.

It is the Stark Act, not the AKS, that identifies those relationships that automatically make any business referrals inappropriate because the parties' relationship itself creates a *per se* conflict of interest. The Stark Act provides that if a physician, or an "immediate family member" of the physician, has a financial relationship with an entity such as DS Medical, then

the physician cannot order services or supplies from such an entity.[8] *42 U.S.C. § 1395nn*.

"Immediate family" is specifically defined as husband or wife; birth or adoptive parents; child or

sibling; stepparent, stepchild, stepbrother, or stepsister, father-in-law, mother-in-law, son-in-law,

daughter-in-law, brother-in-law, or sister-in-law, grandparent or grandchild; and spouse of

grandparent or grandchild. 42 C.F.R. § 411.351. However, notably absent from the definition of

"immediate family" are individuals who are involved in "long-standing personal relationships,"

including individuals that are engaged to be married.  Thus, federal statutory law does not

prohibit doctors from ordering healthcare products from their fiancées.

     Apparently displeased with the Stark Act's explicit definition of "immediate family," the

Government strains to place commonplace activity, between unmarried life partners, under the

umbrella of the AKS.  The Government's efforts should be rejected because the language of the

Stark Act – and Congress' intent – is clear as to what the Stark Act  covers and what it does not.

It is therefore inappropriate for the Government to try to expand upon the definition explicitly set

forth in the Stark Act.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 476 U.S.

837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter."); *United States

v. Tebeau*, 713 F.3d 955, 959 (8th Cir. 2013) ("If the intent of Congress is clear from the

statute's language, our inquiry is complete.").  Therefore, without facts supporting the

Government's efforts to show that Ms. Seeger provided renumeration to her fiancé *for the

purpose of inducing* him to use her business when ordering spinal implants, the Complaint  fail

as a matter of law.  42 U.S.C. § 1320a-7b(b)(2).

D.    **The Complaint Improperly Intrudes Upon Liberty Interests of Defendants.**

---

[8] There are exceptions to this prohibition, which are inapplicable here.

Finally, for the Government to take issue with and scrutinize whether Dr. Fonn and Ms. Seeger vacation together, whether they maintain a home together, and whether Ms. Seeger finances some or all of the foregoing items, implicates interests and issues that the Government has no business considering.  Indeed, if the Complaint truly alleged conduct in violation of the AKS, for Ms. Seeger to continue with her business relationship with Dr. Fonn, she must cease engaging in any transactions or conduct that could be construed as providing Dr. Fonn a benefit of any sort.   The response from the Government is presumably that they do not take issue with how two people within an intimate relationship lead their personal life, only their business practices as it relates to Medicare.  However, in this context, it is the Stark Act – not the AKS – that determines whether the parties' relationship, *per se*, precludes a business relationship in the healthcare arena.  Unable to rely upon the Stark Act here, the Government takes aim only at the details and practices surrounding Dr. Fonn and Ms. Seeger's longstanding personal relationship. And this the Government cannot do.

Courts have long recognized the important issues at stake when the Government begins to involve itself in setting parameters upon the interactions two people have within their intimate associations.  *See Hodgson v. Minnesota*, 497 U.S. 417, 446 (1990) (stating that "[w]e have long held that there exists a 'private realm of family life which the state cannot enter'") (internal citations omitted); *United States v. Napulou*, 593 F.3d 1041, 1047 (9th Cir. 2010) (recognizing a "significant liberty interest" at stake when government sought to prohibit contact between life partner as part of criminal defendant's supervised release); *United States v. Wolf Child*, 699 F.3d 1082, 1095 (9th Cir. 2012) (explaining that "a defendant's romantic relationship with his life partner, in this case Wolf Child's fiancé, is a relationship that implicates a particularly significant liberty interest in intimate association"); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (stating

that "for also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy").  This is precisely the world taken on by the Government in its Complaint, where it tries to contort a claim under the Stark Act, to one under the AKS.  And in so doing, the Government effectively demands that Ms. Seeger cease having any personal interaction with her fiancé.  Not surprisingly, there is no precedent or authority uncovered by counsel for Defendants that would sanction these efforts.

### III.    The Complaint's Reliance On Medicare Compliance Certifications As Basis of FCA Claim Fails

The Government does not, and cannot, allege that the underlying claims submitted to the Government by the hospitals for the services and products provided by Defendants were actually "false."  For example, the Government does not allege that the services or products provided by Dr. Fonn were not provided. Instead, the hospitals submitted truthful claims for products and services that had been provided to the patients.  There is no allegation to the contrary. In addition to its reliance on § 1320a-7b(g), the Government appears to rely on the legal theory, which has never been adopted by the Eighth Circuit, that because the Defendants allegedly were not in compliance with the AKS, the hospital's certification as to **its** compliance with the AKS makes any resultant claim false under the FCA.[9]  However, because there is no allegation that the certifications at issue addressed the Defendants' compliance with the AKS, there are, in turn, no allegations that the certifications were false.  The Government's theory, if ever valid,[10] therefore fails in this case.

Courts addressing the Government's certification theory prior to § 1320a-7b(g), have been clear, "[a] claim cannot be false merely because the activity underlying the claim was

---

[9] Not only has the Eighth Circuit never adopted the theory, but since the addition of § 1320a-7b(g), the theory has no viability because Congress has established that  but for causation is required for a  an AKS violation to also serve as  a FCA violation.

[10] See Footnote 9.

illegal, "[i]t is the false certification of compliance which creates liability." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *United States ex rel. Rost v. Pfizer, Inc.*, 736 F. Supp. 2d 367, 376 (D.Mass. 2010). In this case, no Defendant ever submitted claims for the costs of spinal implants to Medicare. Rather, as alleged in the Complaint, those claims were all submitted by unidentified hospitals. The Government is asserting that the claims for the cost of the spinal implants that hospitals submitted to Medicare (and Medicaid) are all false claims. The Complaint does not allege that the claims are factually false because of the services or surgical products submitted as provided, but rather they are each false because they are "tainted" by the alleged underlying kickback violations and the alleged certifications submitted that there were no AKS violations related to the claims. The problem with the Government's theory, however, is that neither Dr. Fonn nor any of the other Defendants execute certifications for the submission of claims by a hospital – only the hospital does so. And, nowhere in the Complaint is there any allegation that the hospital's certifications certify that the Defendants complied with the AKS. (This is not surprising as certifications never certify as to the doctor's conduct but only that the hospital complied with the AKS.)[11] Nor has the Government alleged that the hospitals knew of an AKS violation whey they submitted their respective certifications to Medicare. Becauuse there is no allegation that the hospital's certification is false (or even submitted), the claims submitted by the hospital cannot be false. "A claim cannot be false merely because the activity underlying the claim was illegal, "[i]t is the false certification of compliance which creates liability." *Hopper*, 91 F.3d at 1266;  *Rost*, 736 F. Supp. 2d at 376; *see also Dunn*, 739 F.3d at 419; *United States ex rel. Onnen v. Sioux Falls Independent School Dist. No. 49-5*, 688

---

[11] The Complaint, in fact, only observes that hospitals generally execute certifications, but fails to point to a single certification submitted by any hospital associated with Dr. Fonn and, therefore, there is no allegation as to what exactly is said in the certifications. This flaw is, therefore, also addressed in Defendants' Motion to Dismiss Pursuant to Rule 9(b).

F.3d 410, 414 (8th Cir. 2012).  In *United States ex rel. Thomas v. Bailey*, No. 4:06CV00465 JLH,

2008 WL 4853630, at *7 (E.D. Ark. Nov. 6, 2008), the court addressed the exact issue presented

here. Specifically, the relator alleged that the doctor received illegal remuneration from a vendor

of surgical products. He then argued that the claims for those surgical products submitted by the

hospitals were "false" because the hospitals made an express certification that the doctor's

selection of surgical products was untainted by violation of the AKS when they submitted their

annual cost reports. Just as alleged in the Complaint here, in *Thomas*, there was no allegation that

the hospitals that submitted the bills for the surgical products were aware of any alleged AKS

violation by the doctor.  Rejecting the argument that a certification by the hospital encompassed

a certification that the doctor had complied with the AKS which, in turn, resulted in the claims

submitted by the hospital being false, the Court stated:

> Obviously, anyone can and everyone probably has at some time
> made a false statement without realizing that the statement was
> false. Just as obviously, whether a statement is false and whether it
> is knowingly false are separate questions. Nevertheless, those
> truisms do not translate into an argument that hospitals that submit
> claims to Medicare, Medicaid, or the TRICARE program either
> impliedly or expressly certify that the physicians who attended the
> patients receiving services from the hospital complied with the
> laws and regulations that govern those programs. . . .
>
> **In summary, the hospitals impliedly certified that they were in
> compliance with the Anti-Kickback Statute; but they did not
> impliedly or expressly certify that the physicians who attended
> patients in their hospital complied with that statute**. Thomas
> has expressly disclaimed any contention that the hospitals violated
> the Anti-Kickback Statute or knew that Dr. Chan had done so.
> Consequently, assuming all of the facts alleged in the second
> amended complaint as true, the claims submitted by the hospitals
> were not false or fraudulent claims within the meaning of the False
> Claims Act.

*Id.* at *11-13 (emphasis added) In other words, the Court specifically held that the hospital's

certification was not false because it covered only the hospital's compliance with the AKS, not

the doctor's. *Id.* The end and commonsensical result was if the certification is not false, and the underlying claims are not false (i.e., they seek  reimbursement for services and products actually provided), then there was no false claim.  And, such is the case here.

Defendants are aware of but one court that has held to the contrary. *See United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011). However, Defendants submit that the reasoning in *Blackstone Medical* is significantly flawed. Moreover, to reach its conclusion, it had to reject the analysis of the certification theory relied on by the Government here. *Id.* at 387 ("This court is not bound by the case law Blackstone cites.") Relying on certain non-AKS/FCA cases, the court stated, "The Supreme Court has long held that a non-submitting entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or fraudulent claim, and it has not conditioned this liability on whether the submitting entity knew or should have known about a non-submitting entity's unlawful conduct." *Id.* at 390. While the quoted statement is true, this argument misses the mark.

Defendants do not argue here that a doctor cannot be liable because it caused a third party to file  a false claim. Defendants, instead, argue that the "claim" at issue must, in fact, be false. Here, there are no allegations that either the claims, or the certifications connected to them, were false.  Again, the Government does not allege that the submission of any hospital claim containing the billings for spinal implants falsely represent what was utilized for the patient or falsely represent the services provided.  Nor does the Government allege that any certifications were false insofar as there is absolutely no allegation that the hospitals submitted any certifications as to the Defendants' compliance with the AKS.

It bears reiterating that not only has the Government failed to allege that the hospital certified the Defendants' compliance with the AKS, the Government has made virtually no

allegations concerning the certifications at all.  Thus, there is no allegation that the hospital

signed a certification that was more expansive than simply certifying that the hospital was in

compliance.  As shown in *Thomas*, there is nothing "false" in such a certification:

> The issue, then, is whether the hospitals impliedly or expressly certified that [the doctor's] selection of products was untainted by violation of the Anti-Kickback Statute." 2008 WL 4853630, at *8. In other words, is the certification false? First, nowhere does the Complaint allege that the unidentified hospitals actually submitted certifications. Second, there is no allegation that the certifications make any reference to compliance with the AKS by doctors associated with the hospital. The Court agrees that a hospital's act of submitting a claim for payment to the government impliedly certifies that the hospital has complied with the Anti-Kickback Statute . . . but, it is another matter to say that a hospital's act of submitting a claim for payment is an implied certification that a person who is not employed by the hospital, is not an agent or subcontractor of the hospital, and who does not act under the hospital's control, complied with the Anti-Kickback Statute.
>
> ...[T]o be eligible as a Medicare provider, a hospital is required to certify that it is in compliance with the laws and regulations governing the Medicare program and that it does not employ or contract with persons excluded from participation; but neither this nor any other regulation brought to the Court's attention requires a hospital to certify that physicians who admit patients to the hospital are in compliance.

*Id.* The sound reasoning and analysis in *Thomas* is the proper application of the law, and should

be applied to the case at bar. It is not a question of whether Defendants caused the filing of the

hospital claims—the claims themselves must be false, and the Complaint simply points to

nothing which makes the claims false. Therefore, the claims at issue in this matter, submitted by

any hospital, are not "false" claims which may serve as a basis for the Government's claims

under the FCA.  Dismissal, therefore, is appropriate.

## IV.    The Complaint Fails To State A Claim As To Any Medicaid Claims

In Paragraph 8, the Government relies on the statutory language of §3729(a)(1)-(3), though it incorrectly identifies the pertinent subsections as (a)(1)(A)-(C).[12] "[U]nder the plain language of § 3729(a)(1), claims must be presented to an officer or employee of the government before liability can attach." *United States v. Hawley*, 619 F. 3d 886, 891-92 (8th Cir. 2010). "The government has the burden to prove that [defendant] presented, or caused to be presented, a false claim **to the United States government.**" *Id.* at 893 (emphasis added); *see also United States ex rel. Vigil v. Nelnet, Inc.*, 639 F. 3d 791, 797 (8th Cir. 2011). In *Allison Engine*, the Supreme Court likewise found the FCA reached only claims presented to the Government, as distinguished from claims paid with government funds. 553 U.S. at 671 (2008). The Court additionally held that "it is insufficient for a plaintiff asserting a [FCA] claim to show merely that '[t]he false statement's use … result[ed] in obtaining or getting payment or approval of the claim,' or that 'government money was used to pay the false or fraudulent claim'"; instead, "a plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." Id.at 665.

The Government specifically alleges that the claims for Medicaid are submitted "to the Missouri Department of Social Services for payment"  and that "[t]he states directly pay the

---

[12] In response to a Supreme Court decision finding the FCA reached only claims presented to the Government, as distinguished from claims paid with government funds, *see Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 663(2008), Congress amended the FCA with the Fraud Enforcement and Recovery Act (FERA) of 2009. FERA reworded the FCA to require only presentment of a false claim for payment, not necessarily directly to the Government or with an intent to defraud the Government. *See* 111 P.L. 21, 123 Stat. 1617 (May 20, 2009). These changes were to take effect on the date of enactment (May 20, 2009), and apply to *conduct* on or after that date. For unknown reasons, the Government has chosen to rely on the language of the statute existing prior to the 2009 amendment, though it has incorrectly identified the numbering of the subparts.

providers."  Complaint, ¶¶  21, 20. Therefore, as to the Medicaid claims, the Complaint fails to state a cause of action under §3729(a)(1)(A).

Counts II and III rely exclusively on claimed violations of §3729(a)(1)(A). While Defendants do not know why the Government charged in the manner it did or why Paragraph 8 reads as it does, Defendants and the Court can only proceed based on the allegations asserted in the Complaint. As alleged, the Government cannot state a claim for any Medicaid claims submitted to the State of Missouri.

Alternatively, allegations regarding the Medicaid claims also fail to state a claim because there is no allegation that the Defendants or any hospital ever submitted any compliance certifications relating to Medicaid claims. Because the Medicaid claims are submitted "to the Missouri Department of Social Services for payment," for the Government to be able to support a false certification theory of prosecution, it would need to allege there were false certifications. But, the Government does not ever allege there were any certifications submitted to the Missouri Department of Social Services, let alone any false ones.

The Complaint does not ever allege the Medicaid claims were factually false. Therefore, without false certifications, the Government has no theory as to why or how the Medicaid claims themselves are false. The Complaint does not state a claim as to Medicaid.

**V.     Counts IV And V Fail To State A Claim**

Counts IV and V, the common law claims for unjust enrichment and payment by mistake, are flawed for multiple reasons. First, as discussed above, there is no underlying FCA liability to support them. See, supra § I-III .  Counts IV and V are common law claims that are derivative of the FCA claims (i.e., they both rest on the premise that because the Government payments resulted from false claims, the Government should not have made them and Defendants should

not be permitted to keep them). Because the FCA claims are deficient, the underlying mistake and/or injustice relied upon by the Government for Counts IV and V is not present.

Second, the Government improperly fails to identify whether its claims for mistaken payment and unjust enrichment are brought under federal common law or state common law. *See United States ex rel. St. Joseph's Hospital v. United Distributors, Inc*., 918 F. Supp. 2d 1306, 1316 (S.D.Ga. 2013) (internal citations omitted) (granting defendants' motion to dismiss claims of unjust enrichment and payment by mistake "[b]ecause it [was] unclear from the complaint whether the Government's claims of unjust enrichment and payment by mistake were pled under federal common or Georgia state law").  The Complaint is devoid of guidance in this regard.

Third, Counts IV and V do not state a claim as to Defendants Ms. Seeger or DS Medical because there is no factual allegation that they directly (or even indirectly) received monies from the Government. The Government offers a general allegation about how hospitals "typically" pay spinal implant manufacturers and how the manufacturers typically pay distributors. Complaint, ¶ 33. However, there is no allegation that what "typically" occurs in the industry, in fact occurred with Ms. Seeger or her company.

Fourth, Count IV, alleges that it is "a claim for recovery of monies paid by the United States and the State of Missouri **to defendant Dr. Fonn** as a result of mistaken understanding of facts." (Emphasis added). However, nowhere in the Complaint is there any allegation that the United States made any payment to Dr. Fonn (Paragraph 34 alleges payments to the unidentified hospitals,  paragraph 35 alleges payments to MWN). In fact, Count IV alleges that the only claims involved are those attached as Exhibit 2. The vast majority of claims in Exhibit 2 are Part A claims submitted by and paid to unidentified hospitals. Complaint, ¶ 34.   Those are not "monies paid by the United States and the State of Missouri to defendant Dr. Fonn." The Part B

claims are alleged to be paid to MWN, not Dr. Fonn. *Id.* at ¶ 35.   Count IV does not allege it is seeking payments made to MSN.[13] Since Count IV states it is seeking payments made to Dr. Fonn, and there are no allegations of payments made to Dr. Fonn, it fails to state a claim.

Fifth, Count IV is seeking payments made by the State of Missouri. However, the State is not a party to this lawsuit and the Complaint lacks any allegations which would entitle the federal government to collect on behalf of the State for alleged payment by mistake.

Sixth, as to Count V, unjust enrichment, the count fails to state a claim against Dr. Fonn, Ms. Seeger and DS Medical because the Complaint fails to allege that the Government made any payments to these three defendants. *See United States ex rel. Singh v. Bradford Reg'l Med. Center*, 2013 WL 4504438, *4 (W.D. Pa. Aug. 22, 2013) (ruling that, "because the United States ha[d] failed to allege or show that [certain of the defendants] received any direct or indirect mistaken payments from the government, the common law claims of payment by mistake and unjust enrichment must be dismissed").

Seventh, the Complaint alleges that MWN received payments from the Government. However, those payments were all pursuant to Part B and for "physician services," not for spinal implants. Complaint ¶ 35.] There is absolutely no allegation that the physician services were not provided, were unnecessary, or were misrepresented. Moreover, there is no allegation that any kickbacks were involved for the provision of the physician services. Therefore, there exist no allegations as to how retention of the payments to MWN would be unjust.

---

[13] Were the Complaint seeking payments to MWN, Count IV would still be lacking in that those payments allegedly made to MWN were all pursuant to Part B and for "physician services," not for spinal implants. See Complaint, ¶ 35. There is absolutely no allegation that the physician services were not provided, were unnecessary, or were misstated. Moreover, there is no allegation that any kickbacks were involved for the provision of the physician services. Therefore, there exist no allegations as to how the payments to MWN would be by mistake. See Section I, above.

Eighth, Count V is completely lacking in any particularity. Specifically, Count V provides no indication of what monies by which the Defendants have been unjustly enriched. Unlike the other Counts, the Government identifies no claims related to Count V. Because the vast majority of claims alleged to be improperly paid were paid under Part A (see Complaint, Exhibit 2) and, therefore, were paid to unidentified hospitals and not to the Defendants, the Defendants are left with no idea as to what monies are being asserted as unjustly obtained or retained. "A claim for unjust enrichment has three elements: a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Topchian v. JPMorgan Chase Bank*, 2014 WL 3703995 (8th Cir. July 28, 2014) (additional citation omitted). The Complaint is completely lacking any allegation as to the first two elements let alone any particularity as to those elements.

Finally, "[t]here can be no unjust enrichment claim, however, where an express contract exists." *Id*. Count V has specifically incorporated by reference the allegations in Paragraph 16 wherein it is alleged that there are specific provider agreements which set forth in writing the agreement as to eligibility for payment. Therefore, because the Government has pled an express contract, there can be no unjust enrichment.

Any argument by the Government that it can plead in the alternative does not work in this case because Paragraph 16 is specifically incorporated into Count V. "A complaint is 'subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief.'" *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 998 (E.D. Wis. 2011) (quoting *Jones v. Bock*, 549 U.S. 199 (2007)). A plaintiff pleads itself out of court by pleading factual allegations that establish an impenetrable defense to his claims. *Massey v.*

34

*Merrill Lynch & Co.*, 464 F.3d 642, 650 (7th Cir. 2006). Therefore, a plaintiff's pleading will not survive a motion to dismiss "when it would be necessary to contradict the complaint in order to prevail on the merits." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (additional citation omitted); *McCready v. eBay, Inc*., 453 F.3d 882, 888 (7th Cir. 2006); see also *Burlison v. United States*, 627 F.2d 119, 122 (8th Cir. 1980) (observing that when a defense is established on the face of the complaint, dismissal is appropriate). "In other words, if a plaintiff pleads facts which show he has no claim, then he has pled himself out of court." *McCready*, 453 F.3d at 888 (additional citation omitted). As the Eighth Circuit stated in *Missouri Housing Development Commission v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990): "As a rule, '[a]dmissions in the pleadings … are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." (additional citation omitted).

## CONCLUSION

Wherefore, for all the above reasons, the Complaint in Intervention should be dismissed.


Respectfully submitted,



Dated:  September 17, 2014          **DOWD BENNETT LLP**


By: ___/s/ James G. Martin_____
  James G. Martin, #33586MO
  jmartin@dowdbennett.com
  Edward L. Dowd, Jr. #28785MO
  edowd@dowdbennett.com
  James F. Bennett #46826 MO
  jbennett@dowdbennett.com
  Robert Epperson #46430 MO
  repperson@dowdbennett.com

7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone:  (314) 889-7300
Facsimile:  (314) 863-2111

By:____/s/Curtis O. Poore_____
       Curtis O. Poore      #38067MO

**THE LIMBAUGH FIRM**
407 N. Kingshighway, Suite 400
P. O. Box 1150
Cape Girardeau, MO 63702-1150
Telephone:  573/335-3316
Fax:  573/335-0621
Email: curt@limbaughlaw.com

*Attorneys for Defendants Sonjay Fonn and Midwest Neurosurgeons*

**CAPES, SOKOL, GOODMAN &
SARACHAN, P.C.**
By:/s/ Sanford J. Boxerman_____
       Sanford J. Boxerman, #O37436MO
       7701 Forsyth Boulevard, 12th Floor
       Saint Louis, Missouri  63105
       Telephone:  (314) 505-5470
       Facsimile:  (314) 505-5471
       boxerman@capessokol.com
       *Attorneys for Defendants Deborah Seeger*
       *and D.S. Medical*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 17, 2014, a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.


\s\ James G. Martin       

4830-0936-8094, v.  1