# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. PAUL CAIRNS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 1:12-CV-00004 AGF |
| D.S. MEDICAL, L.L.C., MIDWEST NEUROSURGEONS, L.L.C., SONJAY FONN, D.O., and DEBORAH SEEGER, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OR,
IN THE ALTERNATIVE, FOR A NEW TRIAL**

Defendants Sonjay Fonn, D.O., Midwest Neurosurgeons, L.L.C., Deborah Seeger and

D.S. Medical, L.L.C. (the "Defendants"), by and through their counsel of record, and for their

Memorandum in Support of Joint Motion for Judgment as a Matter of Law Pursuant to Rule

50(b) or, In the Alternative, For a New Trial, state as follows:

**INTRODUCTION**

The jury in this case rejected the vast majority of what the Government claimed, and

sought relief for, in its three-count Complaint and lawsuit. The jury wholly rejected the

Government's claims in Count I and rejected the Government's request for relief as to 48 of the

53 claims it raised in Count II.[1] These findings eviscerate the Government's ability to hang on to

its Count III conspiracy judgment (where the jury awarded the Government less than one-third of

the damages it sought against one Defendant and no damages at all as to Dr. Fonn and Ms.

Seeger). *See* Verdict, ECF No. 418 at 4. The reason for such a result is that, as a matter of law, a

---

[1] In addition, as to Counts I and II, the jury found neither Ms. Seeger nor DS Medical in any way liable
for the damages alleged by the Government.

1

civil conspiracy claim "does not set forth an independent cause of action" and cannot stand on its own. *Hanten v. School Dist. of Riverview Gardens,* 183 F.3d 799, 809 (8th Cir.1999). Instead, it "is sustainable only after an underlying tort claim has been established." *Id.*[2] Here, the Government not only "failed to establish" its underlying claims, many of those claims were outright rejected by the jury (Count I in its entirety and virtually all of Count II).

As discussed below, judgment as a matter of law in the Defendants' favor is therefore appropriate to all, or nearly all, of the claims set forth in Count III because a "***verdict on civil conspiracy should yield to a finding for the defendant on the underlying tort because a cause of action for civil conspiracy is wholly subordinate to the underlying tort's existence***." *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d. 396, 407 (3d Cir. 2000) (emphasis added). Because the jury found in favor of the Defendants as to the alleged underlying tort(s), the verdict on Count III's civil conspiracy claim must yield to those findings.

The importance to this case of the legal axiom that a civil conspiracy does not stand on its own cannot be overstated. And, the Defendants respectfully seek the Court's indulgence in considering the application of the law to these unusual, but not unprecedented, circumstances. As the Third Circuit (which based its own decision on Eighth Circuit precedent) observed:

> "It is not surprising that there are few cases dealing with the sort of mixed verdict we have here, as a jury would not logically be expected to determine that civil conspiracy occurred, but that the underlying tort did not. Candidates for such verdicts would usually be screened out at the summary judgment or pleading stage, and that is indeed where most precedents that state the underlying tort rule are to be found."

---

[2] Because this is a civil, and not a criminal, conspiracy, proof of an "agreement" is insufficient. Instead, the underlying tort must be "established."  The law is "widely accepted that a plaintiff [may] bring suit for civil conspiracy only if he ha[s] been injured by an act that was itself tortious." *Beck v. Prupis,* 529 U.S. 494, 501, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (citing 4 Restatement (Second) of Torts § 876, Comment *b* (1977) ("The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution.").

*Boyanowski,* 215 F.3d at 406. Simply put, the jury's findings as to Counts I and II, one or the other of which served as the underlying basis for Count III, and the insufficiency of the evidence more generally (including failure to call any witnesses from three of the six manufacturers), dictates that this Court, as a matter of law, must find in favor of Defendants as to Count III.[3]

In addition to the reasons summarized above and discussed in detail below, there are additional grounds dictating the entry of judgment in the Defendants' favor as to all three counts. The Defendants moved for judgment as a matter of law under Rule 50 at the close of the Government's case, and again at the close of all evidence. *See* Trial Transcript Vol. VIII at 23; Vol. IX at 107.  For the reasons argued then and set forth below, Defendants renew their request that this Court enter a judgment in Defendants' favor as a matter of law under Fed. R. Civ. P. 50(b) or, in the alternative, Defendants ask that this Court grant a new trial under Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59(a).[4]

## STANDARDS OF REVIEW

## I.      Judgment as a Matter of Law Under Fed. R. Civ. P. 50.

Judgment as a matter of law is appropriate where a "reasonable jury" would not have a "legally sufficient evidentiary basis" to find for the party on the issue before the Court. Fed. R. Civ. P. 50. Likewise, judgment as a matter of law is called for when the "evidence adduced at trial is entirely insufficient to support the verdict." *Genthe v. Lincoln*, 383 F.3d 713, 716 (8th Cir. 2004) (citations omitted); *see also Barber v. American Airlines, Inc.*, 791 F.2d 658, 661 (8th Cir.

---

[3] As explained in detail at Sections I and II of the Argument, under this legal doctrine, it is beyond any question that *at an absolute minimum* 48 of the claims set forth in Count III must be rejected in Defendants' favor.  However, there are additional reasons set forth below as to why the Court should enter judgment in favor of the Defendants as to Count III in its entirety.

[4] Throughout this motion, when requests are made for judgment as a matter of law, it should be assumed that the Defendants seek, as an alternative, a motion for a new trial as provided for under Fed. R. Civ. P. 59 and the authority set forth in the Standards of Review section.

1986) (overturning jury verdict after finding "absolutely no substantial evidence in the record that would justify" the jury's finding). In considering a motion for judgment as a matter of law, while the Court is to "make all reasonable inferences in favor of the non-moving party," such inferences are only deemed reasonable if "it may be drawn from the evidence without resort to speculation." *Genthe,* 383 F.3d at 716 (citations omitted).

The standards for granting or denying the Defendants' present motion for judgment as a matter of law are the same as those applicable to Defendants' prior motion made at the close of the Government's case.[5] However, the Court's prior denial of Defendants' motion does not preclude the granting of the Defendants' present one. *See Seven Provinces Ins. Co. v. Commerce & Indus. Ins. Co.,* 65 F.R.D. 674, 680 (W.D. Mo. 1975) (citations omitted). To the contrary, the Court should now enter judgment in Defendants' favor as to Counts II and III because there was insufficient evidence to support those verdicts.

## II.    Alternative Motion for New Trial Under Fed. R. Civ. P. 59

A new trial may be granted "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Fed. R. Civ. P. 59 reflects the "trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). In addition, "the authority to grant a new trial…is confined almost entirely to the exercise of discretion on the part of the trial court." *Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). The standard for granting a new trial is considerably more lenient than that for entering judgment as a matter of law. *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992). On a motion for new trial, "the trial court can rely on its own reading of the evidence – it can 'weigh

---

[5] *See* Trial Tr. Vol. VIII at 45:7-8.

4

the evidence, disbelieve witnesses, and ***grant a new trial even where there is substantial
evidence to sustain the verdict.***'" *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453,
458 (8th Cir. 2016) (citations omitted)(emphasis added).

## ARGUMENT

**I.     As a Matter of Law, Conspiracy Claims Cannot Stand Alone and Cannot Rest Upon
the Alleged Claims and Conduct Rejected by the Jury.**

         A.     Claims for Conspiracy Cannot Stand Alone.

As mentioned above, a claim for civil conspiracy is not a stand-alone claim but rests upon
the establishment of an underlying claim. *Hanten,* 183 F.3d at 809 ("[A] claim of civil
conspiracy 'does not set forth an independent cause of action but rather is sustainable only after
an underlying tort claim has been established…'") (quoting *K & S Partnership v. Continental
Bank, N.A.,* 952 F.2d 971, 980 (8th Cir. 1991)) (applying Missouri law). Thus, a civil conspiracy
claim requires more than a mere agreement, it requires the "performance of some underlying
tortious act." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)
(citation omitted). *See also supra*, Introduction; W. Prosser, Law of Torts § 46, at 293 (4th ed.
1971) ("It is only where means are employed, or purposes are accomplished, which are
themselves tortious, that the conspirators who have not acted but have promoted the act will be
held liable.")). "Consistent with this principle," the Supreme Court observed that "a conspiracy
claim was not an independent cause of action, but was only the mechanism for subjecting co-
conspirators to liability when one of their member committed a tortious act." *Beck v. Prupis,* 529
U.S. 494, 504 (2000).

         B.     Civil Conspiracy Principles Apply to FCA Claims.

"[C]ivil conspiracy principles apply" to FCA conspiracy claims. *United States ex rel.
Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999). *See also, e.g.*, *United States v.*

*Miller v. Bill Harbert Int'l Construction, Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010) (applying "the elements of common law civil conspiracy"); *United States ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882, 894 (E.D. Wis. 2016) ("The FCA provides for conspiracy claims, see 31 U.S.C. § 3729(a)(3), and general civil conspiracy principles apply."); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) ("[one] important civil conspiracy principle is that no conspiracy can exist without some underlying tortious act. In the context of the FCA, this means that **there can be no liability for conspiracy where there is no underlying violation of the FCA**.") (emphasis added).

Significantly, too, the Supreme Court "presume[s]" that when Congress establishes a civil conspiracy cause of action in a statute, it means to adopt such "well-established civil conspiracy principles," and "interpret[s] the statute in a way that is most consistent with these principles." *Beck*, 529 U.S. at 504, 505 ("We presume, therefore, that when Congress established in RICO a civil cause of action for a person injured…by reason of a conspir[acy], it meant to adopt these well-established common-law civil conspiracy principles.") (internal quotations omitted). The application of these principles to the Government's Count III claim is indisputable. And, as further discussed below, said application is fatal to Count III.

C.      Conspiracy Claims Dismissed at Dispositive Motion Stage Upon Failure of Underlying Claims.

Courts in this and other Circuits have routinely recognized that in order for a civil conspiracy claim to avoid dismissal at either the pleading or dispositive motion stage, the underlying tort/wrongful act must first survive. *See e.g.*, *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999) ("because [plaintiff] failed to state either a substantive or procedural due process claim, [plaintiff] cannot state a claim for civil conspiracy."); *A.J. ex rel. Dixon v. Tanksley*, 94 F. Supp. 3d 1061, 1077 (E.D. Mo. 2015) (entering summary judgment on conspiracy claim because

"in the absence of an underlying constitutional violation, there cannot be an actionable conspiracy claim."); *Hanten*, 183 F.3d at 809 ("because the claims underlying Count III have both been properly dismissed, Count III . . . failed to state a claim for relief as a matter of law."); *Levi v. Anheuser-Busch Co. Inc.*, No. 08-00398-CV-W-RED, 2008 WL 4816668, *5 (E.D. Mo. Oct. 27, 2008) (dismissing civil conspiracy claim and holding that "if the underlying tort claims are properly dismissed, a claim for civil conspiracy fails to state a claim for relief as a matter of law."); *see also Riddle v. Riepe*, 866 F.3d 943, 949 (8th Cir. 2017); *Novotny v. Tripp County, S.D.*, 664 F.3d 1173, 1180 (8th Cir. 2011). Such dismissal of civil conspiracy claims following failure of underlying FCA claims has likewise been deemed appropriate.[6]

d.   Verdicts in Favor of Conspiracy Claims Rejected as Matter of Law when Coupled with Verdicts Rejecting the Underlying Claims.

The law set out above concerning the failure/dismissal of conspiracy claims prior to trial is equally applicable following a jury trial. In *K&S Partnership*, 952 F.2d at 976, the underlying trial resulted in a verdict in favor of the plaintiff on four counts, including an "aiding and abetting a securities fraud" claim and a civil conspiracy claim that was based on the aiding and abetting claim. On appeal, the Eighth Circuit found there was insufficient evidence to support the jury's finding on the underlying claim of "aiding and abetting" the securities fraud. *Id.* at 980. The court also found that the conspiracy count and the underlying tort claim must "rise or fall together" because the conspiracy claim was "sustainable only after an underlying tort claim has

---

[6] *See, e.g.*, *United States ex rel. Solomon v. Lockheed Martin Corp.*, 2016 WL 7188298, at *6 (N.D. Tex. Dec. 12, 2016), *aff'd sub nom. United States ex rel Solomon v. Lockheed Martin Corp.*, 878 F.3d 139 (5th Cir. 2017) (After dismissing all of Plaintiff's other FCA counts: "Defendants are entitled to summary judgment dismissing count VII because secondary liability for conspiracy under § 3729(a)(3) cannot exist without a viable underlying claim."); *In re Plavix Mktg., Sales Practice & Prod. Liab. Litig. (No. II)*, 2017 WL 2780744, at *15 (D.N.J. June 27, 2017); *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 (3d Cir. 2017) (reasons for the dismissal of relator's substantive FCA claim "appl[y] with equal force to the dismissal of [relator's] conspiracy claim").

been established." *Id.* As such, the court held that judgment notwithstanding the verdict was also required on the civil conspiracy claim. *Id.*

Relying on the Eighth Circuit in *K&S Partnership*, but more applicable to the facts in this case is the Third Circuit's decision in *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396 (3d Cir. 2000). There, the court considered a motion for judgment notwithstanding the verdict on a civil conspiracy claim after a rejection of the underlying claim, where just like the case at bar it was the jury – not the court – that had rejected the underlying claim. In *Boyanowski*, the court reviewed a verdict where the jury was asked to decide a civil conspiracy claim that was based on a claim for tortious interference. 215 F.3d at 398. The jury found for the defendant on the tortious interference claim, but for plaintiff on the conspiracy claim. As set out in the block quotation included in the Introduction above, the court observed that "there are few cases dealing with [this] sort of mixed verdict." *Id.* at 406. The court then set aside the jury's conspiracy verdict, reasoning that "in light of the jury's finding that the underlying tort did not occur, we conclude that the civil conspiracy claim cannot survive." *Id.* at 398. Importantly, in so holding, the court did not view the issue as a question of inconsistent verdicts – and that is not what Defendants are arguing here. Rather, the Third Circuit instead relied, in part, on the Eighth Circuit's decision in *K&S Partnership* and reasoned:

> "We nonetheless believe that the defendants' reading is the better one in light of the nature of civil conspiracy. 'Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.' [citation omitted] A verdict on civil conspiracy should yield to a finding for the defendant on the underlying tort because the cause of action is wholly subordinate to the underlying tort's existence. We also are supported by the fact that courts in other jurisdictions have made similar holdings to that in GMH when faced with similar circumstances.

*Id.* at 407 (*citing K&S Partnership*, 952 F.2d at 980).[7]

The Third Circuit is not alone in its analysis and in reversing a jury verdict based upon civil conspiracy law. For example, the Tenth Circuit found that "[b]ecause no independent tort claims were alleged against The Bluffs, LLC, we agree with The Bluffs that the conspiracy claim against it cannot be upheld as a matter of law....We thus reverse the jury's finding of liability against The Bluffs on Plaintiffs' civil conspiracy claim." *Meyer v. Christie*, 634 F.3d 1152, 1157-1158 (10th Cir. 2011). The Seventh Circuit has similarly found:

> Count III specifically alleged that the named officers conspired together with the purpose of impeding, obstructing, hindering and defeating the due course of justice and to deprive Lenard of equal protection of the law. This count is complementary to Count V of the Complaint charging malicious prosecution. All parties agree that Count III goes to a conspiracy to maliciously prosecute Lenard for the traffic, liquor and gun violations. In light of our holding regarding the malicious prosecution charge, infra, we must reverse the jury verdict on Count III for failure of an act implementing the conspiracy.

*Lenard v. Argento*, 699 F.2d 874, 883–84 (7th Cir. 1983). *See also O'Dell v. Stegall*, 226 W. Va. 590, 625 (2010) ("[F]or all of the torts or wrongs alleged by the plaintiff…there is insufficient evidence to support the jury's verdict. Accordingly, we find that there is also insufficient evidence to support the jury's finding that the defendants engaged in a civil conspiracy to commit any of those alleged torts or wrongs."); *Bd. of County Com'ns of County of Park v. Park County Sportsmen's Ranch, LLP*, 271 P.3d 562, 572 (Colo. App. 2011) ("Here, plaintiffs' conspiracy

---

[7] The Third Circuit subsequently made abundantly clear that its ruling in *Boyanowski* was not based on any claim of inconsistent verdicts. In *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199 (3d Cir. 2009), the court stated:

> Appellant in this case was entitled to a judgment as a matter of law not solely, if at all, because the verdict was internally inconsistent, as in *Mosley*, but rather because the verdict for tortious interference against the appellant cannot stand without appellees showing that appellant had committed a particular underlying tort, precisely what we held that *Boyanowski* required.

claim was based on the underlying wrong of the alleged fraudulent transfer. Thus, because we have concluded that the evidence did not support that claim, we must also set aside the jury's verdict of liability for civil conspiracy and the damages awarded."); *Scanlon v. Gordon F. Stofer & Bros., Co.*, 1989 WL 69400, at *26 (Ohio App. June 22, 1989) ("The failure of proof on the claim of tortious interference with contract automatically results in the failure of proof on the claim of civil conspiracy."); *Gulf Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W. 2d 83, 102 (Tex. App. 1985) (jury's finding of civil conspiracy cannot stand when the underlying claims have not been proven or are barred by limitations), *rev'd on other grounds,* 749 S.W. 2d 762 (Tex. 1987).

Similarly, the Eighth Circuit has affirmed a district court's grant of defendants' motion for directed verdict—and concomitant removal of the case from the jury—on this exact issue. In *Lane v. Chowning*, the Eighth Circuit agreed with the district court that the plaintiff had "failed to establish either a factual or a legal basis for recovery on any of his several [underlying] allegations." 610 F.2d 1385, 1390 (8th Cir. 1979). "It follows, then," the court held, that such a failure, "which is a necessary element in establishing the existence of a civil conspiracy," was fatal to the plaintiff's conspiracy claim. *Id.* Where no underlying offense has been proven, the jury cannot find a civil conspiracy under the law.

## II.  Jury's Verdict in Defendants' Favor as to 48 Claims in Count II Requires Judgment to Be Entered in Defendants' Favor as to 48 of the Claims in Count III.

The reasoning and analysis set forth by the Court in *Boyanowski* and others, coupled with the Eighth Circuit's holdings in *K&S Partnership* and *Lane,* dictates entry of judgment as a matter of law as to, at least, 48 claims at issue in Count III.  Given the jury's verdict was fully in favor of Defendants as to Count I, the Government will presumably argue that Count III's underlying actionable conduct was the receipt of alleged kickbacks from the manufacturers,

rather than DS Medical's alleged kickbacks/sharing of benefits between DS Medical and Dr. Fonn (though it is not how the Government tried its case). In the abstract, this would clearly be the case as the Government's Petition and the jury instructions were built around this idea. Indeed, the underlying wrongful conduct (i.e., the alleged "kickback") the Government alleged in connection with Count II was identical to that alleged in Count III.

> For Count II, the jury was instructed in part:

>> The United States alleges that another way the Anti-Kickback Statute was violated in this case was that Defendants knowingly and willfully solicited or received remuneration from spinal implant companies Amedica and Verticor, in exchange for arranging for or recommending the purchase or ordering of those companies' products by St. Francis Medical Center.

ECF No. 422, Instruction No. 9.

> For Count III, the jury was instructed in part:

>> With respect to the first element of the conspiracy claims as described in Instruction No. 12 and further defined in Instruction No. 10, the United States alleges that the agreement or understanding to submit or cause the submission of claims in violation of the Anti-Kickback Statute involved the Defendants knowingly and willfully soliciting or receiving remuneration from spinal implant companies Amedica, Verticor, Life Spine, Genesys, Ethical Medical, and Omni (aka Spine 360), in exchange for arranging for or recommending the purchase or ordering of those companies' products by St. Francis Medical Center.

*Id.*, Instruction No. 13

Thus, as this Court recognized in its Judgment, Count II was based on the solicitation and receipt of kickbacks from two manufacturers, Amedica and Verticor, in connection with 53 claims, while Count III was based on the alleged solicitation or receipt of "kickbacks from six implant manufacturers (including Amedica and Verticor)…with respect to 223 claims." *See* Judgment, ECF No. 465 at 2. Thus, the 53 claims in Count II's FCA claim were also at issue in Count III's conspiracy to violate the FCA claim.

As this Court is well aware, Count II was almost entirely found in favor of the Defendants. Ms. Seeger and DS Medical were completely exonerated and Dr. Fonn only had five claims found as false—and those five claims related to one specific incident of a stock purchase by Dr. Fonn. In regard to those five claims, the Government contended at trial that Amedica's offer of stock to Dr. Fonn constituted illegal remuneration.[8] The basic allegation was that Dr. Fonn bought Amedica stock, and that Dr. Fonn thereafter used Amedica implants in a handful of surgeries on Medicare beneficiaries. This theory is fundamentally different from the Government's other contentions about the manufacturers in this case. In every other instance, the Government argued the remuneration from the manufacturers was to Ms. Seeger in the form of commission payments. The offer of stock to Dr. Fonn is therefore totally unique and entirely different. This fact is further evidenced by the complete rejection of all other claims in Count II (including those involving Amedica) by the jury.

Therefore, aside from Dr. Fonn's purchase of Amedica stock, under the case law discussed in Section I above, any verdict in the Government's favor as to Count III's claims connected to Amedica and Verticor cannot be more expansive than the five individual claims against Dr. Fonn and MWN in Count II. And as the Eighth Circuit has held, if the Count II conduct is in fact the underlying wrongful conduct of Count III, then the Government's Count III conspiracy count and its underlying Count II claim must "rise or fall together" because the

---

[8] Defendants are also moving for judgment as a matter of law because the Government failed to disclose this stock purchase as alleged illegal remuneration during discovery. Defendants propounded a contention interrogatory requesting the Government list all items it contended were remuneration. *See* Trial Tr. Vol X. at 85:15-87:24, 96:13-101:22; ECF No. 331. The Government did not list Dr. Fonn's Amedica stock purchase or opportunity to so purchase, *see id.*, which was a clear failure to disclose and timely supplement under Rules 26 and 37. *See* Fed. R. Civ. P. 26, 37. Thus this evidence should not have been admitted at trial. *See* Fed. R. Civ. P. 37. And, as detailed herein, because this was the only substantive violation found by the jury, this improperly-admitted evidence had a material effect on the jury's verdict.

conspiracy claim is "sustainable only after an underlying tort claim has been established." *K&S Partnership,* 952 F.2d at 980.

III.    **Judgment in the Defendants' Favor as to Count III's Remaining 180 Claims is Additionally Appropriate Because the Government Failed to Present Virtually any Evidence Concerning Life Spine, Genesys, Ethical Medical and Omni (aka Spine 360) and the Required Quid Pro Quo.**

Though almost the singular focus of the Government's evidence at trial, as discussed above and detailed in Section V below, Count I cannot serve legally as the underlying wrongful conduct for the jury's finding under Count III as to the alleged conspiracy. Likewise, as also previously detailed, the forty-eight claims for which the jury found Defendants not liable under Count II cannot create liability in the jury's Count III finding. Any Government argument to the contrary fails as a matter of law. As to the remaining Count III claims alleging kickbacks received from the manufacturers,[9] it is not enough for the Government to claim it has proved that Dr. Fonn and Ms. Seeger agreed amongst themselves to solicit kickbacks or otherwise share the remuneration received from the manufacturers.[10] This is because it must never be forgotten that a civil conspiracy requires much more than an agreement to violate the law. There must be established proof of substantive violations of the FCA via the AKS. *See supra* Section I. A substantive violation of the AKS, as discussed below, requires an improper quid pro quo between the Defendants and each manufacturer. The quid pro quo requirement is embodied in the statutory term "induce," which has been described as "the gravamen of Medicare Fraud." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989). "[T]o induce…connotes an intent to exercise influence over the reason or judgment of

---

[9] Other than those 48 that fail under the law because of the jury's explicit finding in Count II.

[10] Even if, counterfactually, it were sufficient, it could not be so in this case following the jury's rejection of the Government's theory in that regard in Count I.

another in an effort to cause the referral of program-related business" *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995).

There was no evidence offered to support the Government's contention that there was anything illegal or improper about the remuneration, i.e., commissions, provided by the manufacturers to DS Medical. Indeed, there was no evidence even that the manufacturers knew of any agreement or arrangement between the Defendants that could make the manufacturers' payment of a commission illegal.[11] Indeed, as set forth below, the Government – clearly focused on its Count I case at trial – made virtually no effort to introduce evidence concerning each of the six manufacturers that was required to support various portions its Count III claims.

A.      No Evidence or Explanation for "Quid Pro Quo" Theory.

The jury was instructed that the agreement supposedly underlying the FCA conspiracy "involved" the Defendants knowingly and ***willfully*** soliciting or receiving remuneration from six different spinal implant manufacturers ***in exchange for*** the Defendants arranging for St. Francis Medical Center to purchase those companies' spinal implants. *See* ECF No. 422, Instruction No. 13. The "in exchange for" language is crucial: it is what makes the commissions illegal. Because the remuneration must be "in exchange for" something, each manufacturers must have some knowledge that the commissions are being paid "in exchange for" something. A kickback cannot be one sided. If the giver of the remuneration has no knowledge of the purpose of the payment (in this case believing it is simply paying an ordinary commission for ordinary sales), the receiver's intent cannot turn an innocent payment into a kickback because the transaction would be lacking the element of "in exchange for." In exchange for denotes a "quid pro quo-a specific intent to give or receive something of value in exchange for" some action. *United States v. Sun-*

---

[11] Again, it is impossible to imagine what "agreement or arrangement" between the Defendants could render the payments from the manufacturers illegal in light of the jury's findings in Count I.

*Diamond Growers of California*, 526 U.S. 398, 404–05 (1999). The manufacturers must have knowledge of Defendants' supposed quid pro quo. As the Government acknowledged during the Instruction conference, the conspiracy had "one purpose" which was "to get kickbacks from the manufacturers." Trial Tr. Vol IX at 158.

As set forth below, the evidence simply does not support any of the manufacturers having any knowledge of the Defendants' alleged agreements, let alone illegal agreements. Thus, there simply was not evidence introduced at trial to support substantive offensives related to the six manufacturers. No agreement between Dr. Fonn and Ms. Seeger can itself create a quid pro quo situation involving the manufacturers. Rather there must be an inducement between Defendants and the manufacturers.

The Government never introduced any evidence or otherwise argued that the manufacturers' mere payment of a commission to DS Medical for DS Medical's securing orders for their products was illegal. As explained elsewhere, such a payment simply reflects an ordinary business transaction. Thus, there must be something else in order for the manufacturers to be involved in an "illegal exchange." The Government seemed to suggest that, perhaps, the manufacturers' awareness of the alleged arrangement or agreement between the Defendants was important in this regard. This is flawed for multiple reasons. First, the "arrangement and agreement" between the Defendants that the Government specifically alleged, i.e., kickbacks from Ms. Seeger to Dr. Fonn, was the heart of their Count I claim – and was rejected by the jury.

Additionally, while the Government complained of Dr. Fonn's alleged exclusive use of DS Medical's products, that allegation/complaint was likewise flawed. First, it was not supported by the evidence. Second, there has never been any suggestion or support for the argument that exclusivity is illegal. To the contrary, the Government stipulated that the relationship between

Dr. Fonn and Ms. Seeger was permission unless there existed "illegal remuneration."[12] And, third, and most critical, there was no evidence that each (or any of the six) the manufacturers knew about any alleged agreement between Dr. Fonn and Ms. Seeger regarding anything, let alone his alleged exclusive use of her products.

The manufacturers must be offering remuneration "in exchange for" something. There had to be evidence that the manufacturers knew about a supposed arrangement if they were solicited by or actually gave illegal remuneration to Defendants in exchange for Dr. Fonn utilizing their products—which is what the instruction and the law required the jury to find. Otherwise there is simply nothing willful, knowing, or illegal about the transaction.

      B.      <u>Lack of Quid Pro Quo Evidence With Respect to Each Manufacturer.</u>

      1.      <u>Verticor</u>

As set forth above, the Government chose to focus the jury's attention specifically on Verticor in Count II. The jury was asked specifically in Count II whether the Government had established substantive offenses of the AKS/FCA with respect to alleged kickbacks from Verticor and the jury unequivocally said no as to all four Defendants. That is all that is needed to eliminate Verticor's claims from the Count III's conspiracy claim.

It bears mentioning that the testimony of the Government's own witnesses further supports the jury's position that the commissions paid by Verticor to DS Medical did not

---

[12] Defendants Request for Admission submitted to Plaintiffs read (notably also how it was read to the jury): "In absence of illegal remuneration, it was permissible under federal law for Dr. Fonn, for surgeries he performed on Medicare and Medicaid patients, to utilize spinal implants supplied through a manufacturer's rep or distributor who is his fiancee, but not his wife." Trial Tr. Vol VIII at 59-60.

And the Government responded: "Partially admit. Plaintiff admits, but only to the extent that 'illegal remuneration' is required for there to be a violation of the Anti-Kickback Statute, AKS, and False Claims Act. As set forth in the complaint and intervention, plaintiffs contend that there has been 'illegal remuneration' in this case. See Exhibit 1." Trial Tr. Vol VIII at 60.

constitute illegal remuneration or kickbacks. Indeed, the evidence presented in connection with Verticor makes it clear why the jury rejected the Verticor claims in Count II. Mr. Underhill testified that the Verticor products were of better quality than the ones then being used by Dr. Fonn. *Id.* at 125:2-12. Mr. Underhill further testified that there was absolutely nothing improper about his relationship with either DS Medical or Dr. Fonn. *Id.* at 113:8-23. During his time at Verticor, he believed his relationship with Dr. Fonn and Ms. Seeger fully complied with the law. *Id.* at 117:7-9. Under questioning by the Government, he stated he believed "there was nothing that Ms. Seeger and Dr. Fonn was doing wrong, as far as [I was] concerned." *Id.* at 129:12-16. Additionally, Christopher Canis testified he did not believe any of his post-negotiation interactions on behalf of Verticor with Ms. Seeger were inappropriate. *Id.* at 179:22-25.

In addition to the foregoing, the Government's Verticor "evidence" proved that Verticor knew nothing about the relationship with Dr. Fonn and Ms. Seeger, let alone that it had any bearing on Verticor's negotiations with DS Medical. Chad Underhill testified he was not part of any negotiations between DS Medical and Verticor. *Id.* at 115:23-24. While the Government claimed during discovery that those negotiations were between Ms. Seeger and the president of Verticor, Todd Stanaford, no such evidence was offered at trial because Mr. Stanaford was never called as a witness. Instead, Mr. Canis was the only Verticor employee who testified that he participated in the negotiations between DS Medical and Verticor. He testified that during negotiations he never spoke to Dr. Fonn or Ms. Seeger ***and he had no knowledge that Ms. Seeger and Dr. Fonn had any relationship.*** *Id.* at 172:2-13. Rather, he was interacting with Jon Wait—a figure cited fifteen times in the Government's summary judgment pleadings, but one who never testified. *See id.* at 172:4-7.

In light of the foregoing, there is, in fact, no evidence about Dr. Fonn's use of Verticor products or DS Medical's receipt of commissions from Verticor that supports a finding of inducement or a willful violation of the AKS. To the contrary, the jury's verdict as to Count II found no liability for any Defendant as to interactions with Verticor.

2.    Amedica

As a starting point, it bears mentioning that the Government introduced not a single witness from Amedica. Yet, the Government also chose to focus the jury's attention specifically on Amedica in Count II. The jury was asked specifically in Count II whether the Government had established substantive offenses of the AKS/FCA with respect to alleged kickbacks from Amedica and the jury unequivocally said no as to all four Defendants except for five isolated claims (all relating to a stock purchase by Dr. Fonn). *See supra*, Section II. Like with Verticor, that is all that is needed to eliminate Amedica's non-stock purchase claims from the Count III's conspiracy claim.

Moreover, the jury's Count II findings preclude the Government relying on evidence related to these two manufacturers to support any claim of a kickback coming from any other manufacturer.

3.    Life Spine & Ethical Medical

Mr. Underhill, a Government witness, was the sole witness representing Life Spine. Yet, he testified that as to his work at Life Spine, his and Ms. Seeger's "business relationship was 100 percent legal," *see* Trial Tr. Vol II at 113:17, and that he had no concern "at all" about the legality of his interactions with Dr. Fonn. *Id.* at 113:21-23. Mr. Underhill was also the only employee who testified from Ethical Medical. And, again, Mr. Underhill testified that there was absolutely nothing improper about his relationship with either DS Medical or Dr. Fonn. And, as

18

with Verticor, he did not negotiate either contract. Consequently, no witness testified as to the negotiations for either Life Spine or Ethical Medical or any concept of a quid pro quo.

  4. <u>Genesys and Omni (aka Spine 360)</u>

  There was likewise absolutely no evidence offered to support a *quid pro quo* between Defendants and Genesys and/or Omni or a finding of bad purpose. Indeed, no witness from Genesys or Omni was ever called as a witness to testify at all about the relationship between Defendants and their respective companies. Not even Dr. Fonn or Ms. Seeger were asked about their relationship with Genesys. And, while a few questions were asked about Omni, no evidence was solicited regarding any negotiations between Omni and Defendants. No evidence therefore exists that anyone from Genesys or Omni even negotiated the contracts with Ms. Seeger or Dr. Fonn and no evidence exists that anyone at Genesys or Omni even knew of the relationship between the Defendants. There is simply no evidence about Dr. Fonn's use of Omni or Genesys products or DS Medical's receipt of commissions from those manufacturers that supports a finding of inducement or a willful violation of the AKS.

  There is not anything close to sufficient evidence to support any of the six manufacturers were part of a quid pro quo. Even should the Court disagree as to an individual manufacturer, the claims related to the others would need to be removed from any final verdict and judgment just like the 48 the jury ruled specifically on in Count II.

  C. <u>No Evidence that the Rate of Commissions Made Them Illegal.</u>

  The Government seemed to suggest that DS Medical had "high" commissions with several of the manufacturers, but never offered any evidence (or argument for that matter) that the rate of those commissions somehow made them "illegal."  To the contrary, the Government's evidence in no way established that the commission paid Ms. Seeger were even out of line with

19

the industry standard.[13] Government witness Chad Underhill testified the going rate was 50-55%, and Government witness Jerry Huber testified he was getting 35-50% himself. Trial Tr. Vol II at 122:15-18; Trial Tr. Vol V at 58:19-21. When everyone at Life Spine was getting 50-55%, Ms. Seeger's contract with Life Spine provided only 40%. Trial Tr. Vol II at 111:2-9. And Government witness Chris Canis testified that Ms. Seeger's 50% commission was right in line with what Verticor paid in similar circumstances. *Id.* at 172:17-173:2. Nothing about the commissions established a quid pro quo.

**IV.    Judgment Should be Entered in Defendants' Favor as to Count III Because a Conspiracy Between Dr. Fonn and MWN is Not Actionable.**

Ms. Seeger and DS Medical cannot be found liable under Count III. As to both Counts I and II, these two Defendants were found to have no liability for the substantive offense of a false claim based on a violation of the AKS. *See* ECF No. 418. That fact is beyond dispute. Therefore, under civil conspiracy law, Ms. Seeger and DS Medical cannot be liable under Count III.

Once Ms. Seeger and DS Medical are eliminated from any alleged Count III conspiracy, the only Defendants left are Dr. Fonn and his company, MWN. However, a corporation cannot conspire with its employees, let alone its sole owner. *United States ex rel. Hagerty v. Cyberonics, Inc.,* 95 F.Supp.3d 240, 269-70 and n.20 (D.Mass. 2015) ("Multiple federal judges have found that companies cannot conspire with their employees or agent in the [False Claims Act] context."); *see also United States v. Cathedral Rock Corp.*, 4:03CV1090 HEA, 2007 WL 4270784, at *6 (E.D. Mo. Nov. 30, 2007) (dismissing Count III under intra-corporate immunity doctrine because "as this Count is written, it appears to attempt to state a cause of action for conspiracy between the corporate entities, their subsidiaries and their employees."); *United*

---

[13] Even if they were in excess of the industry standard, that would not render them "illegal." And the Government has never offered any or argument to the contrary.

*States ex rel. McCarthy v. Marathon Techs., Inc.*, 2014 WL 4924445, *3 (N.D.Ill. Sept. 30, 2014) (explaining that a corporation cannot conspire with its wholly-owned subsidiaries or employees to commit a conspiracy in violation of the FCA); *United States ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, *11–12 (C.D.Ill. Oct. 25, 2013) (holding that FCA conspiracy claims are barred where all the alleged conspirators were either employees or wholly-owned subsidiaries of the same corporation); *U.S. ex rel. Peretz v. Humana, Inc.*, 2011 WL 11053884, *10–11 (D.Ariz. Apr. 8, 2011) (dismissing FCA conspiracy claims because "it is a legal impossibility" for a parent corporation to conspire with its wholly owned subsidiary); *U.S. ex rel. Lacy v. New Horizons, Inc.*, 2008 WL 4415648, *6 (W.D.Okla. Sept. 25, 2008) ("FCA conspiracy claims based upon the actions of a corporation and its agents are barred by the intracorporate conspiracy doctrine.").

Under the foregoing precedent, as a matter of law, Dr. Fonn and MWN cannot be found liable under Count III for claims not applicable to Ms. Seeger and DS Medical. Judgment should therefore be entered in Defendants' favor as to Count III.

## V. The Jury's Verdict on Count I Would Also Require the Entry of Judgment in Defendants' Favor as to Count III.

Notwithstanding the Government's clear intent when it filed this lawsuit to point to "kickbacks from the manufacturers" as the underlying basis for Count III's conspiracy claim, the reality is that at trial it was Count I's alleged kickbacks/sharing of benefits which the Government made the focus of its Count III claim. And, because the jury rejected Count I in its entirety, under the law set forth in Section I above, the judgment entered in favor of the Government as to Count III's conspiracy based on Count I claim cannot survive.

A.   <u>Government's Theory, Under Count III, for Why Remuneration Provided by the Manufacturers is Illegal/Actionable is Vague and Confusing.</u>

21

The Government's underlying theory for Count III and its claim for *illegal* remuneration provided by the Manufacturers has been a constant source of confusion. Even the Court – at nearly the *end* of a multi-week trial – advised the Government that "honestly I'm not sure I have a proper -- that I necessarily have the correct understanding of the government's claim in Count III to begin with." Vol. X, at 40:24-41:1 (Instruction Conference). During trial, the Government repeatedly conflated (and confused) Count I and Count III such that, while it gave some lip service to the remuneration provided by the manufacturers in Count III, it was the sharing of that remuneration with Dr. Fonn by DSM that was the focus of its entire case (which was also the remuneration at issue in Count I).[14]

B.  The Government Repeatedly Suggested That It Was Count I's Conduct That Was at the Heart of Count III.

1.  Review of Transcript Confirms that Count III's Requisite Underlying and Illegal Conduct is DSM's Alleged Sharing of Commissions with Dr. Fonn.

A review of the transcript confirms that any supposed evidence offered by the Government of illegality of the commissions provided by any of the Manufacturers to DSM was based on DSM's sharing of those commissions with Dr. Fonn. By way of example, the

---

[14] Defendants suggest that one of the reasons Count III proved to be so confusing was that the Government had, for years, focused its Count III case concerning the manufacturers on witnesses and testimony that never materialized at trial. For example, for years the Government held out Todd Stanaford as its "star witness" that would speak to various claims in connection with one of the manufacturers (Verticor). As the Court knows, the Government obtained a guilty plea and cooperation agreement from Mr. Stanaford relating to the issues raised in this litigation. During discovery, the Government claimed that Mr. Stanaford directly negotiated with Ms. Seeger regarding the Verticor/DSM contract. However, prior to and during trial, the Government did a complete 180: the Government allowed Mr. Stanaford to withdraw his plea, did not call him as a witness at trial, and told the jury it was Jon Wait who negotiated the Verticor/DSM contract. Yet, incredibly, the Government also did not call Jon Wait as a witness at trial, notwithstanding the fact that the Government had relied upon and referenced Mr. Wait 15 different times in its response to Defendants' Motion for Judgment, ECF No. 216. Moreover, as discussed above at Section III, even though Count III is ostensibly based on "kickbacks" solicited from all six of the Manufacturers, the Government produced not a single witness to testify from three of the manufacturers (Amedica, Genesys, and Omni). In light of the foregoing, confusion as to the Government's Count III theory is hardly a surprise.

Government early on explained to the Court that "the conspiracy allegation is between Dr. Fonn and Ms. Seeger, and it's that he is making implant decisions and *then she is going to share the proceeds of those implant decisions with him.*" Trial Tr. Vol. I at 103:1-12. Likewise, during oral argument on Defendants' first Motion for Judgment as a Matter of Law, the Government explained the conspiracy "scheme" as follows: "I'm going to implant the device, you're going to get the commissions, and *then it's going to come back rolling around.*" Trial Tr. Vol. VIII at 41:23-25. Similarly, in its opening statement, the Government described to the jury the alleged conspiracy agreement as a "wheel" that took commissions from the manufacturers and, eventually, delivered them to Dr. Fonn:

> The second agreement is similar, and this one involves Dr. Fonn and Ms. Seeger working together and asking spinal implant manufacturers [companies like Amedica and Verticor]. . . if they would be willing to send benefits, *initially at least*, to Ms. Seeger in exchange for Dr. Fonn choosing to use their implants as opposed to somebody else's implants. Again, *this agreement functions like a wheel*. He will keep sending the Medicare and Medicaid patients to spinal implant manufacturers *as long as they keep sending the benefits on the back end.*"

Trial Tr. Vol. I at 4:19-5:8. The Government's focus here was not on the "initial" payments to DS Medical, but instead was on the benefits to Dr. Fonn "on the back end."

Finally, the Government repeatedly described the Count III remuneration as remuneration provided by the manufacturers to Deborah Seeger *and* Dr. Fonn. *See e.g.*, Trial Tr. Vol. VIII at 39:22-40. However, the Government has never argued, nor did it present evidence, that the commissions provided by the manufacturers were paid directly or indirectly to Dr. Fonn. Instead, under the Government's theory, those commissions were provided to DSM/Ms. Seeger and then allegedly shared with Dr. Fonn. In short, it was the alleged sharing of commissions with Dr. Fonn (i.e., the "kickbacks" to Dr. Fonn) that was the heart of the Government's Count III (and Count I) case.

23

2.      Review of Transcript Confirms that Count I's Requisite Illegal Conduct is Also DSM's Alleged Sharing of Commissions with Dr. Fonn.

The Government's trial theory of "illegal" remuneration for the Count III conspiracy claim is duplicative of that alleged for Count I: the purported "wheel" that facilitated DSM/Ms. Seeger's sharing of her commissions with Dr. Fonn. Like with Count III, the Government in its opening statement relied upon its "wheel," the purpose of which was to send commissions through DSM to Dr. Fonn:

> "Imagine a wheel that goes around and around.  On the top of the wheel it's the patients going from Dr. Fonn to Ms. Seeger who need implants; on the bottom of the wheel it's the profits and the commissions **and the benefits from DS Medical flowing back to Dr. Fonn**.

Trial Tr. at 4:19-5:8. Likewise, in its opening, the Government described Count I as:

> "Dr. Fonn is going to agree that he is going to order spinal implants for his Medicare and Medicaid patients through his fianceé Deborah Seeger's business DS Medical in exchange for **Ms. Seeger agreeing to share some of the profits and the benefits of that business back to Dr. Fonn**."

*Id.* at 4:10-18. In closing, the Government further explained:

> "[O]ur theory is that Deborah Seeger and/or DS Medical is providing or offering benefits, **and/or Dr. Fonn and Midwest Neurosurgeons is receiving those benefits**. That's our Count I theory."

Vol. X at 154:14-17.

The alleged willful conduct (i.e., the "wheel") relied upon by the Government in Count III's conspiracy count is the same as that relied upon in Count I's False Claims Act count.[15]  But, as this Court knows, the jury unequivocally rejected Count I, finding in favor of Defendants. *See* Verdict, ECF No. 418 at 1.

D.      Jury's Rejection of Count I and Finding that Neither Ms. Seeger Nor Dr. Fonn Owed Any Damages Renders Count III Verdict Unsustainable as a Matter of Law.

---

[15] Tellingly, the Government insisted that the damages sought by Count I and Count III were "identical." Vol. X at 50-51.

24

For the reasons discussed at Section I above, the Government cannot argue that its "wheel" which provided for Ms. Seeger/DSM's alleged sharing of commissions with Dr. Fonn described in Count I is what somehow rendered the remuneration by the Manufacturers described in Count III's conspiracy claim as illegal. The reasoning and analysis set forth by the Third Circuit in *Boyanowski*, coupled with the Eighth Circuit's holding in *K&S Partnership* dictates entry of judgment as a matter of law as to Count III in the case at bar. The jury rejected Count I's underlying claim against Defendants, but found in favor of the Government for conspiracy. As in *Boyanowski,* the jury's "verdict on civil conspiracy should yield to a finding for [Defendants on Count I] because the cause of action is wholly subordinate to the underlying tort's existence." *See Boyanowski*, 215 F.3d at 407.

The argument in favor of "yielding" to the jury's Count I verdict in this case is even more compelling than found in *Boyanski* and *K&S Partnership*. Here, the jury clearly and *repeatedly* rejected the Government's longstanding argument that Dr. Fonn had received improper benefits/commissions from and/or through Ms. Seeger. First, as previously discussed, the jury found in Defendants' favor on Count I. Second, and even more pointedly, the jury found neither Ms. Seeger nor Dr. Fonn were responsible for a single penny of the damages that it awarded the Government in Count IIII. *See* Verdict, ECF No. 418 at 4. In the face of such a finding, the Government cannot argue that the evidence of illegality was Dr. Fonn's alleged receipt of DSM's commissions. Indeed, it defies reason that the jury reviewed the evidence, determined that DSM's commissions were improperly shared with Dr. Fonn but nonetheless ruled for the Defendants on Count I and allowed Ms. Seeger and Dr. Fonn to keep those commissions in Count III. The Government is "not entitled . . . to the benefit of unreasonable inferences or those 'at war with the undisputed facts.'" *Marcoux v. Van Wyk*, 572 F.2d 651, 653 (8th Cir. 1978)

(finding motion for judgment notwithstanding the verdict appropriate because of insufficient evidence) (citations omitted).  Rather, "in light of the jury's finding that the underlying tort did not occur, we conclude that the civil conspiracy claim cannot survive." *Boyanski,* 215 F.3d at 398.

**VI.     Alternatively, Judgment in Favor of Defendants Should be Entered as to Count III Because Government Failed to Adduce Sufficient Evidence of Willfulness.**

As discussed above, any analysis of the sufficiency of Count III must separately review the evidence related to each manufacturer – a quid pro quo arrangement with one manufacturer does not taint transactions with any other manufacturer.

A.     <u>Willfulness A Critical Element of Count III's Conspiracy Claim.</u>

The Final Jury Instructions identified four elements that the Government was to prove in order to prevail on its Count III conspiracy claim. *See* ECF No. 422 at Instruction No. 12. At issue is the Government's failure to present sufficient evidence to satisfy the first element, which was set forth as follows:

> *First*, from on or around January 2009 through on or before March 31, 2012, two or more people or entities reached an agreement or understanding to submit or cause the submission of claims for payment to the government which falsely or fraudulently represented compliance with the Anti-Kickback statute, ***as defined in Instruction No. 13***;

*Id.* (emphasis added). Instruction No. 13, in turn, provides:

> With respect to the first element of the conspiracy claims as described in Instruction No. 12 and further defined in Instruction No. 10, the United States alleges that the agreement or understanding to submit or cause the submission of claims in violation of the Anti-Kickback Statute involved ***the Defendants knowingly and willfully soliciting or receiving remuneration from spinal implant companies*** Amedica, Verticor, Life Spine, Genesys, Ethical Medical, and Omni (aka Spine 360), in exchange for arranging for or recommending the purchase or ordering of those products by St. Francis Medical Center.

*Id.* at Instruction No. 13 (emphasis added). Thus, for the jury's verdict on Counts II or III to stand, there must be sufficient evidence of an agreement that provided for the Defendants to "willfully" solicit or receive remuneration from each spinal implant company. "Willfully" was defined for the jury as follows:

> "Willfully means that an act is done voluntarily and purposely and with the **bad purpose either to disobey or disregard the law**. In order to act willfully, a defendant must act unjustifiably and wrongly while knowing that his or her actions are unjustifiable and wrong. A defendant need not be aware of the specific law or rule that his or her conduct may be violating."

*Id.* at Instruction No. 10 (emphasis added). It follows, therefore, that for any individual false claims to stand, there must be sufficient evidence that the Defendants reached an agreement wherein they intended to act unlawfully when soliciting or receiving the remuneration from the specific manufacturer.

With respect to Count III, there was no evidence presented by the Government that Dr. Fonn/MWN solicited or received remuneration from the manufacturers.[16] Therefore, the Government's insurmountable obstacle as to Count III was, and remains, its inability to point to evidence establishing why it was *unlawful* for DSM to solicit or receive remuneration (in this case commissions) from the manufacturers.  In other words, why is DSM – a spinal implant distributor – forbidden from doing what every other distributor of spinal implants does on a daily basis: working to obtain commissions from spinal implant manufacturers in return for securing sales of the manufacturers' products. Indeed, numerous Government witnesses testified that spinal implant distributors were compensated through commissions from spinal implant manufacturers – including through commissions from the very manufacturers identified in

---

[16] The Defendants have long maintained, and as discussed below the jury plainly found, that Dr. Fonn also did not even indirectly solicit or receive remuneration from the Manufacturers.

Instruction No. 13. *See, e.g.*, Vol. II at 106:10-16; 119:20-21 (Chad Underhill testifying that most smaller companies were giving their distributors 50% commissions). In light of the foregoing, the critical question is: what evidence did the Government present that could have allowed a jury to find that the commissions received by DSM from the manufacturers were somehow "illegal", while commissions received by other distributors were not?

      B.      <u>Government Cannot Rely Upon Count I Conduct to Demonstrate Willfulness for Count III.</u>

As discussed above, in light of the jury's finding for the Defendants on Count I, the commissions cannot be deemed "illegal" based on the Government's allegations that DSM/Ms. Seeger shared the commissions with Dr. Fonn.

      C.      <u>Government Cannot Rely Upon DS Medical's Desire to Earn a Profit as Evidence of Willfulness.</u>

All the Government established was that DSM and Ms. Seeger worked – as they were entitled to do under federal law – with Dr. Fonn to provide him spinal implants and other medical equipment from the Manufacturers. And that DSM was compensated for that work. The commissions received by DSM do not reflect "illegal remuneration" but, rather, the compensation received by a distributor of spinal implants – consistent with other spinal implant distributors as established by the Government's own witnesses.[17] *See Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 262, 267 (8th Cir. 1984) (court overturning jury finding on basis of insufficient evidence of antitrust violations where, in part, "a careful study of the evidence [] reveals nothing from which a jury could reasonably conclude that [defendant's challenged conduct] was anything other than ordinary commercial conduct.").

_____

[17] In fact, the jury was instructed that neither the FCA nor AKS "prohibits companies or individuals from seeking or earning profits, or seeking to maximize profits." Final Jury Instructions, ECF No. 422 at 13 (Instruction No. 11).

D.     Government Cannot Rely Upon Status of Ms. Seeger as Dr. Fonn's Fiancee as Evidence of Willfulness.

The fact that Ms. Seeger is Dr. Fonn's fiancée does not somehow transform those commissions into "illegal" remuneration. This is disappointing to the Government. Throughout the long history of the Government's criminal and civil prosecution of the Defendants, it became very clear that the Government simply does not like the fact that Congress did not include fiancées among those groups of people that are prohibited by the Stark Act from serving as a distributor for a doctor. *See* 42 U.S.C. § 1395nn; 42 C.F.R. § 411.351. In fact, the creation of DSM coupled with Dr. Fonn and Ms. Seeger's long engagement was repeatedly pointed to by the Government as something that was unusual and, presumably, improper.[18] However, as the Government stipulated, without "illegal" remuneration, the relationship between Dr. Fonn and Ms. Seeger was perfectly acceptable. *See* Trial Tr. Vol. VIII at 59:24-60:11.

E.     There is No Evidence of Willfulness.

As reflected in the jury instructions, the solicitation of remuneration must be "willful" (i.e., "with bad purpose either to disobey or disregard the law") in order for the remuneration provided by the manufacturers to be an illegal kickback. The Government failed to present sufficient evidence of willfulness. Thus, the Government cannot "direct [the Court's] attention to any claim that [Defendants] engaged in legally actionable conduct which the jury did not reject

---

[18] For example, the Government *opened* its closing argument with: "why have Dr. Fonn and Ms. Seeger not gotten married? And Dr. Fonn told you himself, the reason was because we wanted to maintain this distributorship.  Remember that. Maintain this distributorship." Trial Tr. Vol. X at 136:17-23. Similarly, the Government argued to this Court: "You heard many of the manufacturers. . . [testify that they] . . . don't know of any other situation where a fianceé serves as a distributor for the spinal surgeon that's putting the spinal implants into his patients." Trial Tr. Vol. VIII at 40:14-17 (oral argument on motion for judgment as a matter of law as to Count III). Yet, the Court recognized, and even the Government could not dispute that, **as a matter of law**, DSM *could* serve as Dr. Fonn's distributor even though Ms. Seeger was Dr. Fonn's fianceé – so long as they remained in complaince with the AKS. Trial Tr. Vol. VIII at 59:24-60:11.

at trial." *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 216 (3d Cir. 2009).

"[J]udgment as a matter of law is appropriate 'when the record contains no proof beyond

speculation to support [a] verdict.'" *Jackson v. City of Hot Springs*, 751 F.3d 855, 860 (8th Cir.

2014) (citations omitted). And, where there is insufficient evidence to support a jury's finding of

a conspiracy, courts will either direct a verdict in the defendant's favor, or overturn the verdict

entered against the defendant. *See e.g., Marti v. City of Maplewood, Mo.,* 57 F.3d 680, 685 (8th

Cir. 1995) (affirming granting of judgment as a matter of law on conspiracy claim)*; Schwimmer

v. Sony Corp. of America*, 677 F.2d 946, 952-56 (2d Cir. 1982) (trial court should have granted

JNOV when there was insufficient evidence to establish defendant entered into a conspiracy);

*H.L. Moore Drug Exchange v. Eli Lilly and Col,* 662 F.2d 935, 946 (2d Cir. 1981) (same);

*Feldman v. Allegheny Intern., Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988) ("Having found

insufficient evidence to make out a prima facie case of tortious interference, any conspiracy

claim based on tortious interference as the underlying wrong is similarly unsupported.").

For the reasons set forth above, there was insufficient evidence that the Defendants

"willfully" solicited or received remuneration from any of the manufacturers. As such, the Court

here should enter judgment as a matter of law in the Defendants' favor as to Count III.

## VII. Judgment Should be Entered in Defendants' Favor as to Counts II and III as the Government Failed to Introduce Sufficient Evidence Establishing "But-For" Causation.

While we are aware the Court has previously rejected this argument, we submit that more

recent case law further strengthens the argument and is worthy of the Court's reconsideration.[19]

---

[19] Separate and apart from Defendants' argument regarding "resulting from" and *Burrage*, Defendants also objected to the verdict director making it appear that any violation of the AKS was automatically a violation of the FCA. Trial Tr. Vol. IX at 141- 142 (relating to a misleading definition of "false and fraudulent" and application of the instruction to pre-2010 conduct.) We renew those arguments herein as further support for this motion for judgment as a matter of law.

As the Court knows, the United States Supreme Court in *Burrage v. United States*, 134 S. Ct. 881 (2014) held that the phrases "resulting from" and "because of" within a statute both require "but-for" causation. The AKS utilizes both phrases. Moreover and importantly, in June 2018, the Supreme Court in *Husted v. A. Phillip Randolph Institute*, 2018 WL 2767661 (June 11, 2018), doubled-down and held that in a civil context the phrase "because of" requires at least but-for causation.

However, in this case, the instructions provided to the jury (over Defendants' objection) did not did call for any finding of causation. *See* ECF No. 422, Instruction No. 7; Instruction No. 26; Trial Tr. Vol. IX at 141:18-142:20; *Id.* at 154:7-25.[20] Nor did the Government present evidence that established any causation, let alone a "but-for" causation. As such, judgment should be entered in Defendants' favor as to both Counts II and III.

Since 2010, the AKS has explicitly provided that a claim submitted to the government for reimbursement is "false or fraudulent" for purposes of the FCA where the claim "includes items or services ***resulting from*** a violation" of the AKS. 42 U.S.C. § 1320a-7b(g) (emphasis added). And, pursuant to *Burrage* and *Husted*, the Supreme Court has clearly found that that "resulting from" requires a "but-for" analysis. Yet, the Government presented no evidence that but for the alleged AKS violations, the Part A claims submitted by the hospital (or MWN Part B claims) would have been any different.[21] *See* Trial Tr. Vol. VII at 24-25; Trial Tr. Vol. IX at 109-10. Moreover, the jury instructions failed to inform the jury of the but-for causation requirement. *See* Trial Tr. Vol. IX at 141:18-142:20; *id.* at 154:7-25.

The courts have made very clear that not every fraud perpetrated against the government is a violation of the FCA. By its plain language, the FCA attaches liability not to underlying

---

[20] *C.f.*, Defendants' Proposed Instruction No. 22A at Doc. 303 at 38.
[21] This failure of evidence will also apply to Part B claims submitted by Midwest Neurosurgeons.

fraudulent activity but to the "claim for payment." 31 U.S.C. § 3729(a)(1)(A)-(B); *United States. ex rel. Dunn v. N. Mem'l Health Care*, 739 F.3d 417, 419 (8th Cir. 2014); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998). And, to fall under the FCA, the claim for payment must be false.

The AKS and the FCA have different purposes. The AKS makes it illegal to offer or pay knowingly "any remuneration (including any kickback, bribe, or rebate)" to any person to induce that person to "purchase, [] order…or recommend purchasing [] or ordering any good…or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The AKS is meant to ensure that a physician's medical judgment is based on the best interests of the patient and not improper financial incentives. On the other hand, the FCA was enacted to "indemnify the government…against losses caused by a defendant's fraud." *Mikes v. Strauss*, 274 F.3d 687, 696 (2d Cir. 2001) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549, 551-52 (1943) (emphasis added).

The AKS provides the specific circumstances under which a violation of the AKS—a criminal statute—can also amount to a false claim under the FCA. The AKS explicitly provides that a claim submitted to the government for reimbursement is "false or fraudulent" for purposes of the FCA where the claim "includes items or services ***resulting from*** a violation" of the AKS. 42 U.S.C. § 1320a-7b(g) (emphasis added). Specifically, in *Burrage* the Court stated that "it is one of the traditional background principles 'against which Congress legislate[s],' that a phrase such as 'results from' imposes a requirement of but-for causation." 134 S.Ct. at 889 (citations omitted). The Court explained that, "[i]n the usual course," a defendant's wrongful conduct is an "actual cause" of an injury if "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id*. at 887-88 (additional citations and internal quotations

32

omitted). Relying on the "traditional background principles" that inform statutes using "results from" or similar language such as "because of," "based on," and "by reason of," the Court found that "resulting from" requires a showing of but-for causation. *Id*. at 889. Importantly, the *Burrage* decision rests not upon any defined term peculiar to that statute, but upon the ordinary meaning of the words "results from." *Id*. at 887.

The Court in *Husted* reiterated its direction that phrases "results from," because of," "based on," and "by reason of," require causation whether found in a criminal case or a civil statute. In *Husted*, the Court analyzed the phrase "by reason of." The Court explained that "'by reason of' is a 'quite formal' way of saying 'because of.'" 2018 WL 2767661 at *7. It then held that "by reason of" always "denotes some form of causation." *Id.* at *8 (citation omitted). The Court further described but-for causation as the least stringent of the possible causation standards the phrase could impose. "When a statutory provision includes an undefined causation requirement, we look to context to decide whether the statute demands ***only but-for cause*** as opposed to proximate cause or sole cause." *Id.* at *8 (citations omitted) (emphasis added). In *Husted*, the Supreme Court found "by reason of" required proof of the "sole cause." *Id*. at * 9. But, the Court also clearly held that "by reason of" and thereby "because of" required at least "but-for" causation.

The reading articulated in *Burrage* and *Husted* must also apply here to the AKS.[22] Consequently, not every alleged violation of the AKS results in a violation of the FCA.  Rather,

_____

[22] The Government may point to the recent decision from the Third Circuit, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96 (3d Cir. 2018).  There the court, relying upon AKS's legislative history rather than the statutory language, found that "resulting from" in the FCA did not require a "but for" causation. However, the Supreme Court has made clear that if the language's meaning is unambiguous when "read in its proper context," *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991), "then, this first canon is also the last: 'judicial inquiry is complete.'" *United States v. Smith* 756 F.3d 1070, 1073 (8th Cir. 2014) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). "[T]he 'cardinal canon' of statutory interpretation is 'that a legislature says in a statute what it means and

the Government must present sufficient evidence of a "but for" causation. There was no evidence at trial that established that but for the alleged kickbacks, the same claims for the same implants would not have been the submitted. The evidence at trial therefore was insufficient to establish an FCA violation, rendering all three counts unsupportable.

For the reasons set forth above, as well as those argued by Defendants in detail in previous briefings, the Government failed to produce sufficient evidence of but-for causation required to supports each of its three claims in this lawsuit. *See* ECF No. 68; ECF No. 84; ECF No. 199; ECF No. 461. Defendants incorporate their prior briefing and argument on this issue by reference herein. For the reasons therein described and those set forth above, Defendants should be granted judgment in their favor with respect to all three counts.[23] Alternatively, the Court should order a new trial so that a jury instruction properly setting forth the "but-for" requirement may be presented to the jury. *See* ECF No. 303 (Defs. Proposed Jury Instructions).

## VIII.   Judgment Should be Entered in Defendants Favor as to Counts II and III as the Government Failed to Introduce Sufficient Evidence Establishing Materiality.

The Government was required to present sufficient evidence that the alleged falsehood or misrepresentation connected to the disputed claims was material to the government's decision to pay them. *See* 31 U.S.C. § 3729(a)(1)(A); *Universal Health Services v. United States ex rel.*

---

means in a statute what it says there.'" *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1012 (8th Cir. 2010) (citation omitted).

[23] As set forth in detail in Defendants' responsive briefing on Plaintiff's Request for Entry of Judgment (ECF No. 444 and ECF No. 450, and incorporated herein by reference) the "but-for" analysis also applies to the question of damages as the FCA provides in pertinent part that a defendant:

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains ***because of*** the act of that person.

*Escobar,* 136 S. Ct. 1989, 2001 (2016). Materiality has been described by the Supreme Court as "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (citation omitted). In the FCA setting, the Court held it is a "rigorous" and "demanding" standard. *Id.* at 2003-04. The jury should have been told the standard is rigorous as Defendants requested. Trial Tr. Vol. IX at 160; Defendants Proposed Instruction 22A. At trial in this case, the issue became whether the alleged AKS violations were/would have been material to the Government's decision to pay the disputed claims. And, with respect to this motion, the issue is whether the Government introduced sufficient evidence of materiality as to the Part A claims at issue.[24] As described below, regarding the claims submitted by the hospital, the Government not only failed to introduce sufficient evidence of materiality- rigorous -, it introduced no evidence of materiality whatsoever.

The analysis of materiality is much different for claims made to the Government by SFMC, as compared to those made by MWN, because there was never an allegation nor any evidence that SFMC took part in or was in any way aware of the AKS violations alleged at trial. Therefore, even assuming (counterfactually) Defendants committed an AKS violation, the claims to the Government (i.e., Medicare) *from SFMC* reflect those made by an innocent third party. And while the Government may argue that Medicare had the right to refuse payment for those claims, that is not a relevant question under the Supreme Court's decision in *Escobar*. Indeed, there the Supreme Court specifically held that it is <u>not</u> "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar,* 136 S. Ct. at 2003.

---

[24] Defendants do not challenge the issue of materiality related to the Part B claims, though Defendants raise several other challenges to the Part B claims.

The Government did not put on *any* witness to testify how an AKS violation would impact the payment decision to be made by the Government – either from Medicare, its agents, or Medicaid. There was evidence that Dr. Fonn and Ms. Seeger signed certifications that indicated that claims *they* filed had to be compliant with the AKS. Nothing in either of those certifications, however, indicated that claims filed with the relevant Government decision maker (e.g., Medicare) by an innocent third party (e.g., SFMC) would be rejected because of underlying AKS violations.

The Government itself has acknowledged that materiality in a civil FCA case should be for the jury to decide.  In *United States ex rel. Marsteller v. Tilton*, No. 16-11997, the Department of Justice submitted to the Eleventh Circuit a brief as amicus curiae.  *See* 2016 WL 4492976. Relying on *Escobar*, the Government argued that "because materiality depends on a holistic assessment, in many cases it is likely to be a determination for a jury." *Id.* at *19 (citations omitted). The Government also cited the Restatement (Second) of Torts § 538 cmt. e (1977), which explained that "the materiality of a misrepresentation will often depend on a jury determination of what is reasonable." *Id.*

More recently, in *Ruckh v. Salus Rehabilitation, LLC*, 2018 WL 3621854, the Department of Justice not only re-emphasized its position that materiality is a jury question, but stated:

> As *Escobar* illustrates, the materiality inquiry is holistic, and no one factor is typically dispositive. For example, while a misrepresentation will not automatically be deemed material as a matter of law solely because the government designated compliance with a particular requirement as a condition of payment, such designations are highly relevant for a factfinder. *Escobar*, 136 S. Ct. at 2003. And *Escobar* identified at least three other factors a factfinder might examine when evaluating materiality: whether the violation goes to the "essence of the bargain," *id.* at 2003 n.5; whether the violation is significant or "minor or insubstantial," *id.* at 2003; *20 and whether the government refused to make payment in this case or others when it had knowledge of similar violations, *id.* at 2003-04.

In the case at bar, the Government did not offer any evidence as to any of these factors.

The Government's failure to call a single witness to testify as to the Government's view of "tainted" claims from an SFMC, an innocent third-party, renders it impossible for the Government to have met the demanding standard of materiality. For the reasons set forth above, as well as those argued by Defendants in detail in previous briefing, the Government failed to introduce sufficient evidence of materiality as to the Part A claims and judgment in the Defendants' favor as to those claims should be entered. *See* ECF No. 199; ECF No. 369; ECF No. 444; ECF No. 450. Defendants incorporate their prior briefing and argument on this issue by reference herein.

IX.    **Judgment Should be Entered in Defendants Favor as to Counts II and III as they Pertain to Claims Submitted by SFMC as the Government Failed to Introduce Sufficient Evidence that SFMC's Claims are False.**

It was the Government's burden – in prosecuting a False Claims Act case – to prove that the disputed claims submitted by SFMC to the Government were, in fact, false.  See *United States ex rel Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 629 (S.D. Ohio 2000) ("[a]t a minimum, the FCA requires proof of an objective falsehood"). As argued by Defendants in detail in previous briefing, the Government failed to produce evidence in either discovery or sufficient evidence at trial of such falsity. *See* ECF No. 68; ECF No. 84; ECF No. 199; ECF No. 414; *see also* Trial Tr. Vol. VIIII at 23-34; Trial Tr. Vol IX at 107-135. More specifically, there was no evidence presented during trial sufficient to allow the jury to find that SFMC certified compliance, implied or otherwise, with the AKS, and therefore there is no evidence that the claims were legally false. Defendants incorporate their prior briefing and argument on this issue

by reference herein. For the reasons therein described, Defendants should be granted judgment in their favor with respect to the claims submitted by SFMC.

**X.     Judgment Should be Entered in Defendants Favor as to Counts II and III as the Government Failed to Introduce Sufficient Evidence that the Primary Purpose of the Alleged Illegal Remuneration was to Induce Referrals.**

As argued by Defendants in detail in previous briefing and in its proposed jury instructions, the Eighth Circuit Model Instructions require that the Government must prove that the alleged illegal remuneration was "primarily to induce referrals." Eighth Circuit Model Instructions, §6.42.1320 (2009). These instructions have been used by the courts in the Eighth Circuit, as well as the United States Attorney's Office for the Eastern District of Missouri. See e.g., *United States v. Yielding*, 657 F. 3d 688 (8th Cir. 2011); *United States v. Zia Iqbal*, 4:15-cr-003432-CPD, ECF No. 43. Moreover, the Eighth Circuit has (at least) twice acknowledged the appropriateness of the "primary purpose" standard.  See *United States v. Iqbal,* 2017 WL 3613335 (8th Cir. August 23, 2017); *United States v. Yielding,* 657 F 3d 688, 708 (8th Cir. 2011), *cert. denied,* 132 S. Ct. 1777 (2012).

In the case at bar, the Court failed to give an instruction requiring the Government to satisfy the "primary purpose" standard. The Government, in turn, failed to present sufficient evidence that the primary purpose of alleged illegal remuneration was obtain referrals. For the reasons set forth in the Defendants' prior briefing and proposed jury instructions (incorporated by reference herein), judgment as to all three counts should be entered in Defendants' favor.  *See* Defendants' Briefing at ECF No. 199 at 23; ECF No. 282; ECF No. 303 (Defs. Proposed Instructions). *See also* Trial Tr. Vol. IX at 145:12-146:19. Alternatively, the Court should order a new trial so that a jury instruction properly setting forth the "primary purpose" standard may be presented to the jury.

XI.    **Judgment Should be Entered in Defendants' Favor as to Counts II and III as the Government Failed to Present Evidence Sufficient to Establish a Violation of the Anti-Kickback Statute Beyond a Reasonable Doubt or by Clear and Convincing Evidence.**

As argued by Defendants in detail in previous briefing and in their proposed jury instructions, the standard of proof for establishing a violation of the Anti-Kickback Statute ("AKS") as a predicate offense for liability under the False Claims Act ("FCA") must be beyond a reasonable doubt (or at least by clear and convincing evidence). Without application of this standard, the jury's finding of FCA violations on the party of the Defendants was unconstitutional. The Defendants briefed this issue in detail in prior briefing, as well as in their proposed jury instructions, all of which are incorporated herein by reference. *See* ECF No. 67, ECF No. 86, ECF No. 199; ECF No. 303 (Defs.' Proposed Instructions) Trial Tr. Vol IX at 137-138. The Court, however, issued an instruction requiring the Government only to satisfy a preponderance of the evidence standard. *See* Final Jury Instructions, ECF No. 422, Instruction Nos. 4, 7, 10, 12, 22, 23, 24, and 26. As set forth elsewhere herein, the Government failed even to satisfy that less-stringent standard and, it follows, also failed to satisfy a beyond a reasonable doubt standard. For the reasons set forth in Defendants' prior briefing, judgment as to all three counts should be entered in Defendants' favor. Alternatively, the Court should order a new trial so that a jury instruction properly setting forth the reasonable doubt standard (or at least by clear and convincing evidence) may be considered by the jury.

XII.    **The Judgment of The Court as a Matter of Law Must be Corrected**

As to Count III, the jury—which had already found in favor of Ms. Seeger as to both Counts I and II—found that Ms. Seeger was liable for zero damages. As to Dr. Fonn, having already found in favor of Dr. Fonn for 218 of the possible 223 claims, found that he also was liable for zero damages. The verdict form, which specifically asked the jury to identify damages

as to each individual defendant, was prepared by the Government. Instruction No. 25, again offered by the Government, instructed the jury "if you find that the defendants violated the FCA, you should determine the amount of damages for which *each defendant may be responsible **as to each question posed in the verdict form**.*" *See* Final Jury Instructions, ECF No. 422 (emphasis added). With all due respect, under such circumstances, the Court cannot impose a multi-million dollar penalty on Dr. Fonn and Ms. Seeger when the jury did not do so. The Defendants briefed this issue and related issues in detail in prior briefing, which are incorporated herein by reference. *See* ECF No. 444; ECF No. 450.

Federal Rule of Civil Procedure 49 addresses the situation where a jury's specific answers (here damage inquiry as to each Defendant) are inconsistent with a general verdict.  The Rule provides only three options for the court: (1) award judgment based on the specific answers, notwithstanding the general verdict; (2) direct the jury to further consider its answers and verdict; or (3) order a new trial. Defendants are not asserting there was an inconsistency. However, Defendants respectfully submit that the Court in its ruling on the Government's motion for judgment actually created an inconsistency. The jury said zero and the Court, at the Government's urging has said $1.6 million. That is inconsistent. Consequently, the Court should either award judgment based on the specific answers or order a new trial.

The case law is full of cases where a verdict came in for the plaintiff, but the jury awarded zero damages. The Seventh Circuit, when confronting this precise issue, held that the District Court either had to respect the jury's findings or interpret a zero damage verdict as in fact a verdict for the defendant.

> As in *Wingerter* the verdict at issue here, (finding for plaintiff, but assessing no damages) appears totally consistent with the evidence. In effect, the jury found that plaintiff experienced a technical violation of his rights, but suffered no damages. *The*

> *only other reasonable construction that could be given the verdict is that it was intended to be a finding for defendant.*

*Joseph v. Rowlen*, 425 F.2d 1010, 1012 (7th Cir. 1970) (emphasis added). The *Wingerter* case referred to by the Seventh Circuit is *Wingerter v. Maryland Cas. Co.*, 313 F.2d 754, 756-57 (5th Cir. 1963), where the Court held:

> To like effect is *Association of Western Railways v. Riss and Company, Inc.*, 1962, 112 U.S. App. D.C. 49, 299 F.2d 133. In that case, civil antitrust action under 15 U.S.C.A. § 1 *et seq.*, the Sherman Anti-Trust Act, the jury held for the plaintiff against five of the defendants and awarded '$None' as damages. The District Court refused to accept the verdict and awarded a new trial. The Court of Appeals (P. 135) reversed, 'The finding that the conspiracy had not damaged the plaintiff was therefore a finding that the plaintiff has not proved its claim,' and remanded for entry of judgment for the defendants under 28 U.S.C.A. § 2106.

*See also Woods v. Wills*, No. 1:03-CV-105 CAS, 2006 WL 521497, at *2 (E.D. Mo. Mar. 2, 2006), aff'd, 225 F. App'x 420 (8th Cir. 2007)("Because the jury rendered its verdict in favor of plaintiff Woods but awarded her no damages, and plaintiff failed to object to the verdict or to request a nominal damage instruction, defendant Wills was entitled to judgment as a matter of law on the battery claim and the Court entered judgment accordingly."); *Ruiz–Rodriguez v. Colberg–Comas,* 882 F.2d 15, 17 (1st Cir.1989) ("A jury's award of zero damages, where such has a rational basis in the record, is commonly viewed as, in effect, a judgment for the defendant."); *Poydock v. Adams Transfer & Storage Co.*, 51 F. Supp. 374, 374 (W.D. Pa. 1943) ("The jury found 'a verdict in favor of the plaintiff, Joseph Poydock, Administrator of the estate of Richard Poydock, dec'd, in the sum of none and against Adams Transfer & Storage Co. a corporation and Henry Poydock, third party defendant.' Despite its rather peculiar form, the verdict can be interpreted only as a finding in favor of the defendant.")

## CONCLUSION

For the reasons set forth above, judgment as a matter of law should be entered in

Defendants' favor as to Counts I, II and III.  In the alternative, a new trial should be ordered as to

Counts II and III.


October 12, 2018                              DOWD BENNETT LLP

                                             By:  */s/ James G. Martin*
                                                  James G. Martin #33586MO
                                                  Edward L. Dowd, Jr. #28785MO
                                                  James F. Bennett #46826MO
                                                  Robert F. Epperson, Jr. #46430MO
                                                  7733 Forsyth Blvd., Suite 1900
                                                  St. Louis, MO 63105
                                                  314/889-7300 (Telephone)
                                                  314/863-2111 (Facsimile)
                                                  jmartin@dowdbennett.com
                                                  edowd@dowdbennett.com
                                                  jbennett@dowdbennett.com
                                                  repperson@dowdbennett.com

                                             CAPES, SOKOL, GOODMAN &
                                               SARACHAN, P.C.

                                             By:  */s/ Sanford J. Boxerman*
                                                  Sanford J. Boxerman #37436MO
                                                  Drey A. Cooley #58784MO
                                                  7701 Forsyth Blvd., 12th Floor
                                                  St. Louis, MO 63105
                                                  314/505-5470 (Telephone)
                                                  314/505-5471 (Facsimile)
                                                  boxerman@capessokol.com
                                                  cooley@capessokol.com

                                             *Attorneys for Deborah Seeger and D.S.
                                             Medical, L.L.C.*

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2018 the foregoing was filed electronically with the

Clerk of Court to be served by operation of the Court's electronic filing system.

<em>/s/ James G. Martin</em>