UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. PAUL CAIRNS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:12 CV 00004 AGF |
| | ) | |
| D.S. MEDICAL, L.L.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND REQUEST FOR A NEW TRIAL**

Plaintiff, the United States of America, opposes Defendants' motion for judgment as a matter of law and request for a new trial (#468) and respectfully requests that the Court deny the motion in its entirety and enter final judgment in accordance with the Court's September 25, 2018 Order (#465).  The centerpiece of Defendants' brief—an argument concerning civil conspiracy—should be squarely rejected.  That argument was never raised at an earlier point in this proceeding, and thus is waived.  Moreover, Defendants' brief ignores the case law specifically addressing FCA conspiracies, which expressly undercuts Defendants' entire theory. Applying the FCA conspiracy body of law to this matter confirms that there is no basis for altering or amending the jury's verdict in any way.

Defendants' challenges to the sufficiency of the evidence are similarly without merit, as the government presented ample evidence at trial to support its conspiracy count.  Defendants also contend that the jury's verdicts under Count I and Count II fatally undermine the Count III verdict.  These arguments are premised on an erroneous interpretation of the government's theories and thus lack merit.  Defendants also rehash previous arguments that were properly

1

rejected by the Court at an earlier stage of the proceeding.  Defendants present no new authority

or reasoning that require the Court to change its rulings on any of these issues.  Accordingly, for

all the reasons stated below, Defendants' motion fails to meet their heavy burden of

demonstrating that no reasonable jury could arrive at these verdicts or that a new trial is required

to prevent a miscarriage of justice.

## ARGUMENT

## I.  Legal Standards

### A.  Rule 50(b)—Motion for Judgment as a Matter of Law

"The law places a high standard on overturning a jury verdict because of the danger that

the jury's rightful province will be invaded when judgment as a matter of law is misused."

*Washington v. Denney*, 900 F.3d 549, 558 (8th Cir. 2018) (citing *Hunt v. Nebraska Public Power*

*Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)).  When ruling on a motion for judgment as a matter

of law, "the district court must:  (1) consider the evidence in the light most favorable to the

prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the

prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to

prove, and (4) give the prevailing party the benefit of all favorable inferences that may

reasonably be drawn from the facts proved."  *Washington*, 900 F.3d at 558-59 (quoting *Haynes*

*v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir. 1996)).  The district court "must deny the

motion if reasonable persons could differ as to the conclusions to be drawn from the evidence."

*Washington*, 900 F.3d at 558-59; *Haynes*, 80 F.3d at 1238 (moving party cannot meet the "heavy

burden" to prevail on a motion for judgment as a matter of law if some witness testimony

supports verdict).  Normally, the district court can only consider evidence favoring the

nonmoving party when ruling on a motion for judgment as a matter of law, and is not to consider

questions of credibility.  *Dace v. ACF Indus., Inc.*, 722 F.2d 374, 376 (8th Cir. 1983).

As such, "[j]udgment as a matter of law is warranted only when no reasonable juror, taking all reasonable inferences in the light most favorable to the opposing party, could find against the movant." *Estate of Snyder v. Julian*, 789 F.3d 883, 887 (8th Cir. 2015).  "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining [the prevailing party's] position." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 863 (8th Cir. 2004); *see also Top of Iowa Co-op. v. Schewe*, 324 F.3d 627, 633 (8th Cir. 2003); *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1194 (8th Cir. 2001).  "The resolution of factual disputes is the very function that juries are asked to perform, and it is not within the province of the district court to replace the jury's reasonable findings with its own." *Hunt*, 282 F.3d at 1030-31.

### B.    Rule 59(a)(1)(A)—Motion for a New Trial

The standard for granting a new trial is higher than the standard for granting a motion for judgment as a matter of law.  *Michigan Millers Mut. Ins. Co. v. Asoyia Inc.*, 793 F.3d 872, 878 (8th Cir. 2015).  The "key question" is "whether a new trial is necessary to prevent a miscarriage of justice." *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 462 (8th Cir. 2013).  Similar to the standard for granting judgment as a matter of law, a district court reviewing a motion for a new trial is "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions" or because the court "feels that other results are more reasonable." *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 186 (8th Cir. 1972) (noting Court has more latitude to order a new trial versus granting a motion for judgment as a matter of law, but that latitude is not unlimited); *see also Bates v. Delmar Gardens North Inc.*, No. 4:15 CV 00783 AGF, 2018 WL 1251828, at *4 (E.D. Mo. Mar.

12, 2018) (denying motion where reasonable minds could differ over the testimony).

A motion for new trial that raises arguments about the jury instructions used at trial should not be granted "unless the errors affected a party's substantial rights . . . . misled the jury, or had a probable effect on the jury's verdict." *Goss Intern. Corp. v. Man Roland Druckmaschinen Aktiengesellschatt*, 434 F.3d 1081, 1093 (8th Cir. 2006) (since all the jury instructions when read as a whole accurately stated the law, no new trial was necessary even if one "intent" instruction was "troubling"); *see also Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006).

## II.     Relevant Factual Background.

When considering Defendants' motion, and the government's opposition thereto, there is an overarching issue which should be kept in mind.  A consistent thread throughout Defendants' brief is their mischaracterization of the government's conspiracy allegations and the jury's verdict on Count III.  Defendants erroneously insist that either Count I or Count II must have served as the underlying and exclusive basis for Count III.  Defs.' Mem. (#469-1) at 3. Therefore, at the outset, it is necessary to examine how Count III can be understood in light of the jury's verdict as a whole, especially when viewing the evidence and drawing all inferences in the government's favor, as must be done at this stage of the case.

At trial, the government presented evidence on three separate and distinct theories under the False Claims Act (FCA).  First, the government argued that Defendants submitted claims and caused claims to be submitted that were false because those claims were tainted by kickbacks that Ms. Seeger offered and paid to Dr. Fonn.[1]  Jury Instr. No. 8 (#422).  Second, the government

---

[1] Throughout this brief, references to "Ms. Seeger" include both Ms. Seeger and her company, DS Medical.  References to "Dr. Fonn" include both Dr. Fonn and his company, Midwest Neurosurgens.

4

presented evidence that Defendants submitted and caused claims to be submitted that were false because they were tainted by kickbacks that were offered and paid to Defendants by two spinal device companies—Amedica and Verticor.  Jury Instr. No. 9 (#422).  Third, the government showed that Defendants reached an agreement to submit or cause the submission of claims to the government that falsely or fraudulently represented compliance with the Anti-Kickback Statute (AKS).  Jury Instr. No. 12 (#422).  Those claims violated the AKS because Defendants solicited or received remuneration from six different spinal device companies, including Amedica and Verticor, in exchange for arranging for or recommending the purchase of products by St. Francis Medical Center for use in Dr. Fonn's surgeries.  Jury Inst. No. 13 (#422).

As discussed in more detail in Section VI, below, Count III is logically distinct and independent from Count I.  Count III focused on the agreement between Dr. Fonn and Ms. Seeger—an agreement to enrich Ms. Seeger with commission revenue based on Dr. Fonn's spinal device choices.  This agreement was not between Defendants and the spinal device companies.  As a result, it was sufficient for the government to show that Defendants entered into such an agreement amongst themselves.  Additionally, that agreement did not require remuneration to pass between Dr. Fonn and Ms. Seeger.  Thus, the jury's Count I verdict has no bearing on its Count III verdict.

Similarly, Defendants improperly conflate Count II and Count III.  The remuneration at issue in Count II was offered or paid by only two spinal device companies—Amedica and Verticor.  That conduct touched only 53 of the 228 claims that were at issue in the case.  *See* Verdict Form, Attachment B (#418-2).  And Defendants' brief consistently minimizes the fact that the jury found Dr. Fonn liable for five of those claims.  *Id.*  By contrast, an additional four spinal device companies were the subject of Court III.  There are 170 claims that were the

subject of Count III, but not included in Count II, in which those other four spinal device companies provided the devices.[2]  With respect to those claims, there was no jury verdict under Count II that could have possibly contradicted or been inconsistent with the jury's verdict on Count III.

## III.    Defendants' New Civil Conspiracy Argument Has Been Waived.

In their latest brief, Defendants' primary argument against the verdict is that a FCA conspiracy claim is only "sustainable" after there has been a finding of liability on an "underlying tort claim," which in this case Defendants argue would be a violation of another provision of the FCA.  To Defendants, a civil conspiracy claim cannot "stand on its own," but rests on the "establishment" of an "underlying claim."  Defendants claim that since the jury found for all Defendants on Count I, and held only two Defendants liable on Count II, the government cannot now recover on the conspiracy count.  *See* Defs.' Mem. (#469-1) at 5-30.

As discussed in Section II, above, Defendants' argument misstates the facts, and confuses and conflates the government's theories of liability.  Further, as discussed in Section IV, below, Defendants' arguments ignore the relevant case law, which contradicts their legal position.  But the Court need not reach the merits on Defendants' "underlying tort" arguments, as Defendants waived them by never presenting them earlier, either in their motions for directed verdict or during the jury instruction conference.

---

[2] Defendants' references to the number of claims that fall into the various categories discussed throughout their brief are inaccurate.  In Section II of the brief, Defendants' refer to 48 claims and then in Section III they refer to the "remaining 180" claims.  Defs.' Mem. (#469-1) at 10, 13.  There are actually 53 claims that were the subject of Count II—on five of which the jury found liability—and an additional 170 claims on which the government sought damages and penalties under Count III.  There are five claims on which the government did not ultimately seek entry of judgment.  *See* Order (#465) at 6 & 7.

A.      **Rules 50(b) & 59 Allow Litigants to** *Renew* **Motions, Not Raise New Legal Arguments.**

Federal Rule of Civil Procedure 50(b) enables litigants to "renew" a motion for judgment as matter of law after verdict that was previously brought under Rule 50(a) before verdict. Accordingly, under Rule 50(b), a litigant's post-trial motion for judgment as a matter of law on any claim may not be entertained unless the movant previously moved for judgment as a matter of law on that same claim at the close of all evidence under Rule 50(a).  *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1061 (8th Cir. 1993) (employer cannot raise new arguments about emotional distress claim in a 50(b) motion after failing to previously challenge that claim under Rule 50(a)).

Fairness prevents litigants from raising new legal issues in a Rule 50(b) motion, as neither the Court nor the opposing party can correct alleged insufficiencies after the jury has deliberated.  *In re Isbell Records, Inc.*, 774 F.3d 859, 867-68 (5th Cir. 2014) (rejecting attempt to "sandbag" court with new Rule 50(b) arguments about multiple assignments of a contract in a contract dispute).  Accordingly, the motion for judgment as a matter of law at the close of the evidence must assert each of the grounds subsequently relied upon in the post-trial motion for judgment as a matter of law.  *Midamar Corp. v. National–Ben Franklin Ins. Co.*, 898 F.2d 1333, 1337 (8th Cir. 1990); *Lowe v. Conlee*, 742 F.2d 1140, 1141 (8th Cir. 1984).

Similarly, motions for a new trial brought under Rule 59 that raise new legal arguments that should have been raised before the jury instructions were finalized, if not much earlier, are not favored.  The movant for a new trial has the burden to show that a new trial is necessary, and the movant cannot meet that burden when it failed to raise jury instructional issues before jury deliberations.  "Such motions cannot be used to introduce new evidence, tender new theories, or raise arguments which could have been offered or raised prior to entry of judgment."  *Briel v.*

7

*Chang O'Hara's Bistro, Inc.*, Civ. 03-6549 RHK/AJB, 2005 WL 827087, at *2 (D. Minn. Apr. 8, 2005) (party that failed to object to a punitive damages instruction before jury deliberations could not later challenge that instruction with a Rule 59(a) motion); *see also Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001) (reversing grant of new trial and stating that it is extremely difficult to "see how holding the defendants to a jury verdict that faithfully followed an instruction and verdict form that they themselves urged upon the court could give rise to a miscarriage of justice"); *Kossman v. Ne. Ill. Reg. Commuter R.R. Corp.*, 211 F.3d 1031, 1038-39 (7th Cir. 2000).

### B.    Defendants' Conspiracy Arguments Were Not Properly Raised Earlier.

Defendants' Rule 50(a) motions raised a wide variety of issues—including challenges to the sufficiency of the evidence as well as legal arguments concerning implied certification and causation.  *See* Trial Tr. Vol. VIII at 23:15-25:21; 30:16-31:21; 34:24-37:4[3]; *see also* Defs.' Mots. (#409, 413, 414, 426); *see also* Gov. Opp'ns (#404 & 411); Order (#442).  But Defendants never raised any "stand-alone," "underlying tort," or "civil conspiracy" arguments, even viewing the motions liberally.[4]  After the verdict, the government filed a motion to impose treble damages and per-claim penalties pursuant to the FCA.  Gov. Mot. for Entry of J. (#429). Defendants filed a lengthy opposition, but did not raise "civil conspiracy" or "stand-alone" arguments.  Defs.' Opp'n (#444).  Instead, Defendants waited to raise their civil conspiracy

---

[3] The trial transcripts are available on the docket at #432-41 & 443.

[4] The government's Complaint in Intervention (#26) in this case did not allege an underlying FCA violation for each claim that was the subject of the FCA conspiracy count.  Defendants filed lengthy Rule 9 and 12 challenges to that Complaint (#68 & 69), but never raised any "stand alone" or "underlying tort" arguments in their motion to dismiss.  *See also* Orders (#97 & 98).  Similarly, Defendants filed a lengthy summary judgment motion raising a number of legal and factual arguments.  But, once again, Defendants never sought summary judgment on the FCA conspiracy count using "stand alone" or "underlying tort" arguments.  Defs.' Mot. for Summ. J. (#198 & 199).  The Court denied Defendants' summary judgment motion.  Order (#277).

arguments until July 13, 2018, roughly eight months after the jury verdict, in their motion for leave to file a supplemental memorandum of law.  Defs.' Mot. for Leave (#462).

Similarly, before the jury deliberated, Defendants never presented any proposed jury instructions that would have made a finding of liability on the FCA conspiracy count contingent upon the finding of an underlying FCA violation.  *See* Defs.' Proposed Instr. (#303).  Further, Defendants failed to offer a verdict form that would have limited the jury's consideration of the FCA conspiracy count unless and until it first found all Defendants liable under Count I or Count II.[5]  Defs.' Proposed Instructions & Verdict Form (#303 & 415).

Instead, Defendants agreed to use modified versions of the Eighth Circuit pattern instructions for criminal conspiracies.  Jury Instr. No. 12 (#422).  These instructions required the jury to find that the co-conspirators reached an agreement to submit or cause the submission of claims that were false because of an AKS violation, that agreement was voluntarily and intentionally joined, the Defendant knew the purpose of the agreement, and that a person or persons who joined the agreement knowingly did one or more acts to carry out the agreement. *Id.*  Defendants never asked for a jury instruction requiring a finding of an underlying substantive offense as an element of the FCA conspiracy.

Other parts of the instructions—again submitted without specific objections from Defendants—more broadly informed the jury that conspirators did not have to actually succeed in accomplishing their unlawful plan.  Jury Instr. No. 14 (#422).  Instead, it was enough that just "one of the persons" joining the agreement took some act to carry out the agreement, as every

---

[5] *See, e.g.*, Eighth Circuit Manual of Model Jury Instructions, Civil, 13.72 (requiring the jury to first find in favor of the plaintiff and further find that an evil motive or intent has been proven before considering or awarding any punitive damages) for an example of such an instruction.  *See also* Defs.' Proposed Verdict Form (#415) (containing various conditional questions and instructions for proceeding).

member of the conspiracy was responsible for the acts of every other member.  Jury Instr. No. 17

(#422).  Finally, the jury was told that each conspirator was liable for each of the acts taken to

carry out the conspiracy even if he or she did not personally commit all the acts.  Jury Instr. No.

19 (#422).  Read together as a whole, Defendants agreed to multiple conspiracy instructions that

are directly inconsistent with their new "stand alone" arguments about civil conspiracies.

On this record, Defendants waived any arguments brought under Rule 50(b) or 59 that

the government must prove a "stand alone" or "underlying tort" element to establish the FCA

conspiracy, or that FCA conspiracy liability required prior jury findings under Count I or Count

II of the verdict form.  Defendants never raised these legal arguments in their earlier Rule 50(a)

motions, and the Court should not consider them now in this motion.  Similarly, Defendants'

failure to raise the putative "stand alone" tortious act requirements before the jury reached its

verdict prevents them from meeting their burden under Rule 59(a) of showing that a miscarriage

of justice existed at trial that should be corrected with a second trial.

Defendants may try to contend that they had no prior occasion to raise such argument, as

they believed a verdict under Count I or Count II could sustain a conspiracy verdict for the

government.  Such an argument would be disingenuous.  As discussed above, the theory

underlying Count III is distinct from the theories underlying Count I, and there are a number of

claims included in Count III that were not a part of Count II.  After receiving the Complaint,

Defendants were fully aware of the government's theories and had many prior opportunities

during this proceeding to raise their civil conspiracy arguments.  As such, the Court should

conclude that Defendants have waived this argument.

## IV.    Liability for an FCA Conspiracy Does Not Require an Underlying FCA Violation.

In any event, Defendants' "stand alone" or "underlying tort" argument fails on the merits.

The centerpiece of Defendants' brief is an argument that that the case law clearly, consistently, and unequivocally holds that a defendant cannot be held liable for a civil conspiracy when there is not also a separate verdict finding an underlying violation of the FCA.  Defs.' Mem. (#469-1) at 5-10.  That is not so.  Courts considering civil conspiracies in both FCA matters and other cases have rejected the requirement Defendants belatedly seek to impose on the statute here.

### A.     An FCA Conspiracy Does Not Require the Government To Prove an Underlying FCA Violation.

Defendants focus on civil conspiracy case law in general tort actions, and overlook the numerous FCA cases in which courts have held that a defendant can be liable for an FCA conspiracy, even where an underlying offense has not be established.  The Fifth Circuit has expressly held that "presentment of a false claim need not be proven nor pled to prevail on a False Claims Act conspiracy charge."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009); *see also Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 828 (S.D.N.Y. 1986) (collecting cases), *aff'd*, 817 F.2d 1007 (2d Cir. 1987).[6]  Other circuit courts, considering other federal statutes, have similarly rejected the argument that a civil conspiracy verdict cannot stand where there is no underlying substantive offense.  *See Ruocco v. Hemmerdinger Corp.*, 711 Fed. App'x 659, 662 (2d Cir. 2017) (affirming a RICO civil conspiracy verdict where the jury had expressly found that the defendants had not engaged in a

---

[6] Some of the cases cited here refer to the version of the conspiracy provision that existed prior to the 2009 amendments to the FCA.  Prior to those amendments, the conspiracy provision imposed liability upon a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."  31 U.S.C. § 3729(a)(3).  The amended conspiracy provision imposes liability upon a person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  31 U.S.C. § 3729(a)(1)(C) (effective May 20, 2009).  The amendments were intended to remove the presentment requirement read into the FCA by the Supreme Court and to make clear that conspiracy liability could attach whenever a person conspires to violate any provision of the FCA.  S. Rep. 111-10, 10-13, 2009 U.S.C.C.A.N. 430, 437-40.

RICO enterprise).[7]

Defendants cite only three FCA cases to support their conspiracy argument.  Defs.' Mem. (#469-1) at 7 n.6.  In each of those cases, FCA conspiracy claims were dismissed pre-trial after the other FCA counts were dismissed.  Those cases have absolutely no bearing on this case at this stage of the proceedings.  In each of those cases, the conspiracy counts were dismissed because the relators had failed to satisfy either jurisdictional or pleading requirements.  *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 506-07 (3d Cir. 2017) (dismissing FCA conspiracy count because, *inter alia*, the defendants' allegations were too speculative and the alleged wrongdoing was not covered by the provisions of the FCA); *In re Plavix Mktg., Sales Practice & Prod. Liab. Litig. (No. II)*, No. CV131039FLWLHG, 2017 WL 2780744, at *15 (D.N.J. June 27, 2017) (dismissing the conspiracy count after the other FCA counts had been dismissed for failure to adequately plead materiality under Rule 9(b)); *United States ex rel. Solomon v. Lockheed Martin Corp.*, No. 3:12-CV-4495-D, 2016 WL 7188298, at *6 (N.D. Tex. Dec. 12, 2016) (dismissing the conspiracy count after the other FCA counts had been dismissed under the public disclosure bar).

All three cases cited by Defendants rely on *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).  Two rely, in particular, on the following quotation:  "In the context of the FCA . . . there can be no liability for conspiracy where there is no underlying violation of the FCA."  *Id.*  But the quoted language does not actually support Defendants' argument that there cannot be liability for an FCA conspiracy unless false claims were in fact

---

[7] The bulk of the federal cases Defendants rely upon involve the interpretation or application of state law. *See Meyer v. Christie*, 634 F.3d 1152, 1157 (10th Cir. 2011) (applying Kansas law to resolve the conspiracy issue).  In the primary case relied upon by Defendants, *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir. 2000), the Third Circuit was predicting how the Pennsylvania Supreme Court would decide the civil conspiracy issue under state law.  In reaching its conclusion, the Court recognized that "there are arguments to the contrary."  *Id.* at 407.

submitted and paid.  *Pencheng* itself cites *United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998), which "dismiss[ed] a conspiracy action because, among other things, the alleged fraudulent actions of defendants were 'entirely lawful' and did not violate the FCA."  *Pencheng*, 71 F. Supp. 3d at 89.  Read in their full and proper context, the *Pencheng* and *Amin* decisions hold that a claim for an FCA conspiracy cannot exist unless *the object* of the conspiracy was to commit an FCA violation.  *See id.*

This holding is in line with well-established legal principles.  It is axiomatic that "[a]n agreement to commit a lawful act by lawful means . . . is not actionable."  *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, No. CIV. A. 94-7316, 2000 WL 1207162, at *11 (E.D. Pa. Aug. 24, 2000), *aff'd on other grounds*, 473 F.3d 506 (3d Cir. 2007).  Consequently, it makes logical sense for a court to dismiss a conspiracy claim once it has concluded that the underlying substantive offenses alleged by the plaintiff actually consisted of lawful pursuits—if the alleged conspiracy is to commit a lawful activity, necessarily a conspiracy to defraud cannot exist.  Here, by contrast, there is no dispute that the underlying conduct, submitting claims tainted by an AKS violation, was wrongful.  *See* 42 U.S.C. § 13720a-7b(g).  "The giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal."  *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998).

Furthermore, multiple courts have expressly rejected an argument that the failure to adequately plead a completed FCA violation defeats a related conspiracy allegation.  *See, e.g.*, *United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 268 (S.D.N.Y. 2014) ("Because conspiracy is an inchoate crime, the plaintiff need not prove that the defendant actually achieved the object of the conspiracy and completed a substantive FCA violation (such as the presentment of a false claim).");  *see also United States ex rel. Griffith v. Conn.*, 117 F.

Supp. 3d 961, 983-84 (E.D. Ky. 2015); *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 123 (W.D. Pa. 2006). For all of these reasons, the cases cited by Defendants in the footnote do not support their position.

### B.     Damages Are Not an Element of an FCA Action.

Case law holding that a civil conspiracy cannot be established without an underlying offense is largely based on the premise that to obtain a recovery on a civil conspiracy verdict, a plaintiff must establish that they were in fact harmed or damaged by the conspiracy. *See, e.g.*, Thomas J. Leach, *Civil Conspiracy: What's the Use?*, 54 Miami L. Rev. 1, 8-10 (Oct. 1999). When setting forth the elements of a civil conspiracy action, the Eighth Circuit repeatedly lists the elements without requiring independent proof of an underlying wrong. *See, e.g.*, *Mizokami Bros. of Arizona v. Mobay Chem. Corp.*, 660 F.2d 712, 718 (8th Cir. 1981); *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir. 1973). But the Eighth Circuit also recognizes that a claim only exists if there is an overt act or wrong done in furtherance of the conspiracy that results in damages. *Rotermund*, 474 F.2d at 1145; *see also Mizokami Bros.*, 660 F.2d at 718 ("[t]he principal elements of [a civil conspiracy] are an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.").

The requirement of damages, however, do not apply to FCA cases. Unlike cases arising under the common law, damages are not a mandatory element of an FCA action. *See* Order (#465) at 7 n.2; *United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1016 (W.D. Mo. 1995) ("civil penalties are recoverable under the FCA even in situations . . . where the United States has failed to show actual damages"), *aff'd without opinion*, 86 F.3d 1159 (8th Cir. 1996); *see also Grubbs*, 565 F.3d at 193; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n.7 (4th Cir. 1999); *United States ex rel. Wilkins v. N. Am. Const. Corp.*, 173 F. Supp. 2d 601,

639 n.33 (S.D. Tex. 2001). Thus, it is also the case that "[p]roof that a false claim was actually

presented to or paid by the government as a result of the conspiracy is not necessary for a

defendant to be held liable for the civil penalty and costs under [the FCA] for each conspiracy

proven." *Blusal Meats*, 638 F. Supp. at 828; *see also Bartlett*, 234 F.R.D. at 123. If it does not

prove an underlying FCA offense, the government will only be entitled to recover penalties, and

not damages, under the conspiracy count.

When the government establishes that the conspiracy was consummated, and false claims

were submitted and paid, then it is entitled to both damages and penalties. *See, e.g.*, *United*

*States v. Bd. of Educ. of City of Union City*, 697 F. Supp. 167, 177 (D.N.J. 1988) ("Once liability

for a conspiracy under the False Claims Act is established, each defendant conspirator is liable

for a penalty and [thrice] the government's damages for each false claim submitted pursuant to

the conspiracy even if he did not personally submit or cause the claim to be submitted."); *see*

*also Kelsoe v. F.D.I.C.*, 724 F. Supp. 448, 453 (E.D. Tex. 1988).

**C.      The Jury Was Properly Instructed on the Elements of a Civil Conspiracy.**

Here, viewing the jury instructions as a whole, the jury was properly charged on the

elements of a conspiracy. The jury was instructed on the elements of the AKS and the FCA; in

particular, the jury was instructed that knowingly submitting or causing the submission to the

government of a false claim for payment would violate the FCA, and that a claim submitted in

violation of the AKS would be a false claim for purposes of the FCA. Jury Inst. Nos. 6 & 7

(#422). With respect to Count III, the jury was informed that the agreement at heart of the

alleged conspiracy was an "understanding to submit or cause the submission of claims for

payment to the government which falsely or fraudulently represented compliance with the Anti-

Kickback Statute." Jury Inst. No. 12 (#422); *see also* Jury Inst. No. 13 (#422). The jury was

then told, properly and without objection, that "[i]t does not matter whether the false or

fraudulent claims were actually submitted or whether the alleged participants in agreement

actually succeeded in accomplishing their unlawful plan."  Jury Inst. No. 14 (#422).  The jury

was also instructed that if Defendants were found liable "[f]or a claim that was false because of a

violation of the Anti-Kickback Statute, the measure of the United States' damages is the full

amount the United States paid out for the claim."  Jury Inst. No. 26 (#422).  Reading these

instructions together, the jury was correctly told that to find for the government on the

conspiracy count, it need not find that Defendants committed a substantive FCA offense; but, to

award damages, it needed to find that false claims were submitted and paid.

> ### D.     The Jury Correctly Applied the Law Governing an FCA Conspiracy.

Viewed in the light most favorable to the government, the jury's verdict represents a

rational assessment of the evidence, and there is no basis for overturning it.  The jury found that

Defendants engaged in a conspiracy with respect to all the claims identified as false in the Count

III verdict.  It appears to have found that the Count III claims can be divided into two categories:

(1) claims that were not only subject to the conspiracy, but were also actually submitted and

paid, resulting in both damages and penalties to the United States, and (2) claims for which there

was no completed FCA violation, only a conspiracy to commit an FCA violation, for which only

penalties can be awarded.  As a result, the government is entitled to all of the damages and

penalties the Court awarded in its September 25 Order and there is no inconsistency between

Counts II and III.

> ### 1.     Because Claims Were Submitted and Paid Pursuant to the Conspiracy, the Judgment Concerning Damages and Penalties is Correct.

The jury found that all of the claims at issue under Count III were the subject of the

conspiracy, and thus the government is entitled to a penalty for each claim.[8]  Moreover, there are numerous indications that the jury found that underlying FCA offenses had been committed with respect to some of the Count III claims, and those underlying offenses support the jury's entire damages award.

The jury expressly found that Dr. Fonn was responsible for five substantive FCA violations.  Verdict Form, Attachment B (#418-2).  All Defendants, as co-conspirators with Dr. Fonn, can be held responsible for the acts he took in furtherance of the conspiracy, including submitting those five claims.  *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 904 (D.C. Cir. 2010); *United States v. Cripps*, 460 F. Supp. 969, 975 (E.D. Mich. 1978); *see also* Jury Inst. No. 19 (#422).

Moreover, the jury awarded the government additional damages under Count III (damages significantly in excess of what it awarded under Count II).  Consistent with the Court's instructions, the jury could have awarded the United States damages against Defendants on Count III only if it concluded that the United States paid some claims that were false under the government's conspiracy theory.  Because the jury awarded the government significant damages on Count III, the Court can easily conclude that the jury determined that false claims were in fact submitted and paid pursuant to the conspiracy.  Furthermore, on Attachment C to the verdict form, the jury expressly stated that all 228 claims listed on the chart were "false claim[s] in violation of the False Claims Act."[9]  Verdict Form, Attachment C (#418-3).  In light of these findings, the jury's Count III verdict can be read to not only have found a conspiracy with respect to all claims at issue, but that that conspiracy was completed and consummated with

---

[8] Except with respect to the five claims that are no longer part of Count III.  *See* note 2, *supra*.

[9] As the Court remembers, the three attachments to the Verdict Form were requested by and drafted by Defendants.  *See* Defs.' Proposed Jury Inst. (#415).

respect to some claims.  Accordingly, the government is entitled to the approximately $1.6 million in single damages awarded by the jury.

### 2.      Count II and Count III Are Not Inconsistent.

The government acknowledges that the jury found for Defendants on some Count II claims that were also the subject of Count III.  For claims that fall into this category, making all inferences in the government's favor, the jury determined that Defendants' entered into a conspiracy with respect to those claims, but that no substantive FCA violation had been completed.  That Count III finding is not inconsistent with the Count II verdict.  It is entirely permissible and supported by the FCA law concerning conspiracy.  It simply shows that the government is entitled to penalties, but not damages, on these claims.  Because the jury awarded the government damages for Count III in an amount less than the total amount the United States paid for all of the claims at issue on that Count, it can be inferred that the jury correctly followed the law and did not award any damages under Count III for the claims on which the jury found no liability on Count II.  Thus, there is no basis for disturbing the jury's award.

* * *

For all of the foregoing reasons, the logical reading of the verdict is that the jury concluded that with respect to some claims that are the subject of Count III, Defendants had in fact submitted or caused the submission of false claims as part of the conspiracy, but with respect to other claims, Defendants only conspired to submit those claims.  Consequently, the United States is entitled to a penalty for each claim at issue in Count III and is entitled to damages in the full amount awarded by the jury.[10]  The jury's verdict can thus be read in a wholly consistent

---

[10] For all of the reasons discussed throughout this brief, Dr. Fonn and Ms. Seeger were both properly found liable for the conspiracy and the damages associated with that conspiracy.  As a result, the intra-corporate conspiracy doctrine is inapplicable here.  *See* Defs.' Mem. (#469-1) at 20-21.

manner, and no adjustment is required to the damages or penalties awarded in the Court's September 25 Order.

**V.   The Government Presented Sufficient Evidence to Sustain the Conspiracy Verdict.**

   **A.   There Was Sufficient Evidence of an Agreement.**

There was ample evidence presented at trial that Ms. Seeger and Dr. Fonn had entered into an agreement to extract lucrative commissions for Ms. Seeger from spinal device companies, based on Dr. Fonn's spinal device choices.  The jury heard that Ms. Seeger only distributed devices to one doctor, Dr. Fonn.  Trial Tr. Vol. II at 27:13-24; Trial Tr. Vol. III at 128:10-16; 176:2-6.  There was also evidence that Ms. Seeger consulted with Dr. Fonn about business issues at DS Medical.  Trial Tr. Vol. III at 200:18-201:11.  For example, Dr. Fonn was involved in negotiating spinal device prices and advised Ms. Seeger on device pricing and her commission rate.  Trial Tr. Vol. II at 40:20-41:17; 43:17-44:18; Trial Tr. Vol. III at 125:3-22; 193:18-198:15; Gov. Exs. 415A, 415B, 603, 604.  It was Dr. Fonn, and not Ms. Seeger, who asked distributors to hire Ms. Seeger.  Trial Tr. Vol. V at 63:8-66:10.

In fact, Dr. Fonn told Ms. Seeger that he would support her and help her get her "business up off the ground."  Trial Tr. Vol. III at 130:3-131:15.  Dr. Fonn followed through on that commitment, switching from Verticor to Amedica products when Ms. Seeger stopped receiving commission payments from Verticor.  Trial Tr. Vol. IV at 34:20-36:8.  He later stated that he did not want to use a company's devices in surgery unless Ms. Seeger had a signed contract in place with that company.  Defs.' Ex. F3.  The government also presented evidence that Dr. Fonn would provide Ms. Seeger advice and direction when she spent DS Medical's commission proceeds.  Trial Tr. Vol. IV at 19:11-22:10; Gov. Ex. 601.  From this evidence, the jury could reasonably infer that Ms. Seeger and Dr. Fonn entered into an agreement to enrich Ms. Seeger

through Dr. Fonn's spinal device choices.

**B.     There Was Sufficient Evidence of Inducement.**

Defendants contend that they are entitled to judgment as a matter of law on Count III

because the government failed to produce evidence of a *quid pro quo* relationship with each

spinal device company.  Defs.' Mem. (#469-1) at 14-20.  They are wrong.

Defendants' argument hinges on the use of the phrase "in exchange for" in the Jury

Instructions.  *See* Jury Inst. No. 13 (#422).  They contend that the jury had to find that

Defendants' solicitation and receipt of remuneration from the six device companies was "in

exchange for" arranging for St. Francis to purchase the companies' devices.  It is unclear if

Defendants are suggesting that the government must prove that a *quid pro quo* agreement existed

between Defendants and each company, or that the company had to be aware of the agreement

between the Defendants to solicit kickbacks from the company.  Either way, they are wrong, as

evidenced by the absence of any legal authority in support of their arguments.

The AKS requires no proof that Defendants had a *quid pro quo* arrangement with

the companies.  As a district court recently stated:

> [A] claim is false if it seeks reimbursement for a prescription that
> was not provided in compliance with the Anti-Kickback Statute,
> regardless of whether the claim was the result of a *quid-pro-quo*
> exchange or would have been submitted even absent the kickback.
> Relators need not show that a *quid pro quo* exchange occurred, or
> that the physicians would not have prescribed Defendant's
> medication but for the kickbacks. It is sufficient to show that
> Defendant paid kickbacks to a physician for the purpose of inducing
> the physician to prescribe specific drugs, and that the physician then
> prescribed those drugs, *even if* the physician would have prescribed
> those drugs absent the kickback.

*United States ex rel. Bawduniak v. Biogen Idec, Inc*., No. 12-CV-10601-IT, 2018 WL 1996829,

at *3 (D. Mass. Apr. 27, 2018) (internal citation omitted) (emphasis in original); *see also* Ex. A

(*United States ex rel. Fesenmaier v. The Cameron-Ehlen Group, Inc.*, No. 13-CV-03003 (ECF #152) (D. Minn. Oct. 22, 2018) (noting that the Eighth Circuit has not adopted a *quid pro quo* requirement for AKS violations)).  As the Ninth Circuit has similarly stated, there is no "basis in the statute, case law, or legislative history to require an agreement to refer program related business."  *Hanlester Network v. Shalala*, 51 F.3d 1390, 1396-97 (9th Cir. 1995) (internal citation omitted).

This argument is supported by the statutory text.  The AKS sets forth two types of violations.  *Compare* 42 U.S.C. § 1320a-7b(b)(1) *with id.* § 1320a-7b(b)(2).  Subsection (b)(1) criminalizes the solicitation or receipt of a kickback.  By contrast, subsection (b)(2) makes it a crime to offer or pay a kickback.  Each side of a kickback transaction is therefore separately, and independently, criminalized—it is illegal for an individual to solicit or receive a kickback, regardless as to whether the other participant in that transaction has satisfied all the elements of the statute.  While the two offenses have different elements of proof, one of the factors they have in common is intent.  Thus, for a violation of soliciting or receiving a kickback, the focus is on the intent of the solicitor or recipient.  Proof of the intent of the payor of the kickback is not an element of the crime of soliciting a kickback.  By arguing that an "innocent payment" of commissions by spinal device companies to a distributor cannot give rise to an AKS and FCA violation, Defendants are improperly conflating two distinct subsections of the AKS.

Since the AKS does not require proof of a *quid pro quo* arrangement, it seems illogical to nonetheless require proof that the payor of a kickback was aware of the intent possessed by the solicitors of the kickback.  Neither Congress nor the courts have imposed any such requirement, and for good reason.  As explained in more detail below, the AKS is violated if "one purpose" of the remuneration was to induce or reward referrals.  Section VIII.E, *infra*.  The kickback payor's

lack of awareness of the kickback solicitor's intent has no bearing on the solicitor's intent.

Regardless, there is evidence of the six device companies' knowledge of the romantic relationship between Dr. Fonn and Ms. Seeger and the impact that relationship would have on the sales of their devices.  Based on this evidence, it would be reasonable for a jury to infer that the six companies identified in Count III were in fact at least tacitly aware of the agreement between Defendants and willing to pay commissions to Ms. Seeger because of her unique relationship with Dr. Fonn.

Dr. Fonn and Ms. Seeger made no efforts to conceal the nature of their relationship.  For example, Ms. Seeger and Dr. Fonn traveled together to Amedica's corporate headquarters in Utah.  Ms. Seeger also testified at trial that while in Utah, she spoke by phone with counsel for Amedica.  Among other things, they discussed Ms. Seeger's relationship with Dr. Fonn, including the fact that Ms. Seeger was Dr. Fonn's fiancée.  *See* Trial Tr. Vol. IV at 236:11-238:5. Ms. Seeger testified that she and Dr. Fonn later met with the Amedica Chief Executive Officer for dinners at restaurants in Cape Girardeau.  *See id.* at 26:10-27:9.

Dr. Fonn and Ms. Seeger's openness about the nature of their business and personal relationships caused concern.  Christopher Canis, an employee of Verticor, testified about a memo he prepared addressing a number of business vulnerabilities confronting Verticor at the time.  In the memo, referring to Dr. Fonn and Ms. Seeger, Canis noted:  "They live together, work out of the same office, use the same fax, etc. etc. etc.  Their relationship is well known by numerous people in the industry – many of whom are alarmed at the lack of discretion that Fonn and Deb Seeger show in regards to their business and personal relationship."  *See* Gov. Ex. 80, p. 5.  Canis further testified that he became aware of the Fonn-Seeger relationship because it was something "people within in the spinal industry" were talking about and were alarmed by.  *See*

22

Trial Tr. Vol. II at 147:6-148:22.

Ms. C.J. Rickstrew was a Clinical Education Manager for LifeSpine, Inc.  She testified that in approximately June 2009, she was told by her boss that LifeSpine had hired DS Medical as a new distributor.  Ms. Rickstrew traveled to Cape Girardeau several times, occasionally having dinners with Dr. Fonn and Ms. Seeger during which she learned that Ms. Seeger worked in Dr. Fonn's office, and that they were engaged.  *See* Trial Tr. Vol. II at 217:1-218:16.

Mr. William Tegel was the Director of Materials Management at St. Francis between 2009 and 2012.  In that capacity he knew Dr. Fonn and Ms. Seeger and became aware that they were engaged.  *See* Trial Tr. Vol. II at 30:12-21.  Also of note is an email from Mr. Tegel to Ms. Seeger concerning a call about DS Medical's prices that he had with Derek Holland, an employee of Omni/Spine 360.  *See* Gov. Ex. 619.  Mr. Tegel notes in the emails that "Derek proceeded to argue with me regarding the Stark Laws," a strong indication that Mr. Holland was aware of the romantic relationship between Ms. Seeger and Dr. Fonn.  Mr. Tegel also testified that the romantic relationship between Dr. Fonn and his spinal device distributor did not look good, and that he and the hospital's lawyers were immediately concerned about Dr. Fonn being compensated in any way from DS Medical.  *See* Gov. Exs. 602 & 603.

Mr. Chad Underhill testified that he first met Dr. Fonn and Ms. Seeger when he was directed by his employer at LifeSpine, Chris Cochoran, to travel to Cape Girardeau to meet with a potential new distributor.  Cochran also told Underhill that Dr. Fonn and Ms. Seeger were engaged.  Within a very short period after he first traveled to Cape Girardeau, Mr. Underhill left LifeSpine and began working for Verticor.  He continued to sell implants on behalf of Verticor to St. Francis through DS Medical.  After working for Verticor for approximately a year Mr. Underhill left to form a new company, Ethical Medical, with two partners.  Although Mr.

Underhill was not directly involved, Ethical Medical sold implants to St. Francis through DS Medical. *See* Trial Tr. Vol. II at 92:22-94:8, 119:4-122:14.

Ms. Seeger and Mr. Underhill also testified about a time period in which Dr. Fonn briefly changed his mind about using DS Medical. Dr. Fonn heard that Mr. Underhill and Ms. Seeger were seen eating out together in Cape Girardeau, believed they might be having an affair, and threatened to end both his personal and professional relationship with Ms. Seeger. Trial Tr. Vol II at 100:2-101:22; Trial Tr. Vol. III at 131:16-134:13. This resulted in Ms. Seeger writing an email to Mr. Underhill informing him "there will be no cases with DS Medical" and Dr. Fonn "will no longer be using DS Medical as his distributor." Gov. Ex. 404; Trial Tr. Vol. II at 100:10-16. Eventually, Dr. Fonn learned there was no romantic relationship between Ms. Seeger and Mr. Underhill, and Ms. Seeger and Dr. Fonn patched up their differences. Trial Tr. Vol. III at 134:7-13. Once their romantic relationship was repaired, Dr. Fonn continued to obtain devices through DS Medical. *Id.* From this testimony, it was not only shown that Dr. Fonn and Ms. Seeger's romantic relationship impacted their professional one, but that spinal device representatives were aware of that connection.

Several other witnesses testified about their knowledge of the Fonn-Seeger relationship, providing further proof of a widespread awareness of the relationship. Greg Martin was employed by St. Jude Medical selling spinal stimulators. He testified that when Dr. Fonn asked him to sell the stimulators to St. Francis through DS Medical, he refused to do so because of his awareness of the romantic relationship between Ms. Seeger and Dr. Fonn and a related concern about possible AKS violations. *See* Trial Tr. Vol. II at 79:15-22, 82:19-86:21. Mr. Jerry Huber sold spinal implant products for Globus Medical, Inc. He was invited to dinner at the home shared by Dr. Fonn and Ms. Seeger, who he knew to be Dr. Fonn's fiancée. At one point, Dr.

Fonn asked if Huber would hire Seeger as his sales representative.  As Mr. Huber testified, "[W]ell, I said I thought Ms. Seeger was a nurse practitioner in gynecology.  And he said no, she's a distributor, she sleeps with me."  *See* Trial Tr. Vol. V at 63:9-64:3.

In sum, although not legally necessary to support the jury's conspiracy verdict, for each of the spinal device companies at issue in Count III, there was either direct or circumstantial evidence that the company was aware of the romantic relationship between Dr. Fonn and Ms. Seeger.[11]  From that fact, the jury could reasonably infer that the spinal device companies were also aware that Dr. Fonn and Ms. Seeger's romantic relationship impacted their business relationship, as it did when Dr. Fonn briefly ceased using DS Medical because of Ms. Seeger's suspected relationship with Mr. Underhill.  Based on this evidence it was perfectly reasonable for the jury to conclude that the spinal device companies were aware of Defendants' intent when soliciting kickbacks.

### C.    There Was Sufficient Evidence of Willfulness.

Defendants also argue that the government failed to adduce sufficient evidence that the Defendants acted willfully in soliciting remuneration from the six companies.  Defs.' Mem. (#469-1) at 26-30.  Once again, Defendants overlook the abundant evidence the government introduced at trial establishing willfulness.

The AKS's "knowingly and willfully" element requires a defendant to know that the conduct was wrongful.  *United States v. Jain*, 93 F.3d 436, 440-41 (8th Cir. 1996).  In both civil and criminal cases, "circumstantial evidence can demonstrate willfulness" and is "just as probative as direct evidence."  *United States v. Hirani*, 824 F.3d 741, 747 (8th Cir. 2016); *see*

---

[11] No direct evidence was submitted regarding Genesys' knowledge of the relationship.  But the jury could infer that Genesys representatives knew of the relationship, given the evidence of the widespread knowledge of Ms. Seeger and Dr. Fonn's relationship throughout the industry.

*also United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.*, No.

4:12CV00848 AGF, 2013 WL 4666338, at *4 (E.D. Mo. Aug. 30, 2013).  As the Eighth Circuit

has noted, "Willfulness . . . may be inferred from circumstantial evidence. . . .  Ordinarily, it is

reasonable to infer that a person intends the natural and probable consequences of conduct

knowingly undertaken or knowingly omitted."  *United States v. Wetzel*, 514 F.2d 175, 177-78

(8th Cir. 1975).

In support of their request for judgment, Defendants suggest that in soliciting

remuneration from the six spinal device companies, Ms. Seeger was simply doing what medical

device distributors do in the regular course of business, trying to earn commissions.  Defendants

contend that proof of willfulness cannot be based on Ms. Seeger's desire to make a profit or from

the mere fact that Ms. Seeger was Dr. Fonn's fiancée.[12]

In making this argument, Defendants again misconstrue and ignore the evidence that was

presented at trial.  The government's evidence was not limited to the fact that Ms. Seeger was

Dr. Fonn's fiancée, or that she approached spinal device companies seeking to earn commissions

by being a local distributor of their product.  Instead, the government's theory was based on the

agreement reached between Dr. Fonn and Ms. Seeger to use Dr. Fonn's ability to select which

devices to utilize in his surgeries, thereby enriching his fiancée through the commissions she

would earn as the local distributor.

There was ample evidence adduced at trial to support the jury's conclusion that Dr. Fonn

and Ms. Seeger reached an agreement.  *See* Section V.A, *supra*.  At trial, Ms. Seeger testified

that Dr. Fonn was willing to support her business.  Trial Tr. Vol. III at 130:3-131:15.  Dr. Fonn

---

[12] Defendants also state that a finding of willfulness cannot be based Ms. Seeger sharing commission
revenue with Dr. Fonn.  As explained throughout, the government is not relying on such evidence.

and Ms. Seeger were also repeatedly educated about the requirements of the AKS, and how it applied to DS Medical, by their attorney, Jim Fogle. *See, e.g.*, Defs.' Ex. V1 ("Memorandum Concerning Stark and Anti-Kickback Analysis"). Viewed in the light most favorable to the government, the Count II verdict against Dr. Fonn indicates that the jury found that he did not follow legal advice regarding using Amedica implants on Medicare patients at the same time as he was an investor in the company. Taken in its entirety, the record evidence provides an ample basis for a jury to find that Defendants knowingly and willfully entered into an agreement to violate the AKS. What they did was not permitted by the AKS, and the jury reasonably determined they willfully ignored their counsel's admonitions.

## VI.    The Count I Verdict Does Not Undermine the Count III Verdict.

Defendants also argue that because the jury found no Defendant liable under Count I, the verdict on Count III must be overturned. Defs.' Mem. (#469-1) at 21-26. Defendants' argument should be rejected because it misunderstands the government's Count III theory.

Under Count III, the government asked the jury to focus on the understanding reached by Dr. Fonn and Ms. Seeger, and to consider the actions taken by them as part of their compact. The agreement entered into by Ms. Seeger and Dr. Fonn was an agreement to enrich Ms. Seeger with commission revenue based on Dr. Fonn's spinal device choices. Once Defendants entered into that agreement, they were jointly responsible for the acts they each individually took to effectuate the AKS violation underlying the conspiracy. In furtherance of the conspiracy, Ms. Seeger received valuable commissions from spinal device companies. And Dr. Fonn restricted his selection of spinal devices to those companies who provided commissions and other benefits to Ms. Seeger. It was not necessary for Dr. Fonn to receive any remuneration directly or indirectly from Ms. Seeger or the spinal device companies in order for him to be liable for

participating in the conspiracy.  *See* Jury Inst. No. 19 (#422).

Defendants contend that the government cannot prevail under Count III unless it proved that Ms. Seeger shared remuneration with Dr. Fonn in violation of the AKS.  Proof of that fact, however, was not necessary for the conspiracy to have functioned or been consummated.[13]  The heart of the conspiracy count was the *agreement* between Ms. Seeger and Dr. Fonn to solicit lucrative commission payments for Ms. Seeger from device companies based on Dr. Fonn's willingness to use those companies' devices in his surgeries, whether or not Dr. Fonn directly benefited from those commission payments.  *See United States ex rel. Nehls v. Omnicare, Inc.*, No. 07-C-05777, 2013 WL 3819671, at *16 (N.D. Ill. July 23, 2013) (an AKS violation can exist when the benefit flows not to the referral source, but rather to a member of his family).  The jury's rejection of Count I did not prevent it from concluding that the government's alternative, complementary theory was correct and that Defendants had entered into an agreement to extract valuable remuneration from various spinal device companies.  The jury was presented with ample evidence from which it could infer that Defendants' had such an understanding.[14]  *See* Section V.A, *supra*.

Defendants' argument also relies upon an incorrect understanding of the requirements to establish a civil conspiracy under the FCA.  As discussed in Section IV, above, no substantive

---

[13] Defendants' selective quotations from the government's opening statement do not further their argument.  In its opening statement, the government described two separate ways in which remuneration could flow.  The first involved commissions received by Ms. Seeger flowing directly to Dr. Fonn. Trial Tr. Vol. I at 4:19-23.  The second involved benefits flowing from spine companies to Ms. Seeger based on Dr. Fonn using the companies' devices.  *Id.* at 4:24-5:8.  The government distinguished the two theories, and when describing its second theory did not assert that the commissions had to flow all the way to Dr. Fonn.  Defense counsel did not object to these statements during the open statement.

[14] Defendants devote significant attention to arguments the government could have made at trial, but did not.  Defs.' Mem. (#469-1) at 22 n.14.  Those points are irrelevant.  At this stage of the proceedings, the focus is on the record evidence, and any reasonable inferences that can be drawn in the government's favor from that evidence.

FCA liability finding was required to support the conspiracy verdict.  Nevertheless, the jury's

Count III verdict demonstrates that the jury found underlying FCA violations with respect to

some claims under that theory.  *See* Section IV, *supra*.  The jury's Count I conclusion has no

bearing upon, and does not require that the Court invalidate, the Count III verdict.

## VII.   The Count II Verdict Does Not Undermine the Count III Verdict.

The Court should squarely reject Defendants' contention that the jury's verdict on the 53

claims that were the subject of Count II fatally undermines the jury's verdict on Count III.

Defs.' Mem. (#469-1) at 10-13.  The claims that were the subject of both Counts II and III can be

divided into two categories—the five on which the jury found Dr. Fonn liable and the remaining

48 claims.  These two categories of claims will be considered in turn.

### A.   The Jury's Finding of Liability on Five Count II Claims Supports the Count III Verdict.

The jury undeniably found that Dr. Fonn committed an underlying FCA violation with

respect to five of the claims at issue in Count II.  Verdict Form, Attachment B (#418-2).

Therefore, even if Defendants were correct that civil conspiracy liability required an underlying

substantive offense, there is an underlying FCA violation to support the Count III verdict with

respect to these five claims.  The verdict against Dr. Fonn under Count II is sufficient to support

the conspiracy verdict against all Defendants, even those Defendants who did not submit or

cause claims to be submitted themselves. *See Miller*, 608 F.3d at 904; *Cripps*, 460 F. Supp. 969.

The entire purpose of conspiracy liability is to enable the government to hold each member of a

conspiracy jointly liable for all of the overt acts taken pursuant to the conspiracy, even if a

particular conspirator did not take a particular action him or herself.  Consequently, Defendants

cannot credibly argue that Count II and III are at odds or that there is not an underlying FCA

offense sufficient to support the conspiracy damages award with respect to these five claims.

Instead, Defendants contend that the five claims cannot support the Count III verdict because the government proceeded under a different theory with respect to these five claims.  At trial, the government presented evidence that Dr. Fonn purchased stock in Amedica, and then used Amedica devices on Medicare beneficiaries.  Trial Tr. Vol. VIII at 152:6-165:7; Gov. Exs. 354, 522, 524, 525.  Those devices were distributed by Ms. Seeger.  Trial Tr. Vol. VI at 173: 6-10 (stipulating that Ms. Seeger provided devices for all surgeries at issue in this case); Gov. Ex. 880.  Defendants state that the stock purchase is fundamentally different from the government's other contentions concerning the conspiracy, but they do not clearly explain why that means the stock purchase could not be part of the conspiracy.  Because they fail to explain this argument, it should be summarily rejected.

Nevertheless, a reasonable jury could have concluded the stock purchase was part of the conspiracy.  The purpose of the conspiracy was to enrich Ms. Seeger.  She was enriched through commissions received from spinal device companies, including Amedica.  Dr. Fonn's purchase of Amedica stock meant he was more likely to keep using Amedica products, which would send valuable commission dollars to Ms. Seeger's company.  Ms. Seeger also attended dinner with Dr. Fonn and Amedica representatives, around when Dr. Fonn first began considering purchasing the stock.  *Compare* Gov. Ex. 44C (receipts for dinner Ms. Seeger attended with Amedica officials, dated November 2, 3, and 4, 2009) *with* Gov. Ex. 354 (Dr. Fonn's email to Mr. Fogle inquiring about stock purchase, dated November 11, 2009); *see also* Trial Tr. Vol. VIII at 151:24-152:16 (Dr. Fonn testifying about the dinner and email to Mr. Fogle) & 161:20-162:7 (Dr. Fonn testifying that he first tried to purchase the stock in December 2009).  Ms. Seeger's commission rate from Amedica was also increased shortly after that dinner.  Gov. Ex. 463.  The jury

30

therefore could have concluded that the couple jointly negotiated with Amedica, and thus that Dr. Fonn's stock purchase fell within the scope of the conspiracy.

Defendants' only effort to argue that the evidence against Dr. Fonn was insufficient to sustain the verdict as to these five claims appears in a footnote. Defs.' Mem. (#469-1) at 12 n.8. In that footnote, Defendants' cursorily argue that the government failed to properly disclose during discovery that the Amedica stock purchase was a form of remuneration.[15]  The evidence concerning the Amedica stock was properly admitted as evidence of illegal remuneration. Federal Rule of Civil Procedure 26(e)(1) requires a party to supplement its interrogatory responses "if the party learns that in some material respect the disclosure or response is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). As the government detailed in argument before the Court, it updated its discovery responses to put Defendants on notice concerning this form of remuneration. *See generally* Trial Tr. Vol. X at 96:13-98:25; 100:6-101:20. Even if the government had not properly updated its discovery responses, Defendants were otherwise made aware of the relevant information during discovery.

The relevant interrogatory asked the government to "[i]dentify each and every spinal implant manufacturer which the Government claims provided Dr. Fonn or Ms. Seeger with illegal remuneration, identifying what was the illegal remuneration, when it was provided, and the documents . . . which support the claim." Ex. A. In its initial response, the government listed

---

[15] Defendants did not file a motion in limine seeking to exclude this evidence prior to trial. And, as the Court correctly pointed out when Defendants belatedly raised this issue shortly before closing arguments, there was no objection or request for a limiting instruction when the evidence was admitted at trial. Trial Tr. Vol. X at 87:3-9. In fact, as discussed below, defense counsel introduced exhibits concerning the Amedica stock purchase during the direct examinations of both Dr. Fonn and Mr. Fogle.

Amedica as one of the spinal implant manufacturers, but it did not specifically list the Amedica

stock purchase as a form of remuneration.  *Id.*  The government, however, regularly

supplemented its responses to Defendants' interrogatories.  In its sixth supplemental response,

the government "refer[ed] defendants to the deposition testimony from and exhibits used during

the deposition of Dr. Fonn, Ms. Seeger, and Mr. Fogle."  *Id.*

During those depositions, the government asked a variety of questions about the stock

purchase and showed the witnesses numerous exhibits related to that transaction.  Ex. C (Fonn

Dep.) at 198:14-222:6 (discussing, *inter alia*, Gov. Exs. 354, 522, 524, 525); Ex. D (Fogle Dep.)

at 201:2-208:14 (discussing, *inter alia*, Gov. Ex. 354).  For example, during the depositions of

Dr. Fonn and Mr. Fogle, the government questioned both witnesses about an email exchange in

which Mr. Fogle advised Dr. Fonn to avoid investing in Amedica because such investments "are

coming under increasing scrutiny and would represent a . . . Anti-Kickback violation if you

subsequently purchased any Amedica products . . . for use on Medicare or Medicaid patients."

Ex. D (Gov. Ex. 354).  This was the very same document used by the government when

questioning Dr. Fonn and Mr. Fogle at trial about the Amedica stock purchase after Defendants

had themselves introduced the document into evidence.  *See* Trial Tr. Vol. VIII at 152:6-160:1

(government cross-examination of Dr. Fonn concerning Gov. Ex. 354); *id.* at 125:12-132:14 (Mr.

Martin's introduction of Gov. Ex. 354 during his direct examination of Dr. Fonn); Trial Tr. Vol.

IX at 100:15-101:15 (government cross-examination of Mr. Fogle); *id.* at 49:14-52:15 (Mr.

Martin questioning Mr. Fogle about Gov. Ex. 354 during his direct examination).  Many of the

other exhibits the government relied upon at trial when questioning Dr. Fonn about the stock

purchase were also used as exhibits during his deposition.[16]  The lines of questioning during the depositions made clear that the government viewed the stock purchase as a form of remuneration.[17]  There was no error in the Court's admission of the evidence at trial.

**B.  The Jury's Verdict on the Remaining 48 Count II Claims Does Not Undermine the Count III Verdict.**

For the reasons discussed in Section IV.D.2, above, the jury's verdict on Count II does not contradict the verdict on Count III with respect to the remaining claims at issue in Count II, those for which the jury found no Defendants liable.

Additionally, as the evidence clearly demonstrated at trial, Dr. Fonn often used devices from more than one company during a given surgery.  *See, e.g.*, Gov. Exs. 881 & 882. Specifically, with respect to 14 of the 48 claims on which the jury found for Defendants on Count II, Dr. Fonn not only used an Amedica or Verticor device, but he also used a device from one of the four other companies at issue in Count III.  *See, e.g.*, Gov. Ex. 881, Unique ID #2 (showing that Dr. Fonn used both a Verticor and LifeSpine device in this surgery).[18]  As a result, for 14 of these 48 claims, although the jury did not find that a substantive FCA violation had occurred with respect to kickbacks paid by Amedica or Verticor, it could have concluded that claims were submitted and paid that were false because they were tainted by kickbacks paid by

---

[16] *See also* Trial Tr. Vol. VIII at 160:5-161:2 (discussing Gov. Ex. 522); *id.* at 161:4-162:7 (discussing Gov. Ex. 524); *id.* at 163:23-165:7 (discussing Gov. Ex. 525).

[17] The government's opposition to Defendants' motion for summary judgment also "otherwise . . . made known . . . in writing" to Defendants that the government considered the stock purchase to be a form of remuneration.  Courts have expressly held that statements made during the summary judgment process can satisfy Rule 26(e).  *See, e.g.*, *Westefer v. Snyder*, 422 F.3d 570, 583-84 (7th Cir. 2005).  The government's opposition to Defendants' motion for summary judgment clearly set forth this theory of remuneration, and described the relevant evidence supporting it in detail.  *See, e.g.*, Gov. Opp'n to Defs.' Mot. for Summ. J. (#216) at 36; Gov. RSUMF (#215) at ¶¶ 142, 189, 193, 200, 344-48.

[18] These surgeries are identified by the following Unique ID numbers on Gov. Ex. 881:  2, 4, 5, 53, 72, 73, 74, 76, 77, 78, 79, 80, 81, and 82.  Devices from other companies were also used in three of the surgeries for which the jury found liability under Count II:  83, 111, and 119.

one of the four other companies.  Thus, at most, there are only 34 claims for which the jury

found that Defendants entered into a conspiracy, but no underlying violation was committed.

## VIII.   Defendants' Remaining Arguments Have Been Repeatedly and Correctly Rejected By the Court, and Should Once Again Be Rejected.

Defendants repeat a series of arguments that have been correctly rejected by the Court in

its previous Orders.  The Court should once again deny Defendants' motions.

### A.     Defendants' But-For Causation Argument is Without Merit.

Defendants once again argue that the use of the phrase "resulting from" in the AKS

injects a more stringent but-for causation requirement to establish falsity under the FCA.  Defs.'

Mem. (#469-1) at 30-34.  The government responded to this argument in numerous prior filings,

*see* Gov. Opp'n to Defs.' Mot. to Dismiss (#78-1), Gov. Opp'n Defs.' Mot. for Summ. J. (#216),

Gov. Opp'n Defs.' Mot. in Limine, (#360), and Gov. Reply on Mot. for Entry of J. (#449), all of

which are hereby incorporated.  On all four occasions, this Court rejected Defendants'

arguments.  *See* Orders (#97, 277, 387, 465).  It should do so again.

As the government has repeatedly noted, Defendants' but-for argument is based on a

fundamental misunderstanding of the 2010 amendment to the AKS.  That amendment, codified

at 42 U.S.C. § 1320a-7b(g), provides that "a claim that includes items or services resulting from

a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  The

legislative history of the 2010 amendment shows that Congress intended "to strengthen," rather

than to curtail, "fraud enforcement."  *See* 155 Cong. Rec. S10852, 10854 (2009).

Numerous courts have rejected arguments similar to the one Defendants make here, after

reviewing the legislative history behind the 2010 AKS amendment.[19]  In fact, the Third Circuit

---

[19] *See also United States v. Luce*, 873 F.3d 999, 1014 (7th Cir. 2017) (Recognizing that a number of sister circuits have "adopted the common-law understanding of foreseeable, or proximate, causation with respect to the imposition of liability and damages under the FCA" rather than a "but for" causation test.);

recently rejected the precise arguments Defendants seek to advance here.  *See, e.g.*, *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 95-98 (3d Cir. 2018).  Taken together, the AKS's legislative history and these cases clearly establish that a claim triggers liability under the FCA if it is linked to or tainted by a kickback violation.  The government is not required to show either that the items or services were, in fact, medically unnecessary, that the services would not have been provided "but for" the kickbacks, or that the kickbacks actually "succeeded" in inducing referrals.

Defendants' reliance on the Supreme Court's interpretation of the statutory phrase "resulting from" in *Burrage v. United States*, 134 S. Ct. 881 (2014), and the phrase "by reason of" in *Husted v. A. Phillip Randolph Institute*, 138 S. Ct. 1833 (2018), is misplaced.  In both instances, the phrases were interpreted in the context of a particular statute.  *Burrage* involved the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and *Husted* the National Voter's Registration Act, 53 U.S.C. § 20501 *et seq*.  In both instances, the Court undertook an analysis of the legislative intent underlying the applicable statute when construing the meaning of the aforementioned phrases.  Thus, the *Burrage* and *Husted* cases are inapplicable in this FCA action premised upon a violation of the AKS.  In fact, in *Husted*, the Court specifically stated that the phrase "by reason of" (taken to be a formal way of saying "because of") did not mean but-for causation under the National Voter's Registration Act.  *See Husted*, 138 S. Ct. at 1842-43.

Despite a complete lack of support, Defendants continue to argue that the government has

---

*United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 n. 19 (3d Cir. 2011); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 331-335 (S.D.N.Y. August 7, 2014); *United States ex rel. Brown v. Celgene Corp.*, No. CV 10–3165–GHK (SSx), 2014 WL 3605896 at *8 (C.D. Cal. July 10, 2014); *United States ex rel. Williams v. Health Management Assoc., Inc.,* No. 3:09–cv–130 (CDL), 2014 WL 2866250 at *11 (M.D. Ga. June 24, 2014); *United States ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 51-52 (D. Mass. 2014);  *United States ex rel. Parikh v. Citizens Medical Ctr.*, 977 F. Supp. 2d 654, 664 n.3 (S.D. Tex. 2013); *United States ex rel. Westmoreland v. Amgen, Inc.,* 812 F. Supp. 2d 39, 52-53 (D. Mass. 2011).

failed to introduce sufficient evidence to prove but for causation.  Even if a but-for causation

showing were required, the evidence presented in this case meets that standard.  The evidence

adduced at trial demonstrated that Defendants devised a business model trading on Dr. Fonn's

ability to select which devices he would use during his surgeries.  More specifically, there is

ample evidence that Dr. Fonn's selection of spinal devices was contingent upon the companies'

willingness to pay generous commission rates to Ms. Seeger.  For example, the jury was told

about an email written by Ms. Seeger to her attorney in which she states, "Dr. Fonn doesn't want

to [do] any cases with any products unless I have a signed contract in place with any company."

Defs.' Ex. F3.  The jury could certainly infer from this evidence that Dr. Fonn would only elect

to use a company's device if Ms. Seeger would receive a commission from the company.  *See

also* Sections V.A-C, *supra*.  In any event, the very purpose of the AKS was to eliminate the

need for the government to engage in such an inquiry.

### B.      Sufficient Evidence of Materiality Was Presented at Trial.

Defendants rehash another argument previously raised in their Motion for Summary

Judgment (#199) by contending that the government failed to introduce any evidence of

materiality.  Defs.' Mem. (#469-1) at 34-37.  The government responded in its Opposition to

Defendants' Motion for Summary Judgment (#216), which is hereby incorporated into this

response.  The Court ruled that a violation of the AKS would satisfy the FCA's materiality

requirement as set forth in *Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S.

Ct. 1989, 2001 (2016).  Order (#277).

In *Escobar*, the Supreme Court provided guidance on how the FCA's materiality

requirement should be enforced.  It began by explaining that a matter is material if:  (1) a

reasonable person would attach importance to it in determining a choice of action, or (2) the

defendant knew or had reason to know that the recipient of the representation would attach importance to the specific matter in determining his choice of action, regardless of whether a reasonable person would do so.  *Escobar*, 136 S. Ct. at 2002-03.  Factors relevant to the materiality inquiry include whether a particular requirement is designated a condition of payment, whether the violation goes to the "essence of the bargain," whether the violation is significant or "minor or insubstantial," and whether the government took action when it had actual knowledge of similar violations.  *Id.* at 2003-04.

Ample record evidence demonstrates that Defendants knew that the government would regard an AKS violation as material to its decision to pay claims.  Testimony at trial established that Dr. Fonn and Ms. Seeger repeatedly consulted with their attorney, Mr. Fogle, about the requirements of the AKS.  Trial Tr. Vol. IX at 9:18-101:15.  At trial, the government introduced numerous emails between Mr. Fogle and Defendants discussing the AKS and their business relationship.  *See, e.g.*, Gov. Exs. 302, 304, 309, 331; Defs.' Ex. V1.  Also introduced into evidence were Medicare enrollment forms signed by each Defendant, certifying that they would abide by "Medicare laws, regulations and program instructions."  Gov. Exs. 276 & 897.  On these forms, both Defendants further affirmed that they understood "that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions," specifically including the Federal Anti-Kickback Statute.  Gov. Exs. 276 & 897.  This evidence is more than sufficient to support a finding of materiality under either the "reasonable person" or "defendant's knowledge" standard.

### C.    The Claims Were False Even Though They Were Submitted By St. Francis.

Defendants' also seek judgment in their favor as to Counts II and III because there was no evidence that St. Francis certified compliance with the AKS.  Defs.' Mem. (#469-1) at 37-38.

37

This issue was previously raised by Defendants in their Motions to Dismiss (#65 & 68), for Summary Judgment (#198 & 199), and for a Directed Verdict (#409 & 414).  The government filed responses to all three motions.  *See* Gov. Opp'n to Defs.' Mot. to Dismiss (#78-1); Gov. Opp'n to Defs.' Mot. for Summ. J. (#216); Gov. Opp'n to Defs.' Mot. for Directed Verdict (#404), which are hereby incorporated into this response.  This Court denied all of Defendants' motions on this issue.  *See* Orders (#97, #277, #465).  It should do so again.

Defendants' arguments are premised on the notion that the government is required, but failed, to present some evidence at trial that St. Francis certified compliance with the AKS. However, as explained in more detail in the government's earlier briefs on this issue, the statutory text of the AKS, and earlier case law, claims for items or services resulting from kickbacks are *per se* "false."  42 U.S.C. § 1370a-7b(g).  It is also clear that a non-submitting party, such as Defendants, may be liable for causing the submission of such a false claim by another party, and that this liability is not conditioned on whether the submitting party knew about the non-submitting party's unlawful conduct.  *See e.g.*, *United States ex rel. Hobbs v. Medquest Assocs.*, 711 F.3d 707, 714 (6th Cir. 2013); *United States ex rel. Hutcheson v. Blackstone Med., Inc.,* 647 F.3d 377, 393 (1st Cir. 2011).  In sum, Defendants' premise is wrong as a matter of law and should be rejected once again.

### D.    Defendants' Primary Purpose Argument is Without Merit.

Defendants next argue that the United States must show that inducement of federal program referrals was the "primary purpose" of the remuneration.  Defs.' Mem. (#469-1) at 38. This is yet another issue that Defendants repeatedly raised without success earlier in this litigation.  The government has addressed this issue in earlier filings, Gov. Opp'n to Defs.' Mot. for Summ. J. (#216), Gov. Opp'n to Mot. for Recons. (#286), which are hereby incorporated into

this brief.  Defendants' motions have all been denied by this Court.  Orders (#277 & #290).

Defendants' argument is based on the Eighth Circuit Model Instructions and two cases which they contend establish the "primary purpose" rule as binding law in this Circuit.  *See United States v. Iqbal*, 869 F.3d 627 (8th Cir. 2017); *United States v. Yielding*, 657 F.3d 688, (8th Cir. 2011).  However, the introduction to the Eighth Circuit Model Instructions clearly states that they are merely suggestions, and not binding on the district courts.  Furthermore, the two cases cited by Defendants are inapplicable for reasons laid out in the government's prior filings.

Moreover, every Court of Appeals to have considered the issue has concluded that the AKS is violated if even "one purpose" of the remuneration was to induce or reward referrals. *See, e.g.*, *United States v. Borrasi*, 639 F.3d 774, 780-82 (7th Cir. 2011); *United States v. McClatchy*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68, 71-72 (3d Cir. 1985).  Defendants' argument provides no reason to depart from this well-established law.

### E.     The Court Instructed the Jury on the Correct Standard of Proof.

Defendants ask the court to hold that for a finding of FCA liability based on an AKS violation, the government must prove the underlying AKS violation beyond a reasonable doubt, or at least by clear and convincing evidence.  Defs.' Mem. (#469-1) at 39.  This issue was first raised in Defendants' Motion Regarding Standard of Proof (#66), and again in their Motion for Summary Judgment (#198).  The government filed responsive briefs to both motions, Gov. Opp'n to Mot. (#76) & Gov. Opp'n to Defs.' Mot. for Summ. J. (#216), which are hereby incorporated into this response.  The Court has twice correctly denied Defendants' Motions as being without merit.  Orders (#87 & #277).

The FCA clearly and unequivocally establishes the government's burden of proof as preponderance of the evidence.  *See* 31 U.S.C. § 3131(d).  Cases applying that statutory standard to FCA cases involving AKS violations consistently use the preponderance standard, notwithstanding the criminal nature of the AKS.  *See e.g.*, *United States v. Rogan*, 459 F. Supp. 2d 692, 716, n. 12 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008); *see also United States ex rel. Health Dimensions Rehabilitation, Inc. v. RehabCare Grp., Inc. et al.*, 2013 WL 5340910 (E.D. Mo. Sept. 23, 2013); *United States v. Campbell*, No. 08–1951, 2011 WL 43013, at *5 (D.N.J. Jan. 4, 2011).  Despite Defendants' contention that those cases were incorrectly decided, the law is well settled.  Accordingly Defendants' motion should be denied for the third time.

**F.      The Jury's Damages Award Is Not Inconsistent with the Finding of Liability.**

Defendants' next argument relies on the fact that the jury did not separately award any damages against either Dr. Fonn or Ms. Seeger on Count III.  Defendant's implicit argument is that an award of zero damages is inconsistent with a finding of liability.  Defs.' Mem. (#469-1) at 39-41.  This argument was raised by Defendants in their Joint Response to Plaintiff's Request for Entry of Judgment (#444).  The government filed a reply brief, Gov. Reply (#449), which is hereby incorporated into this brief.  The Court correctly denied Defendants' argument by entering judgment in favor of the government.  Order (#465).

Defendants' argument should be rejected again.  Despite their careful wording, what Defendants are really saying is that the award of no damages was inconsistent with the jury's general verdict.  However, Defendants' have waived that argument.  As explained in the government's reply brief, Defendants invited any error when they proposed the verdict form with

the "per-Defendant" liability and damage amounts.[20]  Gov. Reply at (#449) at 8-12.  Moreover,

they failed to ask the Court to seek clarification from the jury pursuant to Fed. R. Civ. P. 49(b).

Additionally, and as the Court recognized when entering judgment, courts must

harmonize inconsistent verdicts, viewing the case in any reasonable way that makes the verdicts

consistent.  *S.E.C. v. Quan*, 817 F.3d 583, 590-91 (8th Cir. 2016).  Because the jury was properly

instructed on the law of conspiracy, corporate action, and joint and several liability, the verdict

on Count III can readily be harmonized.  As the Court found, there was sufficient evidence

supporting the jury's finding of liability for a conspiracy to violate the FCA, making all four

Defendants jointly and severally liable for damages.  Order (#465).

Defendants attempt to bolster their argument by citing several cases they believe support

their contention that a finding of zero damages is tantamount to a finding of no liability.  These

cases are inapposite, however.  Most of them do not involve a conspiracy or an issue of joint and

several liability.  One case, *Association of Western Railways v. Riss & Co., Inc.*, 299 F.2d 133

(D.C. Cir. 1962), alleges a conspiracy to commit antitrust violations, but as with the other cases

Defendants cite, it provides no support for the argument they attempt to make here.  In that case

the jury initially returned a verdict finding for the plaintiff as to only five out of 90 defendants,

but determined that there were no damages.  The judge did not accept this verdict and instructed

the jury to reconsider.  After further deliberations, the jury returned a verdict now including

$75,000 in damages which the District Court accepted.  On appeal, the Circuit Court reversed,

holding that the District Court erred by failing to accept the jury's original verdict.  The *Riss*

opinion has no applicability in this case.  Unlike the jury's original finding in the *Riss* case, the

---

[20] Although the government prepared that form, it was merely the scrivener with respect to those
elements.  Changes were made to the verdict form after an extended conference with the Court during
which Defendants requested that the jury make more-detailed findings on the verdict form.

jury here made a finding of liability as to all four Defendants, and specific damages findings as to two Defendants.  The Court has correctly concluded that Defendants are jointly and severally liable for that damages amount, consistent with the instructions given to the jury here.  *See also Kelsoe*, 724 F. Supp. at 453 (despite jury's failure to assess damages against one of three co-conspirators in an FCA case, the court held that conspirator legally responsible for the damages caused by each of the two conspiracies in which he participated).[21]

## IX.    Entry of Judgment in Defendants' Favor is Not Warranted.

For all of the foregoing reasons, Defendants have failed to justify their request that the Court reject the jury's conclusions, substitute its own, and enter a verdict in Defendants' favor on all counts.  At most, Defendants have offered a theory for how the verdicts could be interpreted as being inconsistent.[22]  But the government, as the prevailing party, is entitled to have every inference drawn in its favor, and to have the verdicts on the three counts reconciled if reasonably possible to do so.  The government has demonstrated that the verdict is proper, and the Court has properly entered judgment with minor adjustments to the verdict.  Defendants' motion is without merit and should be denied.

## CONCLUSION

Wherefore, the United States respectfully requests that the Court deny Defendants' motion for judgment as a matter of law and for a new trial, enter a final judgment resolving all claims in this case, award costs, and grant such other relief as it deems just and proper.

---

[21] Moreover, in an antitrust conspiracy action, damages are a condition or element of liability.  In an FCA case, it is well settled that proving damages is not a mandatory element of an FCA action.  *See* Order (#465) at 7 n.2.

[22] This, however, is an argument Defendants' expressly disclaim.  Defs.' Mem. (#469-1) at 7-8.  If the Court is inclined to adopt Defendants' view of the interplay between the various Counts, the correct remedy still would not be entry of judgment in Defendants' favor, but rather a new trial.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

CARRIE COSTANTIN
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

Andrew J. Lay #39937MO
Suzanne J. Moore #45321MO
Gilbert Sison #52346MO
Assistant United States Attorneys
111 South 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

 /s/ Diana K. Cieslak
Michael D. Granston
Tracy L. Hilmer
John K. Henebery
Diana K. Cieslak
Attorneys
Civil Division, Fraud Section
PO Box 261
Ben Franklin Station
Washington, DC 20044
(202) 353-1336

43

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2018, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Matthew T. Schelp
Matthew P. Diehr
Husch Blackwell
*Attorneys for Relators*

James Martin
Dowd Bennett
*Attorney for Dr. Fonn and Midwest Neurosurgeons*

Sandy Boxerman
Capes Sokol
*Attorney for Deborah Seeger and DS Medical*

_____/s/ Diana K. Cieslak___